**S. AMANDA MARSHALL**, OSB # 95347
United States Attorney
District of Oregon
**STEPHEN J. ODELL, OSB # 903530**
Assistant United States Attorney
steve.odell@usdoj.gov
1000 SW 3rd Ave. Suite 600
Portland, OR  97204-2902
Telephone: 503-727-1024
Telefax: 503-727-1117
**MICHAEL SCHOESSLER**
michael.schoessler@sol.doi.gov
Office of the Regional Solicitor
U.S. Department of the Interior
805 S.W. Broadway, Suite 600
Portland, OR 97205
Telephone:  503-231-2140
Telefax: 503-231-2166
  Of Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N,** | CV-10-1331-SU |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT PURSUANT TO THE APA & IN RESPONSE TO PLAINTIFF'S SUMMARY JUDGMENT MOTION** |
| **BUREAU OF LAND MANAGEMENT; THOMAS E. RASMUSSEN, Field Manager, Lakeview Resource Area; and CAROL BENKOSKY, District Manager, Lakeview District, BLM,** | |
| Defendants. | |

## INTRODUCTION

This action involves a project that in the main authorizes the construction of five miles of fencing, the footprint of which will be just over a single acre in size, to be added to an existing, extensive network of fences in a livestock grazing allotment of more than 90,000 acres, to improve rangeland health conditions and wildlife habitat in a single pasture of that allotment. Indeed, the Bureau of Land Management ("BLM") was required by its own regulations to take this "appropriate action" to improve riparian conditions within the 50-acre Horseshoe Meadow upon its determination that the area was not meeting the applicable standard for such conditions.

BLM made its decision after preparing an environmental assessment ("EA") pursuant to the National Environmental Policy Act ("NEPA").  AR Doc. # 289.[1]  The decision will put a stop to the unauthorized livestock grazing that has occurred when cattle have wandered over the unfenced top of Juniper Mountain to use the Horseshoe Meadow and riparian area. This will be accomplished by adding approximately five miles of fence, which will involve disturbance to just a little more than two percent of the meadow, to existing fencing on top of Juniper Mountain to complete four shared pasture boundaries. AR 13570, 13577 (map). The decision also calls for cutting of small amounts of young, invasive juniper surrounding the Horseshoe Meadow area; implementing the closure of BLM Road 7155-AA after completion of the fence and juniper treatment, pursuant to the governing land use plan (called a resource management plan or "RMP"), the Lakeview RMP; and multiple monitoring efforts. AR 13570-71.

---

[1]Citations to the administrative records filed with the Court by Federal Defendants are cited to as "AR ___" when citing to a specific Bates-stamped page or page range. If the citation is to an entire  document as a whole, it is cited as "AR Doc. #___," referring to the number given the document in BLM's "Administrative Record Index." *See* Dkt #34.

Plaintiff Oregon Natural Desert Association ("ONDA") challenges the BLM decision, bringing two claims asserting that the environmental analysis that BLM prepared for the decision violates NEPA and that the decision itself is allegedly inconsistent with the Federal Land Policy and Management Act ("FLPMA").  But the record reflects that BLM undertook a careful and appropriately thorough analysis of all meaningful environmental effects, particularly for a project of the size and type at issue, and that the project not only does not violate FLPMA, but will provide the very improvement in rangeland and riparian health the agency's regulations require.

Thus, for the reasons discussed below, Federal Defendants (hereinafter, "BLM") urge the Court to deny ONDA's motion for summary judgment and instead grant BLM's cross-motion for summary judgment.  Contrary to ONDA's claims, in analyzing and adopting the challenged decision, BLM fully complied with NEPA, FLPMA, and all applicable federal regulations.

## BACKGROUND

### I.  STATUTORY AND REGULATORY FRAMEWORK

#### A.  The National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 to 4370d, is intended to foster better decision-making and informed public participation for proposed federal actions that affect the natural environment.  See 42 U.S.C. § 4321.  The Supreme Court has made clear that NEPA only establishes procedures by which agencies must consider the environmental impacts of their actions, but does not dictate substantive results.  See Marsh v. ONRC, 490 U.S. 360, 371 (1989).  NEPA's mandate is "to insure a fully informed and well-considered decision," put simply, to make sure that an agency "looks before it leaps" when it comes to undertaking actions that are likely to have significant environmental effects. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978).

More specifically, NEPA imposes a duty on federal agencies to prepare an Environmental Impact Statement ("EIS") to evaluate the environmental impacts of any proposed "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4331(2)(C). Where an agency is uncertain whether a full EIS is needed, it may prepare a truncated analysis in an Environmental Assessment (EA). The NEPA implementing regulations the Council on Environmental Quality (CEQ) has promulgated define an EA as a "concise public document" that an agency may generate to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement." 40 C.F.R. § 1508.9. The regulations go on to explain that an EA is to "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id*. If, after considering the analysis in the EA, the agency in fact concludes that its proposed action will not have a significant effect on the environment, it may issue a Finding of No Significant Impact ("FONSI") and forgo preparation of an EIS. *Id.* § 1508.13.

### B.  The Federal Land Policy and Management Act

FLPMA provides guidance to BLM in its management of natural resources on public lands. Several provisions of the statute are relevant to ONDA's claims, as follows.

First, FLPMA requires BLM to develop RMPs for the management of public lands that observe the principles of "multiple use" and "sustained yield." 43 U.S.C. §§ 1701(a)(7) & 1712(c)(1); *see also id*. §§ 1702(c) & 1702(h). BLM is required to manage the public lands pursuant to the principles of multiple use and sustained yield. 43 U.S.C. § 1732(a). The Supreme Court has described "multiple use" as "a deceptively simple term that describes the enormously

complicated task of striking a balance among the many competing uses" identified in FLPMA.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004).

Second, BLM management actions are required to be consistent with the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. 1610.5-3(a).

Third, section 201 of FLPMA states that BLM "shall prepare and maintain on a continuing basis an inventory of public lands and their resources and other values." 43 U.S.C. § 1711(a). During the RMP planning process, BLM is to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." *Id*. § 1712(c)(4).

Fourth, FLPMA addresses BLM's management of wilderness. The Wilderness Act of 1964, 16 U.S.C. §§ 1131-1135, established the National Wilderness Preservation System ("the System") on select federal lands, and defines what makes an area eligible for designation as Wilderness. *Id*. § 1131(c). Only Congress can designate an area as Wilderness, and areas so designated by statute as part of the System are referred to as "designated wilderness."

The Wilderness Act did not address lands managed by BLM. Congress then extended a wilderness review requirement to BLM lands when it passed FLPMA. In particular, section 603 of FLPMA sets forth a two-stage process for the review and identification of public lands that the Secretary of the Interior could recommend for designation by Congress as wilderness. 43 U.S.C. § 1782. The first stage required the Secretary, by October 21, 1991, to "review those roadless areas of five thousand acres or more and roadless islands of the public lands . . . as having wilderness characteristics described in the Wilderness Act." *Id*. § 1782(a). The second stage called for the Secretary, upon completing this review, "to report to the President his recommendation as to the suitability or non-suitability of each such area or island for preservation as wilderness." *Id*. Within two years of receiving the Secretary's report, the

President was to "advise [Congress] of his recommendations with respect to designation as wilderness of each such area." *Id*. § 1782(b). The President's recommendations represented the end of the FLPMA wilderness review process required under section 603 of FLPMA. Upon receiving the recommendations from the President, it is for Congress to decide which lands to designate, if any, as wilderness through subsequent legislation. *See id*. The lands that the Secretary identified for review under section 603(a) are referred to as "wilderness study areas" ("WSAs") and FLPMA directs the Secretary to manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id*. § 1782(c). This management prescription is often referred to as the "non-impairment standard" and BLM must manage WSAs pursuant to it "until Congress has determined otherwise." *Id*.

Fifth, under section 201 of FLPMA, BLM also inventories and has the authority to manage public lands that possess wilderness characteristics to protect such characteristics that are outside of designated wilderness and WSAs given that wilderness characteristics are one of the resources that BLM has the authority to manage for under its FLPMA authorities. *ONDA v. BLM*, 625 F.3d 1092, 1099, 1113(9th Cir. 2010). BLM has issued guidance on how to inventory for lands with wilderness characteristics and, if any such lands are found during an inventory, the options available for protectively managing the lands with wilderness characteristics. *See* AR Doc. # 6 (original BLM Wilderness Handbook issued for the section 603 inventory); AR Doc. ## 7, 9-11 (Organic Act Directive changes, setting out further guidance and interpretation of the 1978 handbook); AR Doc. ## 179, 202 (draft interim guidance issued by the BLM Oregon State Office used in the wilderness characteristics inventory updates prepared in this case); AR Doc. # 149 (explaining history and how each BLM state office was left to proceed on its own regarding wilderness characteristics inventories and inventory updates); AR Doc. # 366 (Secretarial Order

No. 3310, setting out wilderness characteristics policy and directing BLM to issue new

guidance); AR Doc. ## 374-376 (new BLM guidance pursuant to Secretarial Order No. 3310);

AR Doc. # 379 (memorandum from Secretary of the Interior discussing Congressional

appropriations rider that precludes implementation of Secretarial Order No. 3310 and the

guidance issued pursuant to it); AR Doc. # 380 (IM No. 2011-154, setting out current BLM

guidance on how to conduct wilderness characteristics inventories and how to address managing

lands with wilderness characteristics that BLM may find after an inventory or inventory update

during the land use planning process).[2]

     Finally, as relevant here, FLPMA also addresses BLM's authorization of livestock

grazing on public lands. The range resource is expressly mentioned as one of the resources for

which BLM is to manage under the multiple use standard, 43 U.S.C. § 1702(c), and domestic

livestock grazing is one of the principal or major uses of the public lands. *Id*. § 1702(l). Grazing

is authorized pursuant to grazing permits or leases, which cannot exceed ten years in length, *id*. §

---

[2]In December 2010, the Secretary issued an order providing direction to BLM for maintaining inventories for land with wilderness characteristics and how BLM decision-making would be structured to protect such wilderness characteristics or, if BLM decides, to not protect such resources. AR Doc. # 366. BLM then issued three handbooks to implement the Secretary's order. AR Doc. ## 374-376. Congress then passed an appropriations rider prohibiting BLM from implementing the order or the handbooks through the end of fiscal year 2011 (September 30, 2011). *See* AR Doc. # 379. Pursuant to this new direction from the Secretary, BLM issued its current guidance regarding wilderness characteristics. AR Doc. # 380 (IM No. 2011-154 and two attachments, addressing how to conduct inventories and inventory updates and options for how to address managing any such lands with wilderness characteristics that are found by BLM during the land use planning process).

     In 2001, BLM issued a wilderness handbook. AR Doc. # 64. But that handbook was rescinded pursuant to a settlement agreement reached with the State of Utah in 2003. *See* AR Doc. ## 80 (rescinding 2001 handbook), 83-85. It is not the current BLM guidance nor were any of the inventories at issue in this case conducted pursuant to that guidance. Thus, ONDA's intimations in its brief that the 2001 handbook is BLM policy are inaccurate. Plaintiffs' Mem. In Supp. Of Plaintiffs' Mot. For Sum. Judg. ("ONDA Brief") at 8.

1752(a), and FLPMA also authorizes (but does not mandate) BLM to develop allotment management plans. *Id*. § 1752(d).  BLM has issued regulations governing its authorization of livestock grazing, published at 43 C.F.R. Part 4100 (2005).[3]  In the 1990s, the Department of the Interior ("DOI") added new rangeland health provisions to these regulations, discussed below.

### C.  The BLM's Federal Rangeland Health Regulations

Through a final rule effective August 21, 1995, DOI amended the regulations governing BLM's administration of livestock grazing on public lands. *See generally* 60 Fed. Reg. 9,894 (Feb. 22, 1995) (final rule amending 43 C.F.R. Parts 1780 and 4100). These regulations established the "fundamentals of rangeland health" for grazing administration. These fundamentals address the necessary physical components of functional watersheds, ecological processes required for healthy biotic communities, water quality standards and objectives, and habitat for threatened or endangered species or species of special interest. *See* 60 Fed. Reg. at 9,898. These fundamentals are more specifically defined and codified at 43 C.F.R. § 4180.1. The 1995 rule required that BLM develop state standards and guidelines, under the umbrella of the

---

[3] Even though BLM's grazing regulations set forth at 43 C.F.R. Part 4100 *et seq.* were amended effective August 11, 2006, *see* 71 Fed. Reg. 39,402 (July 12, 2006), the United States District Court for the District of Idaho enjoined the implementation of those regulations in all respects. *Western Watersheds Project ("WWP") v. Kraayenbrink*, 538 F. Supp.2d 1302 (D. Idaho 2008), *aff'd in relevant part*, 632 F.3d 472 (9th Cir. 2011), *cert. denied*, 2011 U.S. LEXIS 6858 (Oct. 3, 2011). In accordance with that injunction, BLM has issued Instruction Memorandum No. 2009-109, directing its western field offices (excluding Alaska) not to implement the 2006 amendments to 43 C.F.R. Part 4100. *Available at* http://www.blm.gov/wo/st/en/info/regulations/Instruction_Memos_and_Bulletins/national_instruction/2009/IM_2009-109.html. Thus, citations to the grazing regulations are to the 2005 Code of Federal Regulations (C.F.R.), unless otherwise specified. Current published versions of the C.F.R. (both in hard copy and electronic) still contain the regulations as amended in 2006 and thus are not accurate recitations of the current BLM grazing regulations that are in effect.

fundamentals, to provide specific measures of rangeland health in keeping with the

characteristics of each state or region (such as climate and landform).

The BLM set standards and guidelines for Oregon in 1997. AR Doc. # 43. There are five

standards, which are: Standard 1 (watershed function—uplands), Standard 2 (watershed

function—riparian/wetlands), Standard 3 (ecological processes), Standard 4 (water quality), and

Standard 5 (native, threatened and endangered, and locally important species). AR 4529-34.

Once the state standards and guidelines are approved and in force, the regulations provide:

> The authorized officer shall take appropriate action as soon as practicable
> but not later than the start of the next grazing year upon determining that existing
> grazing management practices or levels of grazing use on public lands are
> significant factors in failing to achieve the standards and conform with the
> guidelines that are made effective under this section. Appropriate action means
> implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part
> that will result in significant progress toward fulfillment of the standards and
> significant progress toward conformance with the guidelines. Practices and
> activities subject to standards and guidelines include the development of grazing-
> related portions of activity plans, establishment of terms and conditions of
> permits, leases and other grazing authorizations, and range improvement activities
> such as vegetation manipulation, fence construction and development of water.

43 C.F.R. § 4180.2(c).

## II.  BLM'S DECISION TO CONSTRUCT A FENCE IN THE JUNIPER MOUNTAIN ALLOTMENT TO IMPROVE RANGELAND & RIPARIAN HEALTH

This case involves a BLM decision on how to most appropriately respond to its finding

that a single rangeland health standard was not being met in the 50-acre Horseshoe Meadow

portion of the Horseshoe Pasture, one of six pastures within the approximately 90,000-acre

Juniper Mountain Allotment.[4]  AR 13475, 13484, 9356. The Horseshoe Pasture, which is the

---

[4]The Horseshoe Meadow is within the 6,335-acre Juniper Mountain Area of Critical
Environmental Concern/Research Natural Area ("ACEC/RNA"). AR 13493. The Juniper
Mountain ACEC/RNA was designated in the Lakeview RMP. AR 8251-52.

smallest of the six pastures, is 4878 acres. AR 13490. Within the Horseshoe Pasture is a riparian

area called the Horseshoe Meadow, which is approximately 50 acres in size and includes

Horseshoe Spring. AR 13488, 13562 (map), 13568, 13475. BLM made a decision to take this

action, as it was required to do so, pursuant to its grazing regulations.

       BLM completed its rangeland health assessment for the Juniper Mountain Allotment on

September 30, 2004. AR Doc. # 106. The assessment concluded that the 50-acre Horseshoe

Meadow, which contains the already-developed Horseshoe Spring, was not meeting Standard 2

for riparian and/or wetland function. AR 9358.[5] BLM also made the determination that existing

grazing practices or levels of grazing use were a factor in the standard's not being met. AR 9364.

In particular, BLM determined that unauthorized livestock use of the Horseshoe Meadow was

the major problem. AR 13475, 13478, 9326, 9370. The previously-constructed pasture boundary

fence does not go all the way up the slopes of the Juniper Mountain itself, as BLM had thought

that the steep terrain and topography would be sufficient to keep livestock from traversing

around the existing pasture fencing and into the Horseshoe Pasture—but this turned out to be an

incorrect presumption. AR 9370, 13490. BLM made several recommendations[6] in the assessment

---

[5]All other rangeland health standards were being met for the allotment, including Standard 5 for wildlife. AR 9356-58, 9361-63. ONDA is incorrect when it states that BLM found the Horseshoe Meadow or the Horseshoe Spring to be in "Functional at Risk" ecological condition pursuant to a proper functioning condition ("PFC") assessment. *See, e.g.,* ONDA Brief at 10, 30, 31, 32, 33. The BLM determined that a 60-acre playa was in such condition, but not the Horseshoe Meadow or Horseshoe Spring. AR 9358. BLM found that the 50-acre Horseshoe Meadow was not meeting Standard 2, but did not find that it was "Functional at Risk." *Id.* All of ONDA's citations to the rangeland health assessment for this proposition are based on this misreading. BLM did use the term "functioning at risk" in the 2010 EA in reference to the Horseshoe Meadow, AR 13488, but that was an error Declaration of Paul Whitman ¶ 134.

[6]BLM maintained an existing exclosure fence around the Horseshoe Spring after the 2005 grazing season. AR Doc. # 109.

---

and noted that a new fence in the Horseshoe Pasture "will reduce livestock presence on Horseshoe Spring." AR 9364; *see also* AR 9370.

Beginning in 2005, BLM also implemented, pursuant to 43 C.F.R. § 4180.2(c), an interim grazing strategy to take appropriate action that would result in significant progress toward fulfillment of the rangeland health standards in the Horseshoe Spring and Horseshoe Meadow. AR Doc. ## 108, 137, 142, 143, 176, 260; AR 13490-91. BLM took this action within the framework of the prior grazing permit for the allotment while it began work on the NEPA process to look at long-term solutions that would begin to make the required "significant progress" under the BLM's rangeland health regulations. The interim grazing strategy entailed BLM's working with the affected permittee to graze within the allotment's rest-rotation grazing system, resting the Horseshoe Pasture every other year and in other years authorizing early season grazing that would ensure that adequate soil moisture would remain to allow for complete regrowth of riparian vegetation in the Horseshoe Meadow. AR 13490-91, 9371.[7] BLM has also conducted compliance monitoring to keep cattle out of the pasture during periods of scheduled rest. AR Doc. ## 124, 126, 130-131, 135, 137, 142-143, 152, 155, 157-158, 176, 187, 189, 190, 205, 208-210, 228-230, 277, 306, 308-310.

BLM then commenced what has evolved into a rather extended NEPA process to evaluate various ways it could provide for the required "significant progress" on a long-term basis. Twice BLM completed EAs and made previous decisions, but each was ultimately pulled. First, BLM prepared an EA in 2005, AR Doc. # 114, and issued a decision that ONDA

---

[7]The Horseshoe Pasture was rested in 2005, 2007, and 2009. In the other years, BLM authorized early season grazing use in the Horseshoe Pasture. AR 13490-91; *see also* AR 9370-71, 10457 12138-39, 13094.

challenged in this Court and was withdrawn after the parties settled the dispute. See AR Doc. ## 122, 123, 125, 128, 129, 134, 138, 148, 150, 153, & 159.

In 2007, BLM prepared another EA. AR Doc. # 174. BLM had updated its inventory for lands with wilderness characteristics in and around the Juniper Mountain Allotment, and it found that no such lands were present. *See* AR 10771-10807. When it had prepared its original inventory under section 603 of FLPMA, BLM had found that the four inventory units did not contain the required wilderness characteristics. AR 481-83, 488-89, 872 (original section 603 inventory for lands within Oregon and Washington) & Declaration of Paul Whitman ¶ 8.

When BLM updated its wilderness characteristics inventory for the 2007 EA, BLM had reviewed and taken into consideration the citizen-prepared information related to wilderness characteristics that ONDA submitted to BLM in 2005. AR 10772-74; AR 9853-65 (ONDA's 2005 submission regarding wilderness characteristics for the Juniper Mountain "proposed WSA," which contains portions of the Juniper Mountain Allotment); AR Doc. # 120. BLM updated its inventory for four inventory units and a previously-uninventoried area, and found that none of them contained wilderness characteristics. AR 10771-10807.  BLM then issued another decision, which ONDA appealed administratively. See AR Doc. ## 182, 183, 184, & 186. After an administrative law judge ("ALJ") stayed the decision, the parties again settled. See AR Doc. ## 188, 194, & 196.

In August 2009, BLM then prepared another EA.[8] AR Doc. # 289. Once again, BLM updated its inventory for lands wilderness characteristics, taking into account ONDA's 2005

---

[8]ONDA and other members of the public provided comments on the 2009 EA. AR Doc. ## 293, 295-300, 315-317. BLM's response to all the comments was attached to the BLM decision. AR 13578-87.

information and also new photos that ONDA had submitted in 2007 and information and photos submitted by other parties. AR Doc. ## 234 (BLM inventory update process), 235 (BLM wilderness characteristics evaluation forms), 233 (BLM road forms), 231 (BLM photos from inventory update field work), 232 (BLM photo log), 191 (ONDA's new photos regarding lands with wilderness characteristics within ONDA's Juniper Mountain "proposed WSA"), 211 (information on road maintenance activities submitted by A.K. Majors), 213 (information submitted by Laird Ranch related to the presence (or non-presence) of land with wilderness characteristics within Allotment); *see also* AR 9853-65.[9]

Because BLM did not find any lands with wilderness characteristics within the project area, BLM did not address it further in the 2010 EA document. AR 013478. This principle has been affirmed by DOI's Interior Board of Land Appeals ("IBLA") in *ONDA, Western Watersheds Project ("WWP")*, 173 IBLA 348, 353-54 (2008), which noted no existing statutory, regulatory, or policy requirement to analyze non-existent resources in a NEPA document.[10]

Based on public comments, BLM updated the EA in 2010 ("2010 EA"). AR Doc. # 348. The 2010 EA analyzes ten alternatives in detail, and three additional alternatives. AR 13480-84.

The 2010 EA also analyzes impacts to sage-grouse. The EA notes that sage-grouse are regularly observed within the 90,000-acre Allotment, AR 13492, but that sage-grouse densities within the Allotment are relatively low. AR 13497. There is sage-grouse brood rearing habitat at

---

[9]ONDA's Juniper Mountain "proposed WSA" does not include all of the Juniper Mountain Allotment and also includes lands outside of the allotment. BLM's inventory update covered all the lands within ONDA's Juniper Mountain "proposed WSA."

[10]While BLM did not find any lands meeting all of the required elements of wilderness character, the BLM did address impacts to naturalness and primitive recreation opportunities (though not outstanding) under the cumulative effects section of the 2010 EA where it found them to individually exist in the area. AR 13541-46.

several locations near springs within the Allotment, including the Horseshoe Meadow AR 13492. There are eight sage-grouse leks within the Allotment, but only two of them are currently active and used by sage-grouse. AR 13492. The active leks are located approximately five and ten miles, respectively, to the south of the Horseshoe Pasture. AR 13492, 13567 (EA map 7).

BLM further stated that impacts to sage-grouse from fencing would be similar under each of the action alternatives, except for Alternative 8. AR 13497, 13501-13502, 13505-13506, 13508-13509, 13512, 13515, 13519-13520, 13524, 13528, 13532.  Under Alternative 2B, the one that BLM ultimately selected, sage-grouse impacts from fencing would be minimal because the fence to be constructed is located in low density sage-grouse habitats, AR 13492, and several miles from the nearest sage-grouse lek. AR 13501-13502, 13505, 13567). In addition, only Alternative 2B removes invasive young juniper and restore Horseshoe meadow through active restoration of the headcuts and removal of unauthorized grazing. AR 13481, 13505-13506.[11]

On July 19, 2010, BLM issued the decision that ONDA challenges in this action.  AR Doc. ## 349 (decision), 350 (accompanying cover letters). The decision selected alternative 2B from the 2010 EA. AR 13570. The BLM decision will stop trespassing cattle from wandering over the unfenced side and top of Juniper Mountain and using the Horseshoe Meadow at times in

_____

[11]After the Oregon Department of Fish and Wildlife ("ODFW") revised its sage-grouse guidance plan in 2011, AR Doc. # 378, BLM reviewed the Horseshoe EA for consistency with this new information and documented this review with a Documentation of NEPA Adequacy Form. AR Doc. # 384. BLM found that the Horseshoe EA and specifically Alternative 2B did conform to the new ODFW guidance. AR 15849-15850. BLM found that the new ODFW guidance and other recent information did not warrant supplementation of the 2010 EA. AR Doc. # 384.
    New information on core area sage-grouse habitats in the 2011 ODFW guidance shows that none of the Horseshoe Pasture is within sage-grouse core habitat. AR 15848, 15855. Approximately half of the Pasture is within sage-grouse low density habitat and the remaining half is in occupied but very low density habitats. *Id*. Sage-grouse use the project area, but sage-grouse using low density and occupied but very low density habitats encompass about 10% of the Oregon sage-grouse population. AR 15656, 15848.

which no livestock are scheduled to be present. The BLM decision achieves this objective by building approximately 5.2 miles of fence to complete four shared pasture boundaries (Horseshoe, Big Juniper, Radio Springs, and Sagebrush Knoll) on top of Juniper Mountain. AR 13570, 13577 (map). The BLM decision further provides for cutting small amounts of invasive juniper surrounding the Horseshoe Meadow area; implementing the closure of BLM Road 7155-AA after completion of the fence and juniper treatment, pursuant to the governing Lakeview RMP; and multiple monitoring efforts. AR 13570-71. It also contains BLM's determination that the adopted strategy will make the required significant progress under 43 C.F.R. § 4180.2(c). AR 13571, 13573-74. In fact, BLM stated that it expected the action to result in a relatively rapid short term recovery—that is, in less than two years—of hydrologic conditions for both soils and vegetation in the Horseshoe Meadow. AR 13504, 13505 (2010 EA).

The BLM decision was issued as a proposed decision pursuant to BLM's grazing regulations, 43 C.F.R. § 4160.1, and since no party filed a protest of the proposed decision, *id*. § 4160.2, the proposed decision became the BLM's final decision by operation of law once the last protest period ended. *Id*. § 4160.3(a); *see also* AR 13575. Interested parties then had 30 days to file an appeal of the BLM decision with an ALJ within DOI's Office of Hearings and Appeals ("OHA"), during which time the BLM decision was inoperative. *Id*. § 4160.3(c). ONDA administratively appealed the BLM decision and filed a petition to stay the effectiveness of the decision. AR Doc. # 354. BLM did not oppose the petition for stay. AR Doc. # 356. The ALJ granted the petition for stay. AR Doc. # 359. Erroneously believing the ALJ had issued his decision on the stay petition outside of the 45-day period, ONDA filed its complaint in this case (Dkt # 1). ONDA then moved to dismiss its appeal before the ALJ, even though BLM had noted

that ONDA may have prematurely filed its complaint in federal court, but the ALJ dismissed

ONDA's administrative appeal per ONDA's request. AR Doc. ## 360, 363-364, 370-371.[12]

**STANDARD OF REVIEW**

Plaintiffs bring their claims under the judicial review provisions of the APA.  Such

provisions provide a narrow waiver of the United States's sovereign immunity to authorize

federal courts to review agency actions under one or more standards.  5 U.S.C. § 706.  As

relevant here, the APA provides that a court may reverse a final agency action if it finds that the

action is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."  5 U.S.C. §

706(a)(2)(A). "An agency's action is arbitrary and capricious if the agency fails to consider an

important aspect of a problem, if the agency offers an explanation for the decision that is

contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to

a difference in view or be the product of agency expertise, or if the agency's decision is contrary

to the governing law." *Lands Council v. U.S. Forest Serv.*, 395 F.3d 1019, 1026 (9th Cir. 2004)

(internal citations omitted); *see also Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*,

100 F.3d 1443, 1448 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*

*Auto. Insurance Co.*, 463 U.S. 29, 43 (1983)). A court may also compel final agency action that

has been unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(a)(1).  Agency decisions

are entitled to a presumption of validity. *Wilderness Public Rights Fund v. Kleppe*, 608 F.2d

1250, 1254 (9th Cir. 1979), *cert. denied*, 446 U.S. 982 (1980). Under the APA's narrow review,

a court may not base its judgment on whether the agency could have made an administrative

---

[12]ONDA claims that the ALJ's Order was untimely. Complaint ¶ 62. BLM explained in the
administrative appeal had ONDA was incorrect in presuming that the ALJ did not rule on the
stay petition within 45 days of the end of the appeal period and thus the BLM decision had then
became "final agency action" challengeable under the APA. *See* 43 C.F.R. §§ 4.21(a)(3), 4.21(c),
4.477(e); AR Doc. ## 363, 370 (setting out BLM's argument and interpretation of rules).

decision differently. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004). Especially when an agency's technical expertise is involved, courts zealously guard the agency's discretion. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376-77 (1989). The Supreme Court has made clear that, for a court reviewing agency actions under the APA, "the ultimate standard of review is a narrow one," and the "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Consistent with this direction, then, a court's review of an agency's actions under NEPA is "extremely limited." *National Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000). A court reviews an EA simply to "ensure that the agency has taken a 'hard look' at the potential environmental consequences of the proposed action." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004).

## ARGUMENT

I.  **BLM COMPLIED FULLY WITH NEPA IN ANALYZING THE ENVIRONMENAL EFFECTS OF ITS HORSESHOW MEADOW DECISION.**

A.  **All Of ONDA's Claims Regarding Lands With Wilderness Characteristics Must Fail  Because ONDA Has Not Challenged The BLM Decision In This Regard Under FLPMA.**

As an initial proposition, ONDA's challenges to BLM's road determinations fail for the simple reason that all of the arguments on which ONDA relies basically allege that BLM did not update its inventory correctly *under FLPMA*, but it has not brought a claim under that statute with respect to such issues, and instead vainly tries to assert that its disagreements over such questions somehow amount to a NEPA violation.  ONDA's allegations about lack of evidence,

failure to detect alleged "drive-arounds," and reliance on inappropriate factors all rely on a

finding that BLM made these alleged errors *under FLPMA*. ONDA's brief and the Miller

Declaration it submitted in support thereof make it clear that all these issues revolve around how

to construe BLM guidance—including how to define and consider maintenance, discussing a

route's purpose, and photo interpretation—as well as various DOI rulings regarding these issues.

ONDA's Op. SJ Brf. at 16-22; Declaration of Craig Miller at ¶¶ 2, 21, 23-50.[13]  ONDA has not

raised such a FLPMA argument. Therefore, ONDA's arguments trying to establish that BLM

violated NEPA based on allegations related to how it construed and implemented FLPMA in the

context of its analysis of wilderness characteristics should be denied on this basis alone.

> ### B.  BLM Properly Found That Lands With Wilderness Characteristics Are Not Present within the Juniper Mountain Allotment and Therefore Did Not Analyze Impacts To This Non-Existent Resource In The 2010 EA.

If the Court somehow finds that ONDA can base a NEPA claim on its disagreements

with BLM's determination that there are no lands with wilderness characteristics in the project

area, ONDA's claim must still fail. ONDA's arguments and claims are based on misstatements,

or misunderstandings, of the facts on the ground and of DOI policy.[14]

---

[13]  A word is in order concerning the allegations that Mr. Miller makes in his declaration, which he asserts he makes both for standing purposes and ostensibly to explain how he believes BLM did not follow its own protocol in conducted its wilderness characteristics analysis.  Miller Declaration at ¶ 2.  He also offers his opinion on potential effects to sage grouse from the challenged decision.  *Id.* at ¶¶ 16-18.  But nowhere in his declaration does Mr. Miller establish that he has any background or training in either natural resource or wilderness management, remote sensing, road engineering, or wildlife biology.  In particular, he has no training or expertise in BLM's road or wilderness inventory procedures.  As a result, the Court should put very little, if any, weight on any such opinions that Mr. Miller offers in his declaration.

[14]Mr. Miller makes statements in his declaration that related to when ONDA provided its wilderness characteristics information to BLM and what BLM did, or did not, put in its various EAs. Miller Decl. ¶¶ 51-55. These statements are inaccurate. Whitman Decl. ¶¶ 45, 126-33.

ONDA's claims here rotate around this primary fact: ONDA believes that its Juniper Mountain "proposed WSA" is one large roadless area containing wilderness characteristics, AR 9853-65, while BLM believes the area is instead comprised of five smaller units. *See* ONDA Brief at 16. This distinction is based on the fact that BLM found that five routes were "roads" that split this area into six smaller inventory units—four that met the minimum size criteria and two that did not. AR Doc. # 235 & Whitman Decl. ¶ 45. ONDA disagrees with BLM's road determinations that resulted in the creation of the six units. AR Doc. # 233. When BLM analyzed the six inventory units, it found that none of these units contained all the requisite wilderness characteristics. AR Doc. # 235.

ONDA does not challenge any of BLM's findings regarding wilderness characteristics (naturalness and outstanding opportunities for solitude or primitive and unconfined recreation) in this regard, but instead, in a much more attenuated and convoluted argument, contends that all five of BLM's road determinations were incorrect and that, had BLM found such roads to be "ways," then the unit would have been larger and it would be nearly certain that BLM would have found all of the required elements of wilderness character to be present. ONDA Brief at 17; Miller Decl. ¶¶ 25-26. This supposition is purely speculative. Whitman Decl. ¶ 44-45.

Regardless, ONDA may prevail on its NEPA claim based on lands with wilderness characteristics only if it can show that BLM's findings in this regard and ultimately, its determination that there were no lands with wilderness characteristics within the Juniper Mountain area, were arbitrary and capricious. That is, the Court must do more than find merely that it might have or would have made a contrary or different determination if it were the agency decision-maker, but rather would need to find that the findings and ultimate determination that BLM did make, based in large measure on its expertise and extensive on-the-ground knowledge

of the area in question, were arbitrarily and capriciously made.  But BLM's analysis, findings, and wilderness characteristics determination are amply supported by the record and ONDA therefore has not and cannot show them to be arbitrary and capricious in any fashion whatsoever.

ONDA focuses its challenge on the five roads mentioned previously and claims that BLM's road determinations were faulty for two reasons: (1) the BLM's determinations run counter to the evidence in the record," ONDA Brief at 18-20, and (2) BLM based its determinations on inappropriate factors. *Id*. at 20-22. BLM believes that ONDA is incorrect on both counts, as discussed more fully below. *See generally* Whitman Decl. ¶¶33, 40, 43, 46-125.

### 1.  The Evidence Supports BLM's Road Determinations.

ONDA alleges that there is no evidence in the record to support that the five roads have been mechanically improved and maintained. This is important because only "roadless" areas can, if other characteristics are also present, qualify as lands with wilderness characteristics. Roadless has long been defined by DOI, based on the legislative history of FLPMA, as "the absence of roads which have been improved and maintained by mechanical means to insure relatively regular and continuous use. A way maintained solely by the passage of vehicles does not constitute a road." AR 15794, 15541, 5320, 360. This definition and subsequent guidance interpreting it were used by BLM when it updated its inventory. AR 10843, 11393, AR Doc. ## 377, 381. Thus, mechanical improvement and maintenance are important factors into the roadless area inquiry.

As an initial matter, to the extent that ONDA is questioning whether mechanical improvement or maintenance has *ever* occurred on these roads, ONDA Brief at 18-19; Miller Decl. ¶¶ 28, 29, 33, 34, 36, 40-42, 44, 46-48, those determinations were made long ago and are not subject to challenge now. *See* Whitman Decl. ¶ 48. BLM's original inventory made such

determinations for each of these roads in 1980. AR 481-83, 488-89, 872. BLM has since

prepared a wilderness characteristics inventory *update*—which is in line with FLPMA's

direction to maintain an inventory on a continuing basis. But ONDA puts forward no evidence

that those original determinations were incorrect. Thus, ONDA's only challenge can be to issues

that have arisen since completion of the original inventory within the last six years.

ONDA claims that there is no evidence to support BLM determinations that maintenance

had occurred on the subject roads. ONDA Brief at 18-19, 20; Miller Decl. ¶¶ 36, 40-41, 44, 47.

In fact, BLM documented evidence of past mechanical improvement and maintenance, or a lack

of current need for maintenance to ensure relatively regular and continuous use, on each of the

five roads in question. AR Doc. # 233; *see also* Whitman Decl. ¶¶ 48-125.

ONDA then puts forward various photographs, maps, and interpretations of such

documents in the Miller Declaration and its attachments as evidence that BLM incorrectly

determined that maintenance had occurred (or would occur) on the roads, alleging the presence

of so-called "drive-arounds" and vegetation within the road. ONDA Brief at 19-20; Miller Decl.

¶¶ 31-33, 42-43, 50.[15] BLM has pointed out the numerous factual errors regarding photo

interpretation that Mr. Miller made. . These errors and misinterpretations are significant. The

items that Mr. Miller and ONDA describe as evidence of "drive-arounds" are, in fact, cattle trails

or abandoned, revegetating segments of roadbed adjacent to relocated, mechanically constructed

roadbed segments. Whitman Decl. ¶¶ 53-125. Once these errors are accounted for, it is clear that

there are no user-created "drive-arounds" on the relevant roads. *Id.*. It is also clear that ONDA's

reliance on an ALJ decision from DOI, ONDA Brief at 19, ONDA Exh. 2, Miller Decl. ¶¶ 29,

---

[15]ONDA makes no specific allegations with any support regarding drive-arounds for Road 6165-
C0. *See* Miller Decl. ¶¶ 46-47.

31-33, 46-47,[16] is not relevant in this case because, when the photos are properly interpreted, it is

clear that the roads at issue here do not have the same "drive-arounds" or vegetation presence in

the road as was the case before the ALJ.[17] Whitman Decl. ¶¶ 53-61, 66-68, 70-76, 79-80, 82-90,

93-97, 100-02, 105-06, 108-09, 113-125. BLM also has pointed out that ONDA's concern about

gates being used as a sign of mechanical improvement, ONDA Brief at 19-20, Miller Decl. ¶ 47,

was not determinative for the BLM road determinations. Whitman Decl. ¶¶ 69, 107 (noting it

was consistent with draft Oregon State Office guidance at that point in time, but was not all by

itself a determinative factor).  In addition, contrary to ONDA's arguments, a road sign can also

serve as evidence of a mechanical improvement relevant to this inquiry. *Id*.

It is clear that ONDA disagrees with BLM's road determinations in this instance and

believes that BLM should have conducted its inventory update differently. But that is woefully

insufficient for it to meet its burden of showing that BLM's road determinations are arbitrary and

capricious within the meaning of the APA.  As the Ninth Circuit has stated, a court must give

deference to an agency's choice of methodology for analyzing impacts, particularly in subject-

matter areas involving high levels of expertise, *The Lands Council v. McNair*, 537 F.3d 981,

993-94 (9th Cir. 2008) (*en banc*), and the same should hold true here regarding inventory

updates. *See also ONDA v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010). ONDA's challenges to the

---

[16]In its brief, ONDA also alleges that the ALJ ruling applies to Roads 7155-C0. ONDA Brief at 19 (citing Miller Decl. ¶¶ 40-43, 45). But Mr. Miller does not make any arguments in those paragraphs regarding the ALJ ruling.

[17]Decisions from DOI ALJs are also not binding on other ALJs or the IBLA.  *West Cow Creek Permittees v. BLM*, 142 IBLA 224, 237 (1998)(citing *McLean v. BLM*, 133 IBLA 225, 235 n.16 (1995)); *Reed B. Robison v. BLM*, 120 IBLA 181, 183 (1991).  Also, it is worth noting that the decision on which ONDA relies was on a petition for stay, which meant that the case was not decided on the merits or the full record.

BLM road determinations are factually inaccurate and based on its own interpretation of agency guidance, and therefore ONDA has failed to show that it is entitled to prevail on this claim.

### 2. BLM's Road Determinations Were Based on Appropriate Factors and are Consistent With All Relevant Laws and BLM Policies.

ONDA also argues that the BLM road determinations were based on inappropriate factors. ONDA's Op. SJ Brf. at 20-22; Miller Decl. ¶¶ 34-35, 37-39, 40, 48, 49.[18] First, ONDA challenges the BLM's use of a purpose of a route as part of its inventory update and road determination process and cites OAD 78-61. ONDA Brief at 21. What ONDA fails to do is acknowledge that the current BLM guidance (which ONDA does not challenge in this lawsuit) allows for the consideration of a route's purpose as *context* for the definitional components of a road (e.g., what would constitute "relatively regular and continuous use" for a particular road and whether maintenance would be performed should the road become impassible) and is very clear how such information is to be used, entirely consistent with the OAD. AR 15795, 15803 15804; Whitman Decl. ¶¶72-73.

Second, ONDA challenges BLM's consideration of whether future maintenance would occur if necessary (when mechanical maintenance has not yet been needed) as part of its road determinations. ONDA Brief at 21-22. ONDA again ignores BLM's past and current guidance, which specifically allows for this consideration, AR 15794. In the OAD 78-61, Change 2, it states that a route that has been improved to ensure relatively regular and continuous use, but has not yet required maintenance, is a road. It also states that the presence of "improvements and relatively regular and continuous use would be an indication that the road would be maintained if the need were to arise." AR 387. This guidance is also in accordance with a holding from IBLA

---

[18]ONDA makes no specific allegations with any support regarding inappropriate factors for Road 6165-C0. *See* Miller Decl. ¶¶ 46-47.

in *Sierra Club*, 62 IBLA 367 (1982). In that case, the appellants argued that the blading of a route which thereafter is in regular and continuous use is insufficient to qualify as a road. The IBLA noted that "a route that was created and maintained solely by the passage of vehicles cannot qualify as a road." *Id*. at 369. But the IBLA also held that

> a route, or a segment of a route which was mechanically improved to permit the passage of vehicles, but which to date has not needed further mechanical improvement or maintenance to facilitate the regular and continuous passage of vehicles, is also a road. To hold otherwise would be to say that once a road has been mechanically improved, in order to thereafter continue its status as such it must receive mechanical maintenance whether it needs it or not – a ludicrous, impractical, and thoroughly unreasonable and unrealistic contortion of the accepted definition.

*Id*. at 370. *See also* Whitman Decl. ¶¶70,75, 78. ONDA never once cites this decision, which is binding on BLM, is completely consistent with the current BLM guidance, AR 15794, and is based on an OAD. *Sierra Club*, 62 IBLA at 370.

Nor does ONDA's reliance on an ALJ's decision on a stay order, ONDA Exh. 2, apply in this instance, as that case did not address the current BLM guidance but instead was a factually-based holding (that was not on the merits). Regardless, BLM has already pointed out how the facts present in that appeal are not present in this case. Whitman Decl. ¶102.

Finally, ONDA claims that BLM's road determinations inappropriately relied on information contained within BLM's ground transportation and FAMS databases. ONDA Brief at 22; Miller Decl. ¶¶ 35, 39, 40, 44, 47, 48.[19] But BLM did nothing inconsistent with BLM

---

[19]Mr. Miller also seems to insinuate that BLM somehow improperly or disingenuously updated the route surface condition field in its FAMS database. Miller Decl. ¶¶ 35, 40, 44, 47, 48. First, he is incorrect that any change to FAMS surface condition occurred for any of the routes and he does not seem to be aware of how this condition rating is generated within the database—or the fact that FAMS surface condition rating was not even taken into account by BLM as part of its road determinations. Declaration of James Elvin ¶¶ 4-10; Whitman Decl. ¶¶64-65, 98, 104.

inventory guidance when it acknowledged these mere facts as part of its roads determinations. Whitman Decl. ¶¶16-17, 52, 64-65, 76-77, 98, 104, 111.

Again, ONDA has failed to show that BLM did not follow its own guidance regarding wilderness characteristics inventory updates. And ONDA's allegations suffer from numerous factual mistakes as well. The Court should defer to BLM's interpretation of its own guidance, Siskiyou Reg. Educ. Proj. v. Forest Serv., 565 F.3d 545, 554-55 & n. 9 (9th Cir. 2009)(citing Auer v. Robbins, 519 U.S. 452, 461 (1997)), and ONDA has failed to meet its burden here in challenging the factors that BLM relied upon during its inventory update.

**C.  BLM Properly Studied Impacts to Greater Sage-Grouse.**

BLM has also fulfilled its duties under NEPA in its analysis of potential impacts of the challenged decision to sage grouse.  While BLM was in the process of revising its 2007 Horseshoe EA, AR 10734 *et seq.*, a series of data on sage-grouse and sagebrush habitat was published. First, the USGS released the Monograph in November, 2009. AR 13894 *et seq.* Second, the US FWS issued its 12-Month Finding that sage-grouse was warranted but precluded from ESA listing. AR 13029 *et seq.*, 15871 *et seq*. Third, the ODFW issued its Draft Assessment and Strategy in July, 2010. AR 13282 *et seq*.

ONDA contends that these publications amount to "significant new… information" requiring the BLM to reconsider and supplement its NEPA analysis pursuant to 40 C.F.R. § 1502.9 (c)(ii). Although the NEPA document at issue is an EA, NEPA implementing regulations provide that an agency needs to supplement an EIS if new information arises that would result in significant environmental effects "*bearing on the proposed action* or its impacts." 40 C.F.R. §1502.9(c)(1)(ii), *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 72–73 (2004)

(emphasis added). This is clearly a project-specific analysis, and courts defer to an agency's determination, even through non-NEPA documents, as to significance, reviewing such decisions under an arbitrary and capricious standard. *See Idaho Sporting Cong,. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000), *Marsh v. ONRC*, 490 U.S. 360, 385 (1989).

Here, neither the information in the Monograph nor the 12-Month Finding can be said to be new and significant in the context of the challenged decision.  And understanding the context is the key to the determination; that is, BLM does not deny the potential importance in the abstract of the Monograph or 12-Month Finding at least as to sage-grouse *range-wide*, even though much of it is simply a compilation of or further elaboration of previous work or generally understood relationships.  However, this information, as it relates to the challenged decision, does not reveal anything that would significantly alter the analysis of likely effects to sage grouse that BLM has already undertaken, as it explained in its detailed Documentation of Land use Plan Conformance and NEPA Adequacy (DNA), AR 15842 *et seq*., in which it carefully analyzed each alternative and ultimately determined that the information was not significant as applied to Horseshoe Pasture, in large measure because only one of the alternatives—which was not selected—would require any alteration on the basis of the new data. *Id.* at 15846.  This is entirely consistent with the analysis and ruling this Court made just last week in rejecting virtually the same NEPA supplementation arguments in a challenge to a much larger BLM project.  ONDA v. BLM, CV-08-1271-KI, Opinion & Order at 14-22 (D. Or. Nov. 15, 2011). The Court should follow the same rationale and reach the same result here.

ONDA also inaccurately describes the spatial scales of the Horseshoe Pasture project area. First, although the proposed fence is 1.8 miles from the nearest lek, ONDA fails to disclose

that the nearest lek is *inactive,* has been inactive since 1980, Forbes Decl. at 5, and the proposed

fence is actually 4.4 miles from the nearest *active* lek. AR 15846, *see also* 13497, 13502, 13567.

Second, although Juniper Mountain may be generally described as core habitat for sage-grouse,

ONDA goes too far in claiming the project area is core habitat. *See, e.g.*, ONDA's Op. SJ Brf. at

26.  In fact, Horseshoe Pasture has *no* core habitat, and 36% of Horseshoe Pasture falls outside

*both* the "Core Habitat" and "Low-Density Habitat" categories. AR 15848.

Third, although female sage-grouse may travel more than 12.5 miles from leks to nests,

the range-wide study ONDA relies on revealed that the *average* distance between a female's nest

and lek was significantly lower, from 2.1 to 4.8 miles, AR 15877, *see* Pl.'s Mem. Supp. Mot.

Summ. J. at 23. Further, contributors to the Monograph recommend sagebrush conservation

within 5.0 km (3.1 miles) for non-migratory nesting and early brood-rearing populations. AR

15085. On a local scale, the final Oregon Strategy, published in April, 2011, establishes that in

Oregon, 80% of sage-grouse nests are within 4.0 miles of a lek in non-migratory populations. AR

15849, 15580. Data from a site-specific study adjacent to the Juniper Mountain Allotment

showed that sage-grouse on Juniper Mountain are non-migratory, and 87% of nests were within

3.0 miles of leks—well within the 4.4 mile distance between the nearest active lek and the

proposed fence—and only 4% of sage-grouse traveled greater than 5.0 miles to nest, AR 15849–

50, 15855–60.

These spatial scales belie ONDA's concerns about habitat fragmentation due to fences.

Although Braun's study in the 12-Month Finding indicates fences may cause habitat

fragmentation, Braun states that "…fences are not equal in their potential to divide habitats

useful to sage grouse," differentiating between strand and woven fences. AR 13929, 15827–28.

The low population of sage-grouse, lack of core habitat, and distance from active leks will have little impact on habitat fragmentation in Horseshoe Pasture.

BLM adequately considered age-grouse mortality directly associated with flying into fences, and indirectly associated with predation by raptors. BLM acknowledged in the 2010 Horseshoe EA that mortality has been correlated to fence-related collisions. AR 13502. BLM did not "discount the possibility of collision," but rather asserted that because of the relatively small increase in fences under the chosen alternative,[20] and because of a nearly five-mile distance to the nearest active lek, collision-related environmental impacts "would be minimal," and not significant enough to require an EIS. *See id.* ONDA cites the most dramatic examples of collision-related mortality, yet the fence studies ONDA cites occurred in areas with high to extremely high sage-grouse densities less than two miles from lek sites, and in heavily used winter areas with "several hundred" sage-grouse. AR 12903. Here, The Horseshoe Pasture project area is not heavily used seasonal sage-grouse habitat, AR 13492, 15849–50, Forbes Decl. at 5, nor is it near any active lek sites. AR 13567, 15855–56.

ONDA fails to recognize that "[n]ot all fences present the same mortality risk to sage-grouse." AR 12904, 15891. "Fences with 1-3 strands of wire are normally not negative to sage grouse…." AR 15827–28. In the EA, BLM chose to preemptively mitigate any risks of collision by providing that "[a]ny protion of fences proposed within 0.5 miles of an active lek would have reflectors installed" to reduce potential impacts from collisions. AR 13480. Indeed, after the 2011 Oregon Strategy was finalized, BLM increased this reflector buffer to 1.0 miles. *See* AR

---

[20] Five miles of new fence are to be added to an existing 66.5 miles of fence within the Juniper Mountain Allotment. *See e.g.*, AR 13497, 13541.

15844. However, this change has no effect on the selected project, because the proposed fence will be 4.4 miles from the nearest active lek. AR 15846. Further, approximately half of the propsed fence will be located in moderate to high density juniper stands, making it nearly impossible for sage-grouse to fly low enough to impact the fence. AR 15850.

Relating to indirect mortality from raptor predation, ONDA emphasizes the importance of a 3.1–4.3 mile radius buffer around perches recommended by the US FWS. AR 15890. However, this recommended buffer is for power lines, not fences. Even so, the placement of the fence is 4.4 miles from the nearest active lek, AR 15846, well outside the 3.1–4.3 mile radius buffer. Moreover, much of the project area is already covered with old-growth juniper, which acts as natural raptor perches. AR 13493. The addition of much shorter perches within areas already covered by juniper would not significantly increase raptor predation.

Further, ONDA asserts that "BLM produced not a single project map depicting the projects *and* sage grouse lek locations," thereby thwarting public involvement in the NEPA process.  ONDA's Op. SJ Brf. at 25 (emphasis in original, internal parenthetical omitted). This assertion simply does not reflect the true state of the record in this regard.  Although the 2010 Horseshoe EA did not provide a *single* project map with lek sites superimposed over the project's proposed fences, BLM did provide all the information necessary for the public to determine approximate distances between fences and leks in multiple maps. BLM provided four maps indicating proposed fence locations for Alternatives 2A and 2B, 6, 8, and 9. AR 13563–66. Immediately following these maps is a map of the entire proposed project area with existing

fences and both active and inactive leks depicted. AR 13567. Further, the DNA provided two additional maps. AR 15855–56. [21]

### D.  ONDA Cannot Prevail on its Claim that BLM Should Have Prepared an EIS.

#### 1.  ONDA Has Waived Its Ability to Challenge BLM's FONSI.

ONDA argues that BLM should have prepared an EIS. ONDA Brief at 25-28. But this argument must fail for several reasons, the initial one being that ONDA has waived this claim by failing to ever present it to the agency. In *Dep't of Transportation v. Public Citizen*, 541 U.S. 752 (2004) ("*Public Citizen*"), the Supreme Court affirmed its longstanding holding that "[p]ersons challenging an agency's compliance with  NEPA must 'structure their participation so that it . . . alerts the agency to the party's position and contentions.'" *Public Citizen*, 541 U.S. at 764 (quoting *Vermont Yankee Nuclear Power  Corp. v. Natural Resources Def. Council, Inc.,* 435 U.S. 519, 553 (1978)). The Court specifically concluded that a number of NEPA claims were waived as a result. *Id*. at 764-65.

The Ninth Circuit case law is in accord with *Public Citizen*. The Ninth Circuit has noted that what is required of "'[p]ersons challenging an agency's compliance with NEPA' is that they 'structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *ONDA v.*

---

[21] ONDA's supplemental NEPA claim must also fail for the additional reason that it never raised the issue in its administrative appeal, AR 13602 et seq., nor has it ever petitioned or presented such an argument to BLM to allow it to respond in the first instance.  As a result, it has either waived the claim or failed to exhaust its administrative remedies with respect to the claim.  See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554-55 (1978).

*BLM*, 625 F.3d at 1120 (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (quoting *Public Citizen*, 541 U.S. at 764) (second alteration in original)).[22]

The same result should obtain here, where ONDA *at no time* ever provided comments or any other indication that it believed BLM should prepare an EIS for the Horseshoe fence project. It provided no such comment on the 2010 EA, *see* AR  Doc. # 299, never filed a protest of the BLM decision raising this point, and did not even raise this point in its administrative appeal of the BLM decision. *See* AR Doc. # 354.[23] In these documents, ONDA never states that an EIS should have been prepared, never alleges that there may be any significant impacts from the alternatives analyzed in the 2010 EA.  As a result, this case is distinguishable from this Court's recent decision in *ONDA v. McDaniel*, where ONDA had at least mentioned the issues in its submissions to the agency or as part of its administrative appeal. *See ONDA v. McDaniel*, 751 F. Supp. 2d at 1167-68. Under *Public Citizen* and Ninth Circuit precedent following that clarion Supreme Court ruling, ONDA has waived its ability to bring a claim under NEPA alleging that BLM failed to prepare an EIS pursuant to NEPA.

### 2.   There are No Substantial Questions Regarding Impacts to Lands with Wilderness Characteristics.

Even if the Court finds that ONDA has not waived this NEPA claim, they have failed to meet their burden to show that BLM should have prepared an EIS. An agency must prepare an EIS "'if 'substantial questions are raised as to whether a project . . . *may* cause significant

---

[22] This Court has similarly noted the *Public Citizen* standard for waiver of NEPA claims not properly put before the agency. ONDA v. McDaniel, 751 F. Supp. 2d 1151, 1158 (D. Or. 2011); *Klamath Siskiyou Wildlands Ctr. v. Symons*, 2005 U.S. Dist. LEXIS 47003 at *81-82 (D. Or. June 6, 2005); *Cascadia Wildlands Project v. U.S. Forest Serv.*, 386 F. Supp. 2d 1149, 1169 (D. Or. 2005).

[23]An examination of ONDA's administrative appeal of the BLM decision shows that it nowhere in its NEPA claim mentioned the failure to prepare an EIS. *See* AR 13612-19.

degradation of some human environmental factor.'"" *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2004) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)) (emphasis in original).

But ONDA has completely failed to meet this standard regarding lands with wilderness characteristics or the wilderness resource. As an initial matter, if ONDA fails to show that BLM made any errors when it updated its inventory and found no lands with wilderness characteristics in the Allotment, then this claim must fail as a matter of law—if lands with wilderness characteristics are not present, then they cannot be impacted *at all*. BLM respectfully submits that ONDA has indeed failed to make that showing. *See supra* Argument Section II.B.

If there are indeed no lands with wilderness characteristics in the Allotment, then the significance factors under NEPA are not even implicated, and ONDA's allegations regarding "intensity," *see* 40 C.F.R. § 1508.27(b), have no relevance. *See* ONDA Brief at 26-28. ONDA argues in particular that there are "unique characteristics of the geographic area" to consider under 40 C.F.R.§ 1508.27(b)(3). But this provision does not even on its face apply to lands with wilderness characteristics. Even if the provision does apply, BLM found no lands with wilderness characteristics to be present in the Allotment. AR 13477-78; *see also* AR Doc. # 235. The FONSI prepared by BLM tracks accordingly and also does not include lands with wilderness characteristics within this definition (though it does mention designated wilderness and WSAs). AR 13472. Just because ONDA alleges that lands with wilderness characteristics are present does not make it so, particularly when the Court needs to defer to the agency on such issues.

ONDA also argues that the effects on the quality of the human environment are likely to be highly controversial, *see* 40 C.F.R. § 1508.27(b)(4), and thus preparation of an EIS is warranted. But this argument is circular, and just as ONDA cannot make lands with wilderness

characteristics materialize merely because they think they are present, nor can ONDA create a controversy just by stating that one exists. As mentioned previously, *see supra* Argument Section II.B, ONDA is incorrect regarding both the on-the-ground facts and the proper DOI policies and definitions regarding the presence of roads and lands with wilderness characteristics in and around the Allotment. These errors and misunderstandings do not create a controversy and do not raise substantial questions warranting the preparation of an EIS. In other words, there is no "hole" in BLM's environmental analysis if BLM was correct in determining that there were no lands with wilderness characteristics in the project area.

All of ONDA's arguments for why an EIS should have been prepared are built on the premise that BLM was incorrect in finding that no lands with wilderness characteristics are present in the Juniper Mountain Allotment but, as explained above, this premise is invalid and its claim must fail.

### 3. The Challenged Decision will not have significant impacts on Sage-Grouse.

ONDA claims that the BLM decision will have "significant impacts" on sage-grouse habitat, and BLM thus violated NEPA in failing to prepare an EIS. ONDA's Op. SJ Brf. at 25. The only support ONDA provides for this claim is that all of Juniper Mountain is in a "core zone" for sage-grouse habitat. *Id.* at 26. ONDA asserts that all of Juniper Mountain has "unique characteristics" as an ecologically critical area sufficient to fall within one of the "intensity" factors provided in NEPA regulations which may establish significance of environmental impacts. *Id.* at 26, citing 40 C.F.R.§ 1508.27(b)(3).

As with the wilderness characteristics argument it lays out in support of its EIS claim, ONDA's sage-grouse argument also rests on a faulty premise. The NEPA regulation notes that

"in the case of a site-specific action, significance would usually depend upon the effects *in the locale* rather than in the world as a whole." 40 C.F.R. § 1508.27(a) (emphasis added). As it relates to sage-grouse, the locale at issue is the Horseshoe Pasture. Although half of the pastures in the Big Juniper Allotment contain "Core Habitat," AR 15848, core-area mapping, as described in the 2011 ODFW Strategy, AR 15652–63, indicates that *zero percent* of the Horseshoe Pasture project contains "Core Habitat," 64.2% contains "Low Density Habitat," and 35.8% falls entirely outside either Core or Low Density Habitat. AR 15848. BLM's finding that the proposed fences the challenged decision will build in Horseshoe Pasture will not have significant effects to sage grouse is wholly reasonable, entitled to deference, and patently not arbitrary or capricious.

## II.  THE DECISION COMPLIES FULLY WITH FLPMA'S DIRECTION THAT MANAGEMENT ACTIONS BE CONSISTENT WITH THE RMP.

### A.  The BLM Decision is Consistent with the Lakeview RMP.

ONDA claims that the BLM decision is inconsistent with the Lakeview RMP on two separate grounds. ONDA's Op. SJ Brf. at 28-34. First, ONDA argues that the BLM decision reopens a route that was closed in the Lakeview RMP. Second, ONDA argues that the BLM decision failed to remove livestock from the Horseshoe Meadow as required by the Lakeview RMP. The first argument twists, or ignores, the actual language and effect of the BLM decision and the Lakeview RMP.  ONDA's second argument is based on an inaccurate reading of the administrative record and the original BLM rangeland health assessment.

Moreover, as an initial matter the Court lacks jurisdiction to review such claims because, properly understood, they are essentially attempts to have the Court compel BLM to undertake an affirmative activity specified in its RMP, which the Supreme Court has made clear are not cognizable under the APA unless they can be read effectively as implementing statutory or

regulatory direction. *SUWA*, 542 U.S. at 71-72. These provisions are not of that nature and hence, the Court should find that it lacks the authority to judicially review them, just as it did under similar circumstances in *Gardner v. BLM*, 633 F. Supp. 2d 1212, 1222-27 (D. Or. 2009).

      **1.  The BLM Decision does not "open" a road closed by the Lakeview RMP.**

Should the Court decide it can reach the merits of ONDA's FLPMA claims, ONDA is correct in stating that the Lakeview RMP identified Road 7155-AA[24] for closure, along with several other roads. ONDA Brief at 28-29 (citing AR 8251, 8521, 13479); *see also* AR 8194, 8244, 8282-83. It is also true that FLPMA and the BLM regulations require subsequent actions to be consistent with the governing RMP. 43 U.S.C. § 1732(a); 43 C.F.R. 1610.5-3(a).

What ONDA fails to account for is the fact that the Lakeview RMP itself stated the implementation phase of many decisions, such as road closures, would occur over the entire life of the RMP—that is, 15 to 20 years. *See* AR 8284. In other words, just because a decision was made in the Lakeview RMP, it does not follow it would be implemented immediately. BLM also noted that "Funding and staffing levels will affect the rate of implementation." AR 8211.

ONDA mischaracterizes what, exactly, the BLM decision at issue would do regarding Road 7155-AA. ONDA claims that the BLM decision "designates as open to motorized traffic" Road 7155-A, "leaves open" Road 7155-AA, "unlawfully opens" Road 7155-AA, "unlawfully re-opens" Road 7155-AA, "expressly re-open[s]" Road 7155-AA, "declare[s] the route as open," and "re-open[s]" Road 7155-AA. ONDA Brief at 14, 28, 28, 29, 29, 29, 30.

---

[24]This road was previously named 7155-0-1AA and is labeled as such in EAs that pre-dated the 2010 EA and in the Lakeview RMP. BLM changed the name of it (and several other roads) when it was updating its road numbering schema in its Facility Asset Management System and Ground Transportation datasets to be consistent.

First, the argument that the BLM decision "re-opens" Road 7155-AA is completely unsupported by the record. The 2010 EA states that the Lakeview RMP "made a decision to close BLM Road 7155-AA. However, the closure has not yet been implemented on the ground due to other management priorities. This closure would be implemented on the ground as a component of each of the ten alternatives analyzed in detail." AR 13479-80. The BLM decision itself expressly states that it will "Implement closure of BLM Road 7155-AA to motorized vehicles by signing." AR 13570; *see also* AR 13571. ONDA's characterizations of the BLM decision to the contrary are wholly without merit.

Second, ONDA argues that BLM's regulations require RMP decisions to be implemented within a reasonable period of time. ONDA Brief at 29 (quoting and citing 43 C.F.R. § 1610.5-3(b)). ONDA argues it was unreasonable for BLM to not put a sign at the beginning of Road 7155-AA by now and that the BLM decision to "re-open" the road is unlawful. But as just described, the BLM decision does not "re-open" Road 7155-AA. In fact, the BLM decision will, after fence construction and juniper treatment, implement the closure set out in the Lakeview RMP. The implementation that ONDA is seeking is part of the BLM decision and therefore 43 C.F.R. § 1610.5-3(b) is not even applicable. The only thing keeping BLM from implementing the BLM decision is this lawsuit, and ONDA is actually seeking to set aside the BLM decision (which would include the implementation of the road closure). This argument must surely fail.

The BLM decision expressly states that *implementation* of the closure of Road 7155-AA will occur after fence construction—it does not "re-open" the road. The closure would be implemented after the construction of the fence and minor juniper treatment, which will run along the road. AR 13570-71; *see also* AR 13477 (FONSI).  The timing of BLM's road closure implementation is designed to facilitate project implementation, is completely within BLM's

discretion, is reasonable, avoids unnecessary impacts, and, most importantly, is in complete

conformance with the Lakeview RMP, FLPMA, and the BLM's regulations.[25]

### 2. The Lakeview RMP's requirements regarding livestock and "at risk/no trend" areas do not apply to the Horseshoe Meadow and the BLM decision.

ONDA alleges that the BLM decision is also not in conformance with the Lakeview RMP

because it did not close the Horseshoe Meadow to livestock grazing. ONDA Brief at 30-34.

However, this argument must fail since the RMP management direction that ONDA references is

not applicable to the Horseshoe Meadow.

The Lakeview RMP does state that livestock "will be removed" from "stream segments

where proper functioning condition ("PFC") assessment ratings are functioning-at-risk with no

apparent trend, downward trend, or nonfunctioning and where grazing is determined to be a

factor in the current condition." AR 8227. However, BLM never made a finding through a PFC

assessment that the Horseshoe Meadow was rated as "functional at risk," as ONDA claims. The

60-acre area that ONDA cites in support of this claim is actually referring to the Hogback Playa,

located elsewhere in the Allotment. It does not refer to the Horseshoe Meadow. AR  4556-60,

9358. In fact, this is the only area in the entire allotment that BLM has documented as

"functional at risk" under the PFC standards. AR  9358, 13842. BLM statements in the 2010 EA

that referred to the Horseshoe Meadow as "functioning at risk" were in error. *See* AR 13488;

Whitman Decl. ¶ 134.  In addition, the directive in the Lakeview RMP  is not ambiguous, but to

---

[25]The BLM decision to close this road and to set out the time frame in which it would be
implemented was done in the Lakeview RMP—which was issued over six years ago and is not
subject to challenge. *See* AR 8191 (Lakeview RMP signed in November 2003); 28 U.S.C. §
2401(a). The BLM decision even attempted to articulate to the public that the previous RMP
road closure decision was not open for challenge by including the statement that "this previous
decision is not subject to protest or appeal." AR 13571.

the extent that the Court finds that it is, BLM's interpretation of its own RMP is due deference

from the Court. *Hapner  v. Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010).

What the administrative record bears out is that ONDA has misread the rangeland health

assessment and has mistaken a 60-acre playa area for the Horseshoe Meadow.  *See* ONDA's Op.

SJ Brf. at 10, 30, 31, 32 (erroneously stating that it is the Horseshoe Meadow that is listed in the

BLM's December 2010 document, *see* AR 13842, when it is in fact the 60-acre playa that is

listed there), 33 (same).  In fact, BLM determined that a 60-acre playa was in such condition, but

not the Horseshoe Meadow or Horseshoe Spring. AR 9358; AR Doc. # 46. BLM found that the

50-acre Horseshoe Meadow was not meeting Standard 2, but did not find that it was "Functional

at Risk" under the PFC standards." *Id*. All of ONDA's citations to the rangeland health

assessment for this proposition are based on this misreading, *see* ONDA Brief at 10, 30, 31, 32,

33 (and citations to AR therein), and ONDA's other citations to the record are to pages of the

2010 EA, which BLM has already explained was an error. Whitman Decl. ¶ 134.

Thus, the provision of the Lakeview RMP cited by ONDA is not applicable to the

Horseshoe Meadow.  In turn, BLM was not required under the Lakeview RMP to remove

livestock grazing and the BLM decision does not violate FLPMA or the BLM's regulations.[26]

### B.  The BLM Decision Complies with the Federal Rangeland Health Regulations.

ONDA claims that the BLM decision violates the BLM's rangeland health regulations

because it does not include "any mandatory, quantitative term or condition that will ensure

---

[26]The general protective measures regarding livestock grazing in the Lakeview RMP still apply
to BLM's management of grazing in the Horseshoe Meadow. *See* AR 8237. Conformance with
this applicable management direction is documented in the BLM decision and EA. AR 13574,
13478-79.

'substantial progress' toward achieving rangeland health standards." ONDA Brief at 34. This argument lacks merit for several reasons.

However, neither regulatory provision cited by ONDA, 43 C.F.R. §§ 4180.1 or 4180.2(c)(3), have any such requirement.[27] It is true that grazing permits are to include mandatory terms and conditions "that ensure conformance with subpart 4180." 43 C.F.R. § 4130.3-1(c); ONDA Brief at 34. But that is only true if a term and condition in a permit is actually needed to make the required significant progress.[28]

Importantly, the BLM decision was not a decision that involved renewing, modifying, or otherwise issuing a grazing permit. In fact, ONDA, while arguing against the intervention of Laird Ranch, stated in its own filings that its challenge to the BLM decision did not implicate in any way a grazing permit. Dkt # 26 at 2, 4, 5. Therefore, 43 C.F.R. § 4130.3-1(c) is not at issue.

Ultimately, ONDA's attack misses the mark factually. BLM did not find that "intensive overgrazing in Horseshoe Meadow" was the source of the violation of Standard 2. ONDA Brief at 34.[29] Instead, BLM determined that trespassing cattle were the problem, trailing back around

---

[27]In fact, 43 C.F.R. § 4180.2(c)(3) is not even part of the current regulations, though the same language is found in the  current 43 C.F.R. § 4180.2(c).

[28]In fact, ONDA's reading of 43 C.F.R. § 4130.3-1(c) would apparently require every "appropriate action" taken by BLM pursuant to 43 C.F.R. § 4180.2(c) to require a term and condition to be placed in the relevant permit. This is not even consistent with the plain language of 43 C.F.R. § 4180.2(c), which states that appropriate action  "means implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part. That list is a menu of options available to BLM in carrying out the mandates of the regulatory provision. Indeed, subpart 4120 involves range improvement projects—such as the fence in this case—and BLM cited 43 C.F.R. § 4120.3-1(f) as authority for the BLM decision. AR 13574.

[29]BLM's rangeland health assessment never used the term "intensive grazing" when discussing the Horseshoe Meadow. AR 9358. Nor does ONDA's citation to AR 13475 (the 2010 EA) support their proposition.

the bottom, side, and top of Juniper Mountain to graze in the Horseshoe Meadow at times in which the area was scheduled for rest. AR 13475, 13478, 9326, 9370.

BLM's chosen solution to the problem was to build the fence and seal off these gaps in the existing fence, bringing fencing up the side and onto the top of the mountain. AR 9370, 13490, 13570-72, 13577. BLM needs no terms and conditions in Laird Ranch's existing permit for this plan to work and for significant progress to be made. BLM found that construction of the fence would make the required significant progress. AR 13571, 13573-74. ONDA has not even challenged that determination in any meaningful way in its opening brief, instead focusing on its factually inaccurate description of the rangeland health assessment as grounds for this argument.

Thus, ONDA's citation to *ONDA v. Tidwell*, 716 F. Supp. 2d 982, 998 (D. Or. 2010) is not on point, as there is no need to address grazing impacts and bank alteration to make the required significant progress. And the fact that the 2010 EA refers to the types of grazing that BLM has been authorizing in the Horseshoe Pasture and Meadow (rest-rotation, 50% utilization), *see* ONDA Brief at 35, does not mean that those schedules and indicators need to be placed as a term and condition on the existing Laird Ranch grazing permit to make significant progress.

ONDA's reliance on *WWP v. U.S. Dep't of the Interior*, 2009 U.S. Dist. LEXIS 121554 (D. Idaho Dec. 30, 2009), is likewise misplaced. That case involved the renewal of grazing permits as part of the BLM decision that was challenged, and also involved an instance in which BLM itself had determined that certain grazing restrictions (rotation schedule and utilization limits) were necessary to achieve the required significant progress. *Id*. at 28-30. But, again, no such finding of necessity was made by BLM in this instance and thus the case is distinguishable because BLM determined that completion of the range improvement project (the fence) would make the required significant progress. The same distinction has been made by ALJs within DOI,

in response to similar challenges brought by WWP. *See* Exh. 1 at 10-12 (decision from ALJ denying a petition for stay in *WWP v. BLM*, OHA No. 310-2011-003 (June 6, 2011)).

If ONDA wishes, it may challenge authorization of livestock grazing for Laird Ranch by attempting to challenge a BLM decision that actually issued or addressed the grazing permit. But the BLM decision at issue in this lawsuit is no such decision and ONDA itself has disavowed any intention of attacking a grazing permit in this litigation. No new terms and conditions in Laird Ranch's existing grazing permit are necessary to make the required significant progress under 43 C.F.R. § 4180.2(c)—completion of the fence by BLM will achieve that result.

## **CONCLUSION**

As Federal Defendants explain above, the challenged decision in this case is a small-scale project situated in habitat that is not vital for sage-grouse. Indeed, the project simply calls for adding only about five miles of fence to a network of fencing in the allotment that already spans across more than 66 miles in the grazing allotment in question, and will result in actual ground disturbance of just 1.2 acres in the 50-acre Horseshoe Meadow. AR 13499. In addition, and just as important, the 50 acres of juniper treatment authorized by the project will be a net benefit to riparian and sage-grouse habitat. AR 13572, 13503-06. ONDA has made clear that it does not like the challenged decision and would, if it were the BLM, have opted for a different approach to improving the rangeland health and riparian conditions in the Horseshoe Meadow. But a simple disagreement does not rise to the level of an arbitrary and capricious agency decision.

For the foregoing reasons, the Court should deny ONDA's motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

Respectfully submitted this 21st day of November 2011.

S. AMANDA MARSHALL

United States Attorney

District of Oregon


/s/ Stephen J. Odell

STEPHEN J. ODELL
Assistant United States Attorney

OSB # 90353

503-727-1024

Of Attorneys for Defendant


**OF COUNSEL:**

**MICHAEL SCHOESSLER**

michael.schoessler@sol.doi.gov

Office of the Regional Solicitor

U.S. Department of the Interior

805 S.W. Broadway, Suite 600

Portland, OR 97205

Telephone:  503-231-2140

Telefax: 503-231-2166