**S. AMANDA MARSHALL, OSB # 95347**
United States Attorney
District of Oregon
**STEPHEN J. ODELL, OSB #903530**
Assistant United States Attorney
steve.odell@usdoj.gov
U.S. Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1024
Telefax:  (503) 727-1117

 Of Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PENDLETON DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASSOCIATION** | No. 10-CV-1331-SU |
| Plaintiff, | |
| v. | **DECLARATION OF PAUL WHITMAN** |
| **BUREAU OF LAND MANAGEMENT, THOMAS E. RASMUSSEN, Field Manager, Lakeview Resource Area, and CAROL BENKOSKY, District Manager, Lakeview District,** | |
| Defendants. | |

1

## INTRODUCTION

1.  My name is Paul Whitman.  I have been the Planning and Environmental Coordinator for the Bureau of Land Management's Lakeview District (BLM) since 1993.  My major responsibilities in this position include providing guidance and oversight of the BLM's land use planning activities on the District in accordance with the Federal Land Policy and Management Act (FLPMA), as well as providing guidance on environmental impact analysis and compliance with the National Environmental Policy Act (NEPA) during all land use and project planning activities.  Prior to this, I worked as both an ecologist and wildlife biologist for over 7 years conducting environmental impact analyses for the U.S. Army Corps of Engineers.

2.  I have been trained in land use planning and environmental law, including but not limited to the NEPA, FLPMA, wilderness study area interim management, BLM's wilderness inventory procedures, and BLM's Proper Functioning Condition (PFC) methodology.   I have extensive training in geographic information system (GIS) technology, database management, and remote sensing, and was primarily responsible for establishing GIS technology and databases in both agencies.

3.  Between 2006-2008, I was involved in the development and review of the Oregon/Washington BLM's draft wilderness inventory procedures (AR 011384-011406, 010834-010854) that were ultimately used during the 2008 Juniper Mountain Wilderness Characteristics Inter-Disciplinary Evaluation.  I was also involved in the development of the Oregon/Washington BLM Wilderness Characteristics GIS Data Standard.  This data standard was used to develop the corporate Wilderness Characteristics GIS theme.

4.   Currently, my secondary duties with the BLM include serving as District Data Administrator. In this role I am responsible for insuring that all data collected within the Lakeview District, including GIS data related to wilderness inventory, is developed and maintained in accordance with approved BLM or inter-agency data standards.

2

5.      I was a key member of the 8-person Inter-Disciplinary (ID) team that prepared the Juniper Mountain Wilderness Characteristics Evaluation (AR 011876).  I worked closely with the Wilderness Inventory ID Team leader throughout the inventory update process.  I conducted the majority of the road field inventory update work in the Juniper Mountain area.  I was responsible for updating the BLM's Ground Transportation (GTRN) GIS dataset on several occasions between 2001 and 2008 for the Juniper Mountain area.  This update effort is documented extensively in the record (AR 005337-005338, 010455, 010488-010489, 010725, and 011570).  I assisted in the preparation of Road Analysis and Wilderness Inventory Forms 1 and 2 (AR 011837-011867, 011876-011914).

6.      During the planning stages for the Horseshoe Pasture Riparian Improvement and Livestock Grazing Management Strategy project, I provided NEPA compliance oversight and overall quality control review for the environmental assessment (EA) (AR 013546).  I prepared the FONSI for Field Manager approval, as well as the public involvement and wilderness inventory discussions contained within the EA (AR 013472-013474, 013476-013478).  I also prepared the discussion of impacts to natural quality and primitive recreation opportunities in the cumulative effects section of the EA (AR 013541-013546).

7.      Based upon my experiences, training, and involvement in the processes described above, I am qualified to explain and/or clarify the wilderness inventory update process that BLM followed in the Juniper Mountain area, as well as the NEPA analysis that the BLM prepared in support of the BLM's final project decision, currently at issue in this case.

## SECTION 603 WILDERNESS INVENTORY

8.      Following the passage of the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM initiated an inventory of lands with wilderness characteristics, as required under Section 603. In 1991, the BLM completed this comprehensive wilderness inventory

3

covering the entire State of Oregon, including all public lands within the Lakeview Resource

Area of the Lakeview District (AR 000418-000874, 001959-003449, 003562-004334). During

this wilderness inventory process, the BLM followed guidance published in its 1978 *Wilderness*

*Inventory Handbook* and several subsequent policy directives (AR 000343-000376, 000384-

000410). A total of 14 wilderness study areas (WSAs) and 1 instant study area (ISA) covering

approximately 486,873 acres and located within the Lakeview Resource Area were designated

during this process (AR003586-003697, 003813-003845). Approximately 254,274 acres were

recommended suitable for designation as wilderness and 224,358 acres were not recommended

suitable as wilderness (AR 003566, 006853). No wilderness quality lands were identified within

any of the inventory units identified in the Juniper Mountain area during the Section 603

inventory effort (AR 000481-000489).

## WILDERNESS AND OTHER RESOURCE INVENTORY UPDATES

**Lakeview Resource Management Plan**

9.      The BLM made updates to its wilderness inventory during the preparation of the

Lakeview Resource Management Plan (RMP) in 2001. This update focused on evaluating the

wilderness characteristics of over 3,000 acres of recently acquired lands within or immediately

adjacent to existing WSAs, as those lands had not been previously inventoried for wilderness

characteristics. Approximately 1,400 acres were found to contain wilderness characteristics at

that time (AR 006066-006070).

**Resource Data Update**

10.     Since 1996, BLM has maintained or updated numerous datasets related to resource

conditions and man-made disturbances or developments that are relevant to RMP development

and implementation, project level planning (AR 011868-011875), as well as assessing the key

factors of wilderness character.  These datasets have included:

> a) Roads from the Ground Transportation (GTRN) and Facility Asset Management
> System (FAMS)
> b) Fences from the grazing allotment and pasture boundaries (GRA)
> c) Wilderness Study Area (WSA) boundaries
> d) Big game habitat
> e) Raptor habitat
> f) Sagegrouse habitat and lek site locations
> g) Pygmy rabbit habitat
> h) Water developments (man-made reservoirs, waterholes, wells, water troughs,
> pipelines, and wildlife guzzlers)
> i) Rangeland Improvement Project System (RIPS)
> j) Utility Corridors
> k) Rock pits and other mining disturbances
> l) Wilderness inventory unit boundaries from 1980
> m) Non-native seedings and other vegetation treatments
> n) Land ownership (LLI)
> o) Cattleguards and gates

11.    Individual metadata record has been created for each of these datasets which

documents when the data was collected, how it was collected, who collected it, what kind of

attributes are associated with it, what format and coordinate system the data is stored in, and

when it was last updated (AR 005337-005338, 010455, 010488-010489, 010725, 011570,

011915-012003, 012607-012710, ). One must review the metadata for each dataset in order to

fully understand the data. Further, this metadata is considered an integral part of the

administrative record supporting both the road analysis and wilderness character determination

processes.

**Road Inventory Data Updates**

12.    Since roads form the majority of wilderness inventory unit boundaries in the

Juniper Mountain area, it is important to understand how the BLM's road and transportation

network[1] data was originally created and how it continues to be maintained on an on-going basis. BLM has been actively maintaining its road inventory information since the early 1990's. This is documented extensively in the record (AR 005337-005338, 010455, 010488-010489, 010725, 011570, 011869-011871, 011935-011944, 012623-012645). The following is a summary of this documentation (see also AR 011870-011871).

13.    The Lakeview Resource Area currently has about 2,500 miles of roads identified within its transportation system. Another estimated 2,500 miles of roads, trails, and other routes exist on the ground that are not currently designated as part of the official transportation system (AR 006895). Transportation system data (e.g. road number, road name, road class, number of lanes, surface type, etc.) were originally gathered by the BLM from field survey work and entered into the Facility Information Management Systems (FIMS) database in the early-1990's. Road lines were originally captured in GIS by the U.S. Geological Survey (USGS) by digitizing roads from published 7.5 minute series topographic quadrangle maps (these are also referred to as 1:24000 scale "quad" maps). The USGS made this road data available to the BLM and other agencies in the mid-1990's. In 1999, the Oregon/Washington State Office, BLM GIS staff took a copy of the USGS digital road dataset for Oregon and added a number of additional attributes to create a new, state-wide GIS theme called Ground Transportation (GTRN). In 2001, the State Office BLM GIS staff updated the GTRN theme for the Lakeview Resource Area with BLM and County road numbers from existing transportation plan maps. Other attribute fields were subsequently populated by linking directly to the FIMS database (using the road number as the link field) and copying over other attribute values from FIMS.

---

1 BLM uses the terms "transportation network", "transportation system", and "transportation plan" synonymously throughout the administrative record. It collectively consists of a series of 1 inch=1 mile scale, published transportation plan maps and road attribute data currently stored in the Facility Asset Management System (FAMS) database. These terms do not refer to a published text document.

14.     Since 2001, the BLM has been updating its road datasets at multiple levels. In 2003, at the national level, the FIMS transportation data was moved into a new database called the Facility Asset Management System (FAMS) which now contains data on all of BLM's facilities, including roads and trails.  In 2005, the State Office BLM GIS staff updated the majority of the GTRN road lines and attributes for Lake and Harney Counties as part of the "Oregon All Roads" project which was funded by the State of Oregon. This update was based on routes visible on newer, 2005 rectified digital ortho-photography. (This data is also commonly referred to as digital ortho quads or DOQs.)  This effort relied on the field office to verify the accuracy of the updates.

15.     At about the same time, the Lakeview Resource Area, BLM staff initiated a comprehensive update of the GTRN data layer. This update process compared existing road lines within GTRN with recent (1994, 2000, 2003, 2005, and 2009) rectified DOQs of the Lakeview Resource Area. The DOQs and the road lines were viewed on a computer screen using GIS technology. BLM staff digitized many potential new road lines using the DOQs as a backdrop and a "heads-up" digitizing process. BLM staff also noted locations where existing road lines were not visible on the DOQ. The BLM then created field maps and went to the field to verify the presence, surface type, and overall condition of these routes. In addition, the field inventory was used to document the presence or absence of evidence of past mechanical maintenance or improvements. Photos were taken in various locations to supplement the photos provided by ONDA (AR 009965-001050). The field inventory results (surface type, evidence of construction or maintenance, and condition) were recorded on field maps or, in some cases, were collected using global positioning system (GPS) technology. This field data (both lines and attributes) were then used to update the GTRN dataset.

16.     The Washington Office has also commissioned a condition assessment study under contract for all roads in the BLM's transportation system (ie. FAMS database) with an assigned maintenance Level of 3, 4, or 5.  Between 2005 and 2008, approximately 60% of these roads in the Lakeview Resource Area had detailed condition assessments completed in the field and the results entered into the FAMS database.  As noted in a separate declaration by James Elvin, former District Engineer, maintenance level 3 roads in the Juniper Mountain area were assessed in 2006 and the data entered into FAMS in 2008.  The FAMS attribute data is automatically linked to the lines stored in GTRN on a weekly basis.

17.     All roads that are currently part of the Lakeview Resource Area BLM's transportation system have been entered into both the FAMS and GTRN datasets.  Those routes that are not currently designated as part of the transportation system are contained only in the GTRN dataset.

**CITIZEN WILDERNESS INVENTORY INFORMATION**

18.     In April 2005, the Oregon Natural Desert Association (ONDA) provided the BLM with an inventory report containing numerous proposed new wilderness areas, including the Juniper Mountain area, that was based on information their staff or members had collected in 2004 (AR 009728-010050).  The document also contained maps, photos, and photo logs. ONDA submitted a set of supplemental digital photos in 2007 for the Juniper Mountain area (AR 011085-011163).  However, it is important to note that ONDA's inventory information does not explain what criteria their staff used in making inventory unit boundary road determinations. While their findings are noted in their photo log, there is no explanation anywhere in the record as to how they arrived at their determination for a given route.

## BLM'S WILDERNESS INVENTORY UPDATE

**Current Wilderness Inventory Update Guidance**

19.    The BLM Wilderness Inventory ID Team followed draft state office wilderness inventory guidance during its 2008 Juniper Mountain wilderness inventory update (AR 011384-011406).   This guidance is substantively the same as current national inventory guidance described in WO IM No. 2011-154 (AR 015780-015781, 015782-015815, 015816-015819). The key factors of wilderness character (roadless area of suitable size, naturalness, outstanding opportunity for either solitude or primitive and unconfined recreation, and supplemental values) that were considered during BLM's wilderness inventory update for the Juniper Mountain area are identical to those identified by Congress in Section 2(c) of the Wilderness Act (16 U.S.C. § 1131(c)), the same as those considered during the first inventory (AR 000355-000358), and the same as those that must be considered under the current national guidance (AR 015785-015796, 015816-015819).

**Juniper Mountain Wilderness Inventory Update**

20.    The inventory update process that the BLM Wilderness Inventory ID Team followed is well-documented in the record (AR 011868-011875, 011573, 011571-011572, 011568, 011533-011534, 011532, 011378-011381, 011384-011406).  The Wilderness Inventory ID Team reviewed the resource data described above, as well as existing wilderness inventory information contained in the BLM's wilderness inventory files, previously published inventory findings, and ONDA's wilderness information (document, maps, photos, and photo log; AR 009728-010050 and 011085-011163), to determine if additional  information or data update was needed.  Field inventory and data updates were determined to be necessary.   In particular, BLM staff drove the roads in the area and took additional photos of field conditions to supplement the

photos provided by ONDA and made updates to the GTRN dataset prior to completing the

Juniper Mountain evaluation (AR 011871-011873).

**Inventory Unit Boundary Determination Process**

21.     At the beginning of the road determination process, the ID team identified

routes within and immediately outside of the evaluation area that, based upon field

knowledge and professional opinion, they believed would likely meet the wilderness road

criteria. An inter-disciplinary analysis was then conducted for each of these routes to

determine if they actually met these criteria. This analysis is documented in both ID team

meeting notes and in individual road analysis forms contained in the record (AR 011837-

011867, 011571-011572, 011573, 011568, 011533-011534, 011532, 011378-011381).

22.     The BLM ID team documented the presence or absence of mechanical improvement

by construction (paving, blading, gravel, roadside berms, and cut and fill), other improvements

(culverts, stream crossings, bridges, gates, cattle guards, drainage features, and barriers), and recent

maintenance on the road analysis forms based on recent field visits or professional knowledge of the

route. Some of these features are documented in the photos taken along a given route[2] (AR 011872).

23.     Routes that were determined to meet the wilderness inventory definition of a road

were used, along with developed rights-of-ways (associated with utility lines/corridors and major

highways), and non-federal ownership boundaries, to define the boundaries for inventory units that

---

2  The 2007 version of the draft Oregon inventory guidance did include a place on the Road Analysis Form to
document the presence of gates and cattle guards along a route as one of many possible types of mechanical
improvements (AR 010853).  While BLM no longer considers either gates or cattle guards to be evidence of
mechanical road improvements in its most recent national guidance (AR 015805), it was only one of many examples
of improvements considered at the time of the Juniper Mountain inventory.  The primary evidence of mechanical
improvements documented on all five routes in question was evidence of construction. The presence of cattle guards
are still considered when making a determination of whether or not a given route is ensuring regular and continuous
use, as cattle guards are only constructed on those routes where the amount of traffic is sufficient to cause problems
with people leaving gates open.

were subsequently evaluated for wilderness characteristics by the BLM wilderness ID team (AR

011872-011873).

**Wilderness Characteristics Evaluation**

24.    Following the determination of unit boundaries described in the preceding section, the
ID team then evaluated a given unit to determine if the area met all of the key factors of wilderness:

    a) Size - at least 5,000 contiguous roadless acres of public land.
    b) Naturalness - the imprint of man's work must be substantially unnoticeable.
    c) An outstanding opportunity for solitude or an outstanding opportunity for primitive and
    unconfined type of recreation must exist.

25.    The evaluation for each inventory unit is documented in both BLM wilderness ID

team meeting notes and in the  wilderness character Form 1 and 2 writeups (AR 011876-011914,

011837-011867, 011833-011836, 011645-011832).

## RESPONSES TO SPECIFIC CLAIMS RAISED IN MILLER DECLARATION

26.    For the remainder of this declaration, I would like to address numerous inaccuracies or

misinterpretations presented in Craig Miller's declaration, dated October 3, 2011, and submitted by

ONDA with its Motion for Summary Judgment and Memorandum in Support of Plaintiff's Motion

for Summary Judgment (Dkt. # 35).  Specifically, I will respond directly to various statements or

claims, generally responding to them in the order in which Mr. Miller laid them out in paragraphs

14, and 17-56 of his declaration.

27.    In his paragraph 14, Mr. Miller claims that ONDA revised its roadless area boundary

in 2007 (eliminating a seeded area) and submitted this to the BLM during the 2007 NEPA process.

ONDA provided comments on the 2007 EA via a letter dated April 6, 2007.  This letter did contain

some new wilderness information in the form of EA comments, additional photos, and photo point

maps (AR 010822-010833).  Mr. Miller also provided the BLM all of his 2007 photos sometime

after November 11, 2007 (the date stamped on the photos) (AR 011085-011163).  However, the

BLM has no record of ONDA or Mr. Miller revising their Juniper Mountain WSA proposal at any time.  Further, Mr. Miller does not cite any specific documents in the record, or provide any other documentation to support this claim.

28.    In his paragraphs 17-18, Mr. Miller claims that the BLM failed to study the environmental consequences of its Juniper Mountain/Horseshoe Meadow grazing plan on wilderness characteristics.   He believes that "if BLM would be required to comply with the law by reanalyzing . . . impacts to roadless areas and wilderness characteristics . . . on Juniper Mountain and Horseshoe Meadow, that more protections for . . . untrammeled wilderness would result".

29.    The record demonstrates that the BLM conducted its own detailed inter-disciplinary wilderness inventory update for the Juniper Mountain area, in accordance with the FLPMA and its wilderness inventory guidance, and did not find any land area where all of the key factors of wilderness character were present (AR 011868-011875, 011573, 011571-011572, 011568, 011533-011534, 011532, 011378-011381).  Since lands with wilderness characteristics were not found to be present within the project area, BLM did not analyze impacts to this resource within the 2010 EA document (AR 013478).  Neither the NEPA or CEQ/BLM regulations or guidance implementing the NEPA, require an agency address a resource value in a given NEPA analysis that is not present in the analysis area.  This principle has been affirmed by the Department of the Interior's Board of Land Appeals in *ONDA, Western Watersheds Project*, 173 IBLA 348, 353-54 (2008), which noted there is no existing statutory, regulatory, or policy requirement to analyze non-existent resources in a NEPA document.   However, the BLM did summarize and incorporate by reference its wilderness inventory findings and address the controversy regarding the presence of wilderness characteristics in the 2010 FONSI and EA (AR 013473, 013476-013478).  Further, while BLM did not find any lands with wilderness characteristics (areas where all key factors of wilderness character where

present, as described in paragraph 24 above), it did analyze impacts to natural character and

primitive recreation opportunities within the cumulative effects section of the 2010 EA, where it

found them to exist individually within the project area (AR 013541-013546). Finally, it is incorrect

for Mr. Miller to assume that analyzing impacts to any resource, including lands with wilderness

characteristics, would automatically result in "more protection" for that resource.  Section 201 of the

FLPMA states that "the preparation and maintenance of such inventory . . .  shall not, of itself,

change or prevent change of the management or use of the public lands".  Further, the NEPA is

purely a procedural statute that requires analyzing and disclosing of impacts of proposed Federal

actions.  It does not require a Federal agency protect any particular resource value.  In addition,

BLM's current wilderness characteristics policy requires BLM to "consider the wilderness

characteristics on public lands as part of its multiple-use mandate in developing and revising land

use plans and when making subsequent project level decisions.  In accordance with NEPA, BLM

Offices must *analyze the potential effects* of proposed actions and alternatives… on lands with

wilderness characteristics *when they are present*" (emphasis added).  This policy does not mandate

any particular protections be applied to lands with wilderness characteristics at either the project

planning or land use planning level (AR 015782-015783).

   30. In his paragraph 19, Mr. Miller claims that the BLM ignored or incorrectly

characterized ONDA's wilderness information.  Mr. Miller also states the BLM did not put any of its

(wilderness inventory) analyses, data, or responses to ONDA's inventory information in the EA

itself and this made it "very difficult to meaningfully participate in the NEPA process…".

   31. The record demonstrates that the BLM did not ignore ONDA's wilderness

information.  In fact, BLM considered this information when it updated its wilderness

characteristics inventory (AR 011871).  In particular, BLM considered ONDA's photos when

making its boundary road determinations (AR 011837, 011840, 011843, 011846, 011849, 011852,

011855, 011858, 011861, 011864, and 011867) and noted ONDA's wilderness information when

making its wilderness characteristic determinations for individual inventory units (AR 011878,

011880, 011881, 011886, 011887, 011888, 011889, 011895, 011897, 011898, 011903, 011905, and

011906).   Further, Mr. Miller and ONDA had numerous opportunities to participate in BLM's

wilderness inventory and NEPA processes for the Juniper Mountain area.  ONDA first provided its

complete wilderness inventory information to the BLM by letter dated April 1, 2005 (AR 009728),

approximately two months *after* the original EA was signed and put out for public comment in

February 2005 (AR 009532-009533).   ONDA also provided an extract of this inventory as part of

their March 31, 2005 comments on the 2005 EA (AR 009709-009727).  When BLM revised its EA

in 2007, it attached its wilderness inventory documentation as Appendix A directly to the EA (AR

010771-010807) and summarized its findings within the main body of the EA (AR 010737, 010745).

ONDA provided comments on BLM's wilderness inventory by letter dated April 6, 2007 (AR

010822-010833).

      32.     In 2008, BLM received and considered additional wilderness information provided by

a variety of public interests, including ONDA/Craig Miller (AR  011085-011163, 010827-010833,

009965-010050, 009853-009865), Jesse Laird (permittee) (AR 011495-011531, 011569), and A.K.

Majors (former BLM manager and consultant for permittee) (AR  011491-011493) during its 2008

wilderness inventory update process.

      33.     Specifically, the Road Analysis Forms document that BLM referenced, reviewed, and

considered all of ONDA's route photos, along with its own photos, and photos provided by Jesse

Laird, during the BLM's boundary road determination process (AR 011837, 011838, 011840,

011843, 011846, 011849, 011852, 011855, 011856, 011858, 011861, 011864, and 011865).  Map 1

attached to the Road Analysis Forms documents the location of all photo points and photos

considered during the road determination process, including those provided by ONDA (AR 011867).

BLM's Wilderness Inventory documentation also references, summarizes, and documents

consideration of ONDA's inventory report information for the Juniper Mountain area (AR 011878,

011880-011881, 011886-011889, 011895, 011897-011898, 011903, and 011905-011906).

  34. Upon completion, BLM provided copies of its 2008 wilderness inventory

documentation directly to ONDA and the permittee (AR 012081, 012082).  BLM also posted its

inventory documentation for public viewing on its webpage at

http://www.blm.gov/or/districts/lakeview/plans/inventas.php. ONDA provided additional

comments on BLM's wilderness inventory as part of its review of the 2009 EA (AR 012856-

012862).

  35. BLM addressed the controversy regarding the presence/absence of wilderness

character within the 2010 FONSI and EA (AR 013473, 013476-013478).  Further, both ONDA and

BLM wilderness inventory documentation were summarized and incorporated by reference into the

2010 EA itself (AR 013477-013478).  BLM's 2008 NEPA Handbook encourages incorporation of

such voluminous information by reference, "to reduce paperwork and redundant analysis in the

NEPA process . . . .  Incorporation by reference allows you to briefly summarize the relevant

portions of these other documents rather than repeat them".  CEQ regulations also direct that,

"agencies shall incorporate material into an environmental impact statement by reference when the

effect will be to cut down on bulk without impeding agency and public review of the action" (AR

011204-011205).  BLM employed this method in the preparation of its 2007, 2009, and 2010

versions of the EA.  CEQ regulations also state that a NEPA document should be "analytic rather

than encyclopedic" and should only briefly discuss issues other than significant ones (40 C.F.R.

Sections 1500.4(b) and (c)).  Other CEQ guidance states that an agency should "identify and eliminate from detailed study the issues which are not significant . . ., narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere" (40 C.F.R. Section 1501.7(3)).

36.     Mr. Miller appears to confuse BLM's responsibilities to analyze and disclose potential impacts of Federal actions under NEPA with its responsibility to maintain an updated inventory of resource values on public lands under Section 201 of the FLPMA.  The record demonstrates that BLM updated its wilderness inventory as required by the FLPMA, but found no lands with wilderness characteristics to be present in the area.  As stated previously in paragraph 29, the NEPA does not require a Federal agency consider issues or resources that are not present in the analysis area.

37.     In his paragraph 20, Mr. Miller states that the BLM never addressed ONDA's wilderness comments in the EA.  Neither the NEPA, nor CEQ/BLM regulations and guidance related to implementing the NEPA require that a response to comments be contained within the body of an EA.  The 2008 BLM NEPA Handbook gives BLM flexibility in how it addresses public comments.  It states that "the requirements for BLM responses to comments differ between EAs and EISs…. You may respond to substantive, timely comments in the EA or in the decision record.  If a substantive and timely comment does not lead to changes in the EA or decision, you may reply directly to the commenter…" (AR 011244).   The 2010 EA included a summary of public comments (AR 013476-013478).  Further, the BLM responded to all of ONDA's comments on the EA as part of the BLM's proposed decision (AR 013568-013587), in a manner consistent with the NEPA handbook direction.

38.     In his paragraph 21, Mr. Miller states that the BLM claims that wilderness character does not exist in the project area are based on ONDA's 2005 and 2007 inventory information, previous BLM inventory information from 1979 and 1980, field visits in 2005 and 2006, and current GIS datasets.

39.     While it is true that BLM's inventory did not find lands with wilderness characteristics to be present in the area, Mr. Miller does not adequately summarize or characterize the wilderness inventory process that BLM actually followed.  The Wilderness Inventory ID Team followed draft BLM Oregon/Washington State Office inventory guidance during its 2008 wilderness inventory update (AR 011384-011406).   The inventory update process itself is documented extensively in the record (AR 011868-011875, 011573, 011571-011572, 011568, 011533-011534, 011532, 011378-011381).

40.     Mr. Miller's statement that "BLM used flawed criteria to evaluate the routes" in the area inaccurately interprets BLM's wilderness inventory guidance related to the inventory boundary road determination process.  Further, he provides no citations to the record to support this claim.  He does elaborate on this claim later in his declaration as it relates to five specific road determinations that he questions.  For this reason, I will address this claim more specifically later in this declaration.

41.     In his paragraph 22, Mr. Miller states that ONDA offered "new information" to clarify the inadequacy of BLM's environmental analysis.  Further, he states that BLM's refusal to agree with ONDA that its Juniper Mountain proposed wilderness area is a single, roadless unit "jeopardizes the wilderness character of this large, roadless area".  Mr. Miller further states the project will impair and cause irreparable harm to wilderness values.   These statements represent his personal opinions about the presence of wilderness characteristics within the project area.  Further, Mr. Miller fails to cite any specific "new information" from the record to support these statements.

42.    The record demonstrates that the BLM did not find any lands with wilderness characteristics to be present in the project area and, therefore, properly determined that there would be no impacts, impairment, or harm to wilderness values as a whole (AR 013477-013478, 011876-011914, and 011837-011867).  However, the BLM did address impacts to natural quality and primitive recreation opportunities, where it found them to individually exist in the area, within the cumulative effects section of the 2010 EA, and found them to be insignificant (AR 013541-013546).

43.    In his paragraph 23, Mr. Miller claims that BLM's wilderness inventory is flawed because BLM misidentified routes as roads instead of ways.  Mr. Miller fails to cite any specific documentation from the record to support this claim.  He does elaborate on this claim later in his declaration in regards to five specific road determinations that he questions.  For this reason, I will address this claim more specifically later in this declaration.

44.    In his paragraphs 24-26, Mr. Miller states that BLM identified five small inventory units.  He then claims that if BLM had identified a larger roadless unit similar to ONDA's proposed 67,523-acre Juniper Mountain proposal, it would have found wilderness character to be present. He further states that it is a basic tenet of wilderness analysis, that the larger the roadless area, the more likely it will possess outstanding (primitive recreation or solitude) characteristics.

45.    BLM actually identified a total of six (6) inventory units in the area: four (4) units that met the minimum size criteria (Gray's Butte, Juniper Mountain, Eagle Butte, Natural Corral Draw), and two (2) units that failed to meet the minimum size criteria (Sherlock Gulch North and Sherlock Gulch South) (AR 011876-011914). The four units that met the size criteria were very similar to the four units identified and evaluated during the Section 603 inventory completed in 1980 (000481-000483, 000488-000489, 000872).   The BLM determined that ONDA's Juniper Mountain proposal was not a single, large roadless area (AR 013477-013478, 011876-011914, and 011837-011867) and

therefore, any claims regarding what BLM would have found if actual ground conditions were different, is entirely speculative.

46.    In his paragraph 27, Mr. Miller states that BLM determined that five (5) specific routes are inventory unit boundary roads.  This statement is accurate; BLM documented these determinations on a series of Road Analysis Forms (AR 011840-00842, 011846-011857, and 011867) and did not include these forms in the 2010 EA, FONSI, or proposed decision.  Nor was BLM required to include these forms in any of the aforementioned documents.  I also need to clarify that the BLM currently refers to the routes in question as BLM Roads 7155-00 segment 0 (Sagebrush Knoll), 7155-00 segment 1 (Sagebrush Knoll), 7155-A0 (Clark Cow Camp), 7155-C0 (East Sherlock), and 6165-C0 (Eagle Butte).

47.    In his paragraph 28, Mr. Miller claims that "the record does not support BLM's road determinations for any of the five routes . . . because BLM fails to provide any documentary proof showing how and when mechanical improvements took place. . . .  In addition, the factors which BLM did consider . . . are not, according to the Department of Interior's own rules, determinative when classifying a route for wilderness inventory purposes."  These claims misrepresent what the inventory record demonstrates, or what BLM's wilderness inventory guidance requires.  Further, Mr. Miller fails to cite any specific documentation from the record to support his claim that BLM failed to provide "documentary proof" of mechanical improvements.  He does elaborate on these claims later in his declaration with regards to the five specific road determinations which he questions.  For this reason, I will address most of these claims in further detail later in this declaration.  However, I will respond directly to his claim of failing to provide documentary proof of mechanical improvements here.

48.    It is generally true that the BLM does not have any documentation describing specifically *when* or how recently these five roads were mechanically constructed or last maintained. However, all five were found to meet the inventory boundary road definition in 1980, which indicates that the BLM staff conducting the inventory had evidence that the five roads in question had been mechanically constructed, improved, or maintained prior to that point in time (AR 000481-000483, 000488-000489, and 000872).  Further, the five Road Analysis Forms, all available (ONDA, BLM, and Laird) photos, and BLM's Photo Log all provide documentation, based on the field inventories conducted by BLM personnel between 2005-2008, that evidence of past mechanical construction, improvement, or maintenance is still present on the ground for all five roads (AR 011645-011814, 011833-011836, 011840-011841, 011846-011847, 011849-011850, 011852-011853, 011855-011856, 011499-011531, 011085-011163, and 009965-010045).  During the road field inventory portion of the wilderness inventory update process, BLM staff drove these five routes, took additional photographs, and made notations on field maps regarding field evidence of mechanical construction, improvement, or maintenance.  Specifically, the evidences of mechanical improvement or maintenance that the field staff were looking for included  such things as paving, construction by blading by either a grader or bull dozer, roadside berms, imported gravel or fill material, and cut and fill sections.  Other evidence of improvements that the BLM looked in the field included such things as culverts, stream crossings, bridges, gates, cattle guards[2], drainage features, barriers, and road signs (AR 011872).   The field notations were then used to update the GTRN, where needed.

49.    Further, written comments provided by A.K. Majors during the inventory process also documented  mechanical maintenance on portions of Road 7155-00 segment 0 (7155-00-00) and Road 7155-A0 (7155-0-1A) that he was personally aware of during the late 1960's and mid-1970's

20

when he was a BLM Field Manager stationed in Lakeview (AR 011847, 011853, and 011491-011492).  Maintenance was also documented for Road 7155-C0 (7155-0-1C) sometime after 1980 (AR 011856).  The claims made by Mr. Miller here and later in paragraphs 30-50 of his declaration demonstrate that he either does not understand how to properly interpret the field evidence or what the photos actually show regarding evidence of mechanical construction, improvement, or maintenance or he discounts this evidence.   I will address more specifically how the photos for a given route document evidence of past mechanical construction or improvement later in this declaration.

50.     In his paragraph 29, Mr. Miller states that all 5 routes have user-created "drive-arounds" because they are not passable.  Further, "braided" vehicle tracks are present.  These statements misinterpret the photo and field evidence.  Further, Mr. Miller fails to cite any specific documentation from the record to support this claim.  He does elaborate on these claims later in in paragraphs 30-50 of his declaration.  For this reason, I will address these claims in more detail in the remainder of my declaration.

### Road 7155-00 Segment 1

51.     In his paragraph 30, Mr. Miller states route 7155-0-1 has been renamed as 7155-00. In fact, all road numbers within the Lakeview Resource Area, BLM have changed from a 7 or 8-digit number separated by hyphens (eg. 6162-0-00) to a 6-digit numbering protocol (eg. 6162-00), where the first 4 digits represents the main road number and the last 2 digits represent the spur number, if applicable.  (The remainder of the BLM District offices in eastern Oregon are currently transitioning their GTRN and FAMS databases to this same consistent numbering protocol).

52.     The road shown as 7155-0-1 (Sagebrush Knoll) on most maps contained in the record, was renumbered within both BLM's GTRN and FAMS databases after 2009 to make both datasets

consistent with BLM's current road segmentation and numbering protocols for eastern Oregon.  To avoid confusion, I will reference both the old and updated road numbers in my responses.  It should be noted that there are actually two distinct segments to Road 7155-00 (Sagebrush Knoll).  These segments are stored as separate records in FAMS and are documented on two separate Road Analysis Forms.  I will refer to this specific road segment as BLM Road 7155-00, segment 1 (7155-0-1) throughout.

53.    In his paragraph 31 (and again briefly in his paragraph 36), Mr. Miller claims that both ONDA and BLM photographs document user-created drive-arounds and multiple tire channels on this road.  As an example, Mr. Miller cites BLM photo 2613.S (AR 011657; which is also attached to Miller's declaration as Page 1 of Attachment 4).  Mr. Miller errs in his photo interpretation.   This photo does not show a "user-created drive-around" at an impassable section.  The photo clearly shows that there is no obstacle in the roadbed, such as large rocks or a large depression that might hold water in the spring, which would cause a driver to need to go off of the road in this location.  In fact, the roadbed in this location is not impassable. What the photo does show is a well-defined single-track *cattle trail* crossing (as evidenced by livestock footprints) creating a disturbed area to the left of the roadbed. Livestock are known to walk along existing roads as it provides easier access to water and forage compared to cross-country travel. As further evidence that this is not a "drive-around", there are two large boulders in the middle of this disturbed area that no vehicle could possibly traverse over (see Attachment 1 with explanatory inserts).  Attachment 2 shows the 2005 aerial photo of this exact location (also referred to as a digital orthophoto quad (DOQ) elsewhere in the record).  If vehicles were driving off-road in this location, it would be readily visible on the aerial photo.  In fact, no drive-arounds are visible from this aerial view.

54.    The Road Analysis Form for Road 7155-00, segment 1 (7155-0-1) documents numerous photo points along this road where photos were taken (by BLM and other parties) and subsequently examined by the Wilderness Inventory ID Team (AR 011849 and 011867).  Both ONDA and BLM's photos are also documented further in separate photo logs (AR 009859-009863, 011833-011836).   Based on the field inventory, photo review, and professional knowledge of the road, the Wilderness Inventory ID Team determined "there is some evidence of past (mechanical) road construction, primarily blading with a bulldozer through tall sagebrush, small berms, and shallow ditches in some sections of the route" (AR 011849-011851).

55.    Past mechanical improvement by blading through sagebrush vegetation, which included the removal of most sagebrush, is particularly evident in photos 2609.S, 261O.N, 2612.N, 2613.S, 2614.N, 2616.N, 2617.S, 2618.N, 2619.N, 2620.SE, 2622.N, 2623.S, 2624.S, 2625.N, 2626.S, 2628.S, 2629.N, 2630.S, 2631.N, 2633.E, JPMT20071112_045, JPMT20071112_041, JPMT20071112_037, JPMT20071112_020, JPMT20071112_017, JPMT20071112_016, CQ035, CQ037, and CQ038 (AR 011653, 011654, 011656, 011657, 011658, 011660, 011661, 001662, 011663, 011664, 011666, 011667, 011668, 011669, 011670, 011672, 011673, 011674, 011675, 011677, 011129, 011125, 011121, 011104, 011101, 011100, 009997, 009999, and 010001).   Past mechanical improvement by blading, in the form of small rock or dirt berms pushed alongside the roadbed as the blade passed, is also evident in photos 2615.S, 2618.N, 2624.S, and 2625.N (AR 011659, 001662, 011668, and 011669).

56.    In his paragraph 32, Mr. Miller states that the (2005) aerial photo documents "braided road channels" along this road.  He cites two specific examples and provides attachments (Aerial Photo 1 and Aerial Photo 2 of Attachment 4).   Mr. Miller errs in his aerial photo interpretations.

57.    The 2005 Aerial Photo 1  in the location portrayed on page 2 of his Attachment 4, does show an obvious, well-traveled road, and a faint, parallel route segment located just a few feet to the north and west.   What Mr. Miller labels as the "current user-created route" on his map is actually showing a mechanically relocated or reconstructed portion of the Road 7155-00 segment 1 (7155-0-1) running parallel to an older, abandoned section of roadbed.  It is not a "user-created route".

58.    While the yellow dashed line labeled "official GTRN Route" does not line up spatially in the exact location where the current roadbed is shown on the 2005 aerial photo, there are numerous technical reasons that can account for this.  As noted in paragraph 13, the original road lines were digitized by the USGS from published, 1:24000 scale topographic maps.  The maps for the Sagebrush Knoll and Juniper Mountain quadrangles (quads) specifically were published in 1984, but were based on 1974 and 1980 vintage aerial images (based on information stated within the legends for these published maps).  These maps meet national mapping accuracy standards of plus or minus 40 feet.  The digitizing process can introduce registration and digitizing error on top of the original mapping error.  While the 2005 digital orthophoto quad may be more spatially accurate than the source materials used to generate the USGS road lines, there is still error associated with registering and rectifying the image to a real-world coordinate system.  These errors all contribute to the failure of the digital road line to align spatially with the road as shown on the aerial photo.

59.    The 2005 Aerial Photo 2 in the location portrayed on page 3 of his Attachment 4, shows an obvious, well-travelled road with a short, faint parallel route segment located a few feet to the east.  Both parallel routes are also evident on the 1982 NHAP photo (#57-180) of this same area, (Attachment 3) which indicates that the relocated roadbed existed very near the time of the original inventory was completed in 1980, if not before. What Mr. Miller labeled here as the yellow dashed

"Official GTRN Route" on his map is actually showing a mechanically relocated or reconstructed

portion of the Road 7155-00 segment 1 (7155-0-1).  What Mr. Miller labeled as a "Braided User-

Created Route" is actually the old, abandoned roadbed.

60.     In his paragraph 33, Mr. Miller claims that numerous ground photos in the record

(which he includes in his Attachment 4) demonstrate that the road has "braided or drive-around

wheel channels".  He then states this situation is identical to a Burns District BLM case (OR-020-09-

06) where the Office of Hearings and Appeals (OHA) granted a stay because of a question regarding

whether or not a specific route met the wilderness inventory definition of a road.  Mr. Miller makes

substantial errors here in his legal comparisons and photo interpretations.

61.     In fact, all of the ground road photos that Mr. Miller cites and includes as pages 1, 4-6,

and 8 of Attachment 4 to his declaration show a defined, single-track *cattle trail* either crossing or

paralleling the roadbed.  These are not wheel tracks.  Livestock are known to walk along existing

roads, as they provide easier access to water and forage compared to cross-country travel.  Hoof

prints are evident in some of these same photos.  In addition, the photo included as page 7 to his

Attachment 4 shows no evidence of any parallel tracks of any kind.  For these reasons, this situation

is not similar or identical to the circumstances found on the Burns District BLM and the legal

decision (granting a stay) rendered there has no relevance to BLM's wilderness road determination

for Road 7155-00 segment 1 (7155-0-1).

62.     In his paragraph 34, Mr. Miller states that  BLM's road determination for Road 7155-

00 (7155-0-1) includes other "flaws", namely including discussions related to the route's purpose,

discussion of data included in the BLM's transportation plan, and statements such as "some

evidence" of past construction, little or no evidence of modern day improvements or maintenance,

and "speculative" future maintenance.   Mr. Miller does not provide any direct support for these

claims in this section of his declaration.  He does expound further on these claims in paragraphs 35-

39 of his declaration.  It is apparent from claims made later in paragraphs 35-50 of his declaration

that Mr. Miller disagrees with the wilderness inventory guidance that BLM followed during its

wilderness inventory update process (AR 010834-010854).

63.    In his paragraph 35, Mr. Miller describes what appears to be an inconsistency in the

surface condition rating that he claims appeared in a September 29, 2008 version of the FAMS

database as "poor".  He then claims that the BLM changed the FAMS surface condition rating to

"good" sometime prior to July 6, 2011, without any type of documented maintenance.

64.    Mr. Miller is correct in noting that the FAMS *surface condition* attribute value in 2011

is listed as "good".   However, according to a separate declaration provided by James Elvin, who

was the District Engineer between 2007 and 2011, the *surface condition* attribute value for this road

is internally calculated by the FAMS software.  The route *surface condition* was rated as "good"

both prior to, and after the contractor completed updates to the FAMS database in 2008.   However,

this claim is irrelevant because the BLM did not use or even reference the FAMS *surface condition*

rating at all during its wilderness road determination process.

65.    As noted in paragraph 16, the road condition assessment work that was conducted by a

contractor in 2006 that ultimately led to updates to FAMS in 2008, is different and separate from the

BLM wilderness road inventory conducted by Lakeview Resource Area BLM staff.    Nowhere in

the record does the BLM state that its assessment of route condition was based on the FAMS *surface

condition* attribute value.  The only place where route condition is addressed at all is under Section

VII. B. of the Road Analysis Form where it asks, "if the route is in good condition, but there is no

evidence of maintenance, would mechanical maintenance with hand tools or machines be approved

by BLM in the event this route became impassable?"  According to the current wilderness inventory

26

guidance, "good condition" within the wilderness inventory context, is defined as "a condition that ensures regular and continuous use *relative to the purposes of the route"* (emphasis added). This definition takes into consideration "whether the route can be clearly followed in the field over its entire course and whether all or any portion of the route contains any impediments to travel" (AR 015805). The BLM documented that the current condition of Road 7155-00 segment 1 (7155-00-1) "is rough in places, but it is still passable by two-wheel drive, high-clearance vehicle along its entire length" (AR 011850). The Wilderness Inventory ID Team's assessment of road condition was based on the field inventory, review of all available photos, and staff field knowledge. Specifically, the record notes that BLM staff "went to the field to verify the presence, surface type, and *overall condition* (emphasis added) of each route" (AR 011871). In this case, the Wilderness Inventory ID Team determined that the route ensured relatively regular and continuous use (AR 011850-011851). It is easy to see how one could confuse this terminology, but the fact remains that the BLM did not consider or utilize the FAMS *surface condition* rating during its road determination process, as Mr. Miller claims. To the extent it is even relevant, Mr. Miller provides no actual evidence that demonstrates that the BLM changed the road's surface condition rating within the FAMS database between 2008 and 2011.

66. In his paragraph 36, Mr. Miller states that BLM has no maintenance records for this road and claims there is no documentation that indicates blading, drainage ditches, or rock removal has occurred either recently or in the distant past. He also claims that the presence of a gate and road sign are not evidence of improvements and the photographs demonstrate that portions are too rough to navigate and people must drive around these areas.

67. BLM's long-standing wilderness inventory road definition states that roads are routes "which have been improved and maintained by mechanical means to insure relatively regular and continuous use" (AR 000349, 011393-011394, 015803, 015794-015795). The definition of a road is

further distinguished from a "way" or primitive, unmaintained route by the statement that "a way maintained solely by the passage of vehicles does not constitute a road" (AR 011393, 015794, 015803).   It is not necessary to determine exactly when mechanical improvement or maintenance actions occurred, as this road definition makes no such distinctions.   The BLM determined that this route was an inventory unit boundary road in 1980, which indicates that evidence of mechanical improvement was present at that time (AR 000482, 000488, 000489, 000872).  As noted previously in paragraphs 54-55, the majority of the photos taken along this road demonstrate evidence of past mechanical improvement, in the form of construction by blading.  Further, the Wilderness Inventory ID Team determined, based on the field inventory, professional knowledge of the road, and evaluation of all of the available photos that "there is some evidence of past (mechanical) road construction, primarily blading with a bulldozer through tall sagebrush, small berms, and shallow ditches in some sections of the route" (AR 011849-011851).

68.    Mr. Miller makes other substantial errors in his ground and aerial photo interpretations for this road.  As detailed in my responses in paragraphs 53-59 above, the ground and aerial photographs which Mr. Miller also included as Attachment 4 to his declaration, document the presence of single-track cattle trails or old, abandoned roadbed segments, and do not show "user-created drive around" segments.

69.    The 2007 version of the draft Oregon inventory guidance did include a place to document the presence of gates along a route as one of many possible types of improvements on the Road Analysis Form (AR 010853).  While BLM no longer considers gates to be evidence of mechanical improvements in its most recent national guidance (AR 015805), it was only one of many evidences of improvement considered in the Juniper Mountain inventory[2].  Further, the BLM did not rely on this one criterion all by itself in making its road determination.  Other

28

evidences of mechanical improvements were documented along this road, most notably mechanical construction by blading (AR 011849-011850).  BLM also contests Mr. Miller's claim that road signs do not represent evidence of mechanical improvements.  Road signs are installed specifically to give travelers on the road an idea of where they are at on the ground.  These signs are directly associated with the road and would not be needed or installed if the road were not there.

70.    While it is true that the BLM has no maintenance records for this road (AR 011850), a lack of either recent or regular maintenance does not automatically disqualify a route from meeting the BLM's wilderness inventory road definition.  Within the road definition, the term "maintained" is further clarified in that it "does not necessarily mean annual maintenance" (AR 011394).  Additional clarification regarding the definition of "maintenance" is provided by the statement that "roads need not be 'maintained' on a regular basis, but rather 'maintained' when road conditions warrant actions to keep it in a useable condition" (AR 011393-011394, 015794).  In the Organic Act Directive 78-61, Change 2, it states that a route that has been improved to ensure relatively regular and continuous use, but has not yet required maintenance, is a road (AR 000387).  These clarifications make it clear that maintenance does not need to occur annually, recently, or even regularly, but only often enough "to ensure relatively regular and continuous use" or "when road conditions warrant actions to keep it in a useable condition".  The Interior Board of Land Appeals (IBLA) has also weighed in on the maintenance requirements of the BLM's road definition.  In *Sierra Club et al.* the appellants argued that the blading of a route which thereafter is in regular and continuous use is insufficient to qualify as a road.  This appears to be a similar argument as that put forth by Mr. Miller.  In that case the IBLA found that " a route that was created and maintained solely by the passage of vehicles cannot qualify as a road".  The IBLA also found that "a route, or a segment of a route which was mechanically improved to

permit the passage of vehicles, but which to date *has not needed further mechanical*

*improvement or maintenance to facilitate the regular and continuous passage of vehicles*

(emphasis added), is also a road.  To hold otherwise would be to say that once a road has been

mechanically improved, in order to thereafter continue its status as such it must receive

mechanical maintenance whether it needs it or not – a ludicrous, impractical, and thoroughly

unreasonable and unrealistic contortion of the accepted definition" (62 IBLA 370).   Once

evidence of mechanical improvement has been documented, the key question that must then be

answered is whether or not the route currently ensures relatively regular and continuous use.  In

this instance, the BLM Wilderness Inventory ID Team determined that this route does not

currently require maintenance to meet the relatively regular and continuous use standard (AR

011850-011851).   I will discuss the definition of the term "relatively regular and continuous use"

further in my responses which follow.

71.    In his paragraph 37, Mr. Miller states that a route's "purpose" should not be a factor

considered in making road determinations.  He cites to Organic Act Directive 78-61 in support of his

claim. He further states that "the only question is whether the route has been improved or maintained

by mechanical means to ensure relatively regular and continuous use".

72.    The Organic Act Directive 78-61, Change 2, states that "the purpose of a route is not

a factor to consider in determining whether a route is . . . a road", the directive goes on to state that

"if a route has been improved and maintained by mechanical means to insure relatively regular and

continuous use, it is a road, regardless of the purpose of that use" (AR 000387).  So I would agree

with Mr. Miller that the main question that the BLM must address is whether "the route has been

improved or maintained by mechanical means to ensure relatively regular and continuous use".  The

draft wilderness inventory guidance that the BLM followed during its 2008 wilderness inventory of

the Juniper Mountain area included a place on the Road Analysis Form to describe the route's

purpose specifically to provide the overall context for making a determination as to whether or not a given route ensures relatively regular and continuous use (AR 011403).   The term "relatively regular and continuous use" is defined as "vehicular use that has occurred and will continue to occur on a relatively regular basis. Examples are: access roads for equipment to maintain a stock water tank or other established water sources; access roads to maintained recreation sites or facilities; or access roads to mining claims"  (AR 011393-011394, 015794).   Thus, a route's purpose is directly relevant to the process of determining if a given route meets the standard of ensuring relatively regular and continuous use.  As a practical matter, it would have been less confusing if this discussion had been located directly under the "Regular and Continuous Use" section of the form to better demonstrate this relationship.

73.    That approach is completely consistent with the BLM's current national wilderness inventory guidance which now places the discussion of route purpose under a heading called "Route Context" to better articulate what the BLM is trying to document (AR 015803).  Further, this guidance clarifies this intent by stating that "the purpose of a route is not a deciding factor in determining whether a route is a road for wilderness characteristics inventory purposes. The purpose of a route does provide context for factors on which such a determination may be based, particularly the question of whether maintenance of the route ensures relatively regular and continuous use. The purpose also helps to determine whether maintenance that may so far have been unnecessary to ensure such use would be approved by BLM when the need arises" (AR 015795, 015804).  The draft state office wilderness inventory guidance that BLM followed during its inventory update for the Juniper Mountain area was reviewed and found to be substantially similar to the current national wilderness inventory guidance regarding the use of route purpose (AR 015816-015817, 011403, 015795, 015803, 015804).

74.    In his paragraphs 38 and 39, Mr.  Miller states that "speculation about future maintenance" should not be a factor in making road determinations.  He also claims that whether or

not a route is "passable" should not be a factor in making road determinations.  He elaborates that a route must be mechanically improved or maintained to ensure relatively regular and continuous use – *not merely by specialized farm vehicles or BLM high clearance vehicles, but by ordinary vehicles driven by the general public*" (emphasis added).  He claims that this is a higher standard than a road being "passable".  Further, he states that road maintenance levels, as assigned in a transportation plan, should not be a factor in making road determinations.

75.    Mr. Miller's interpretations of the "relatively regular and continuous use" standard do not conform with BLM's long-standing definition for use of this term.  In the Organic Act Directive 78-61, Change 2, it states that "improvements and relatively regular and continuous use would be an indication that the road would be maintained if the need were to arise" (AR 000387).  Further, the IBLA found that "a route, or a segment of a route which was mechanically improved to *permit the passage of vehicles*, but which to date has not needed further mechanical improvement or maintenance to facilitate the regular and continuous *passage of vehicles*, is also a road (emphasis added)" (62 IBLA 370).  BLM's current national wilderness inventory guidance states that "a route, or a segment of a route, which was mechanically improved to permit the *passage of vehicles*, but which to date has not needed any further mechanical improvement or maintenance to facilitate the relatively regular and continuous *passage of vehicles*, can be a road in those circumstances where the *road would be maintained if the need were to arise* (emphasis added) (AR 015794).  Based on this guidance, a discussion within the Road Analysis Form as to whether or not a route is "passable by vehicles" or "passable" along with a statement of BLM's intent to maintain this road should the need arise is, in fact, relevant to making a road determination.

76.    As explained in paragraphs 67, 70, 74-75 above, a route that has been mechanically improved does not need to be maintained annually, recently, or even on a regular basis to meet the

definition of a road.  It must only be "maintained when road conditions warrant actions to keep it in a *useable condition*" (emphasis added) (AR 011393-011394, 015794).   Another way of stating this would be a route that has been mechanically improved only needs to be maintained often enough or when "warranted" to "ensure relatively regular and continuous use" to continue to meet the definition of a road.  As noted previously, the term "relatively regular and continuous use" is defined as "vehicular use that has occurred and will continue to occur on a relatively regular basis" (AR 011393-011394, and 015794).  This definition includes some examples of roads that may exist to serve certain purposes or types of uses, but provides no clarification of the terms "vehicle use" and "relatively regular basis".  This is where the discussion of maintenance level can be useful or relevant to the road determination process.

      77.    Road maintenance levels help describe the type of vehicle or vehicle use for which the road is constructed and maintained to accommodate.  BLM Road 7155-00 segment 1 (7155-0-1) has an assigned maintenance level of 2 (AR 011850).  The following maintenance level definition comes from the BLM's Ground Transportation Edit Guide and Data Dictionary: Maintenance Level 2 "is assigned to roads where the management objectives require the road to be opened for limited administrative traffic.  Typically, these roads are passable by high clearance vehicles" (AR 015992-015993).

      78.    Mr. Miller's claim that (maintenance) "level 2 roads are not maintained to ensure relatively regular and continuous use, but rather are 'spot' maintained," incorrectly assumes these terms are mutually exclusive.  While it is true that the BLM typically maintains just the "spots" or segments on these roads that have become "impassable", this is typically all that is needed to keep such roads passable or useable by high-clearance vehicles throughout and, therefore, ensure relatively regular and continuous use.  In other words, BLM does not expend road maintenance crew

time and tax-payer expense maintaining segments of roads that do not currently need it.   As the

IBLA found  "to say that once a road has been mechanically improved, in order to thereafter

continue its status as such it must receive mechanical maintenance whether it needs it or not – (is) a

ludicrous, impractical, and thoroughly unreasonable and unrealistic contortion of the accepted

definition" (62 IBLA 370).

79.    Mr. Miller interprets relatively regular and continuous use as being limited to

"ordinary vehicles driven by the general public".   While he does not clarify exactly what he means

by this, or provide any citations in support of his interpretation, he believes it is something other than

"specialized farm vehicles or BLM high clearance vehicles".  Presumably, his interpretation is that a

route must be passable by low clearance or passenger vehicles.  However, there is no such language

in BLM's long-standing road definition to support such an interpretation.  In making its road

determination, BLM does not discuss "specialized farm vehicles" at all.  While the BLM did

document that this road is passable by both a moderate-sized stock truck and an 18-wheel semi-truck

(AR 011501-011503, 011510-011511, 011525-011531), the vehicle use that the BLM typically

documented in the area is actually referring to use by a two-wheel drive pickup truck (AR 009965,

011504-011505, 011507-011508, 011521, 011523, and 011701) that is, in fact, commonly driven by

the general public.

80.    All of the photos for this route (as referenced in AR 011849) demonstrate that the

entire road is currently passable or useable by high-clearance vehicles, and in fact is receiving such

vehicle use in its current condition.  This is the conclusion reached by the BLM Wilderness

Inventory ID Team (AR 011850-011851). Thus, BLM has met its burden of documenting that this

road currently ensures use on a relatively regular and continuous basis.

34

## Road 7155-A0

81.     In his paragraph 40, Mr. Miller states that BLM's road determination for Road 7155-A0 (Clark Cow Camp/7155-0-1A) suffers from many of the same flaws as Road 7155-00 segment 0 (7155-0-1) including: evidence of braided tire channels, unfounded reliance on the route's purpose, and inclusion in BLM's transportation plan, claims of construction, little evidence of modern day improvement or maintenance, speculative future maintenance, and a condition class rating of "good" in FAMS.  Mr. Miller does not provide any direct support for these claims in this section of his declaration.  He does expound further in his paragraphs 41-43.  I will respond to these specific claims further in my responses in paragraphs 83-92, which follow.

82.     In his paragraph 41, Mr. Miller claims that none of the photos show evidence of "*current* (emphasis added) mechanical maintenance or improvement that would ensure regular and continuous use".  Mr. Miller merely disagrees with BLM's photo interpretations.

83.     BLM's Road Analysis Form and Photo Log document numerous photo points along this road where photos were taken (by BLM and other parties) and subsequently examined by the Wilderness Inventory ID Team (AR 011852, 011833-011836, and 0118867).  Based on the field inventory, photo review, and professional knowledge of the road, the Wilderness Inventory ID Team determined that the route was bladed with a bulldozer at some point in the past. Additional evidence of mechanical improvements include some drainage features, as noted in the GTRN natural improved (graded and drained) surface type description.  A bulldozer and pull type grader was used on the southern portion of this route in the late 1960's. Minor maintenance was conducted on short portions of this route between 1968 and the mid-1970's (Memo from AK. Majors dated July 26, 2008) (AR 011853).

84.    Past mechanical improvement or maintenance by blading is evident in the form of sagebrush removal from the roadbed surface and/or small rock or dirt berms alongside the roadbed in photos 2601.S, 2602.N, 2603.S, 2604.N, 2605.S, 2606.N, 2607.S, 2608.N, 261O.N, IMG_0619, IMG_0631, JPMT20071112_049, JPMT20071112_048, JPMT20071112_046, CQ005, EX004, EX007, BJ3, BJ4, BJ5, and BJ6 (AR 011645-011652, 011654, 011710, 011712, 011132-011133, 011130, 009969, 010018 010020, 010023, 011503-011506).

85.    As I discussed for Road 7155-00 Segment 1 (7155-0-1) in paragraphs 67, 70, and 74-75 above, Mr. Miller errs in his interpretation of the frequency of maintenance required under BLM's long-standing road definition.  While it is true that the BLM has no recent maintenance records for this road (AR 011853), it did document past maintenance between 1968 and the mid-1970's, as documented in a Memo from AK. Majors, a former field manager for the Lakeview BLM (AR 011853, 011491-011493).   A lack of *recent* maintenance does not automatically disqualify a route from meeting the BLM's wilderness inventory road definition.  To reiterate, "roads need not be 'maintained' on a regular basis, but rather 'maintained' when road conditions warrant actions to keep it in a useable condition" (AR 011393-011394, 015794).  Organic Act Directive 78-61, Change 2 (AR 000387) and IBLA case law (62 IBLA 370) make it clear that maintenance does not need to occur annually, recently, or even regularly, but only often enough "to insure relatively regular and continuous use" or "when road conditions warrant actions to keep it in a useable condition".

86.    The BLM documented "though short segments are rocky, the entire route is currently passable by two-wheel drive, high-clearance vehicle. This is documented by the photos, BLM staff knowledge, and a letter from the permittee (letter from Jesse Laird dated August 7, 2008)…. The route would be maintained in the future if it became impassable or otherwise needed maintenance. … This route currently receives regular and continuous use. The route is passable by two-wheel drive, high-clearance vehicles. The photos referenced above provide additional evidence that the

route provides regular and continuous use. It is used by the BLM staff for monitoring the surrounding grazing allotment; it is used to monitor range health; it is used for wildlife studies; it is used by special recreation permit holders. The permittee uses this route (letter from Jesse Laird dated August 7, 2008). The route receives recreational hunting use from August through November" (AR 011853-011854). In essence, the BLM documented this road did not currently need maintenance to ensure relatively regular and continuous use.

87.     In his paragraphs 42 and 43, Mr. Miller claims that BLM photos 2607.S and 2608.N (AR 011651-011652) (also included as Attachment 5 to his declaration) show a braided or user-created route parallel to Road 7155-A0 (7155-1-A0). Further, the 2005 aerial photos also demonstrate "obvious user-created, parallel tracks" in two locations (Aerial Photos 3 and 4 of Attachment 5). Mr. Miller makes substantial errors in his ground and aerial photo interpretations.

88.     In reality, photos 2607.S and 2608.N (AR 011651-011652) document a single-track cattle trail immediately adjacent to the main roadbed of BLM Road 7155-A0 (7155-1-A0), not a "braided, user-created, drive-around". ONDA took several other photos in this same area (Attachment 4). Photo JPMT200711112_048 looks to the northwest from a curve in this road and shows no obvious user-created or braided or parallel routes in the area (AR 011132). Likewise, ONDA Photo JPMT200711112_049 looks to the northwest from a point located just to the south of where photos 2607.S and 2608.N were taken and also shows no obvious user-created or braided parallel routes in the area (AR 011133). The 1983 NHAP aerial photo (#127-125) (Attachment 5) shows this road in exactly the same place as the 2005 aerial photo. However, no side trails or linear disturbances are visible on this photo at that point in time. A closer examination of the 2005 aerial photo (Attachment 4) for this area indicates these faint linear disturbances can be better explained as

multiple cattle trails adjacent to the roadbed.   Examination of the 2009 aerial photo shows these cattle trails are even less obvious (Attachment 6).

89.    Mr. Miller's Aerial Photo 3, taken in 2005, shows an obvious, well-traveled roadbed on the west, and one or two faint, parallel linear disturbances on the east.   While the yellow dashed line labeled "7155-0-1A" does not line up spatially in the exact location where the current relocated roadbed exists on the aerial photo, there a numerous technical reasons that could account for this, as explained previously in paragraph 58.   These same faint parallel disturbances are evident on the 1983 NHAP aerial photo (#127-121) of this same area (Attachment 7)  which indicates that that the well-traveled roadbed existed very near the time of the original inventory was completed in 1980, if not before.  What Mr. Miller labels as "braided channels" on his map can be better explained as a mechanically relocated or reconstructed portion of Road 7155-A0 (7155-0-1A) running parallel to, and west of the old, abandoned roadbed (Attachment 8).   Additional evidence of construction of the relocated roadbed in this area is visible in photos 3950, 3951, 3957, and 3959 (Attachment 9) taken in October 2011.   Evidence includes blading that removed vegetation and created a small dirt berm, as well as, a constructed drainage ditch.   The abandoned and reclaiming roadbed is visible in photos 3952-3956, 3958-3959.  Photo 3958 shows an old culvert from the abandoned roadbed segment (Attachment 9).

90.    Mr. Miller's Aerial Photo 4, taken in 2005, shows two very faint linear disturbances parallel to and immediately southeast of Road 7155-A0 (7155-0-1A) running about 400 feet in length.  The 2009 DOQ shows that these parallel disturbances are reclaiming (Attachment 10). Photos 3974, 3976-3980 were taken in this area October 2011.  In particular, photos 3977-3980 clearly show that these disturbances represent an abandoned and reclaiming road segment (Attachment 11).  They do not represent currently traveled "drive-arounds".  Photos EX-001 (AR

010017) and 3976 (Attachment 11) indicate a very short segment of this road (approximately 200 feet) is rocky, but is still passable by high-clearance vehicles, and in fact is still frequently travelled. BLM's Road Analysis Form for this road states that "though short segments are rocky, the entire route is currently passable by two-wheel drive, high-clearance vehicle. This is documented by the photos, BLM staff knowledge, and a letter from the permittee (letter from Jesse Laird dated August 7, 2008)" (AR 011853).

91.    Mr. Miller does not specifically elaborate on his objections to BLM's reliance on the route's purpose and inclusion in BLM's transportation plan, speculative future maintenance, and a surface condition class rating of "good" for Road 7155-A0 (7155-1-A0).  Generally speaking, my responses to these same claims for Road 7155-00 segment 1 are applicable to Road 7155-A0 (7155-1-A0).  Refer to my responses in paragraphs 62-65, 71-73, and 75-77 regarding these same general claims.

## Road 7155-C0

92.    In his paragraph 44, Mr. Miller claims that BLM Road 7155-C0 (7155-0-1C) suffers from same "flaws" described for other roads, including reliance on the route's purpose, the fact it is included in BLM's transportation plan, historic evidence of mechanical construction, little or no evidence of modern day improvement or maintenance, and altered surface condition class rating in FAMS between 2008 and 2011.  Mr. Miller does not provide any direct support for these claims in this section of his declaration.  He does expound further on the claim of braided/parallel user-created routes in paragraphs 45 of his declaration.   I will respond to these specific claims further in my responses which follow.

93.    In paragraph 45, Mr. Miller claims that ONDA photographs and the 2005 aerial photo (Miller Declaration, Attachment 6) show parts of the road have deteriorated and "user-created drive-

arounds" exist.  He also states that BLM offers no photographic documentation of the route except at its northern and southern ends.

94.     It appears that Mr. Miller believes that BLM only relied on the photos that it collected in making its road determination.  As stated repeatedly throughout my declaration, the BLM Wilderness Inventory ID Team relied on field inventory, staff knowledge, and an evaluation of all available photos, including BLM's photos and those provided by ONDA and the permittee, during its road determination process.  Consideration of all of these photos is documented in the Road Analysis Form (AR 011855).

95.     Mr. Miller also makes substantial errors in his ground photo interpretations.  Photo 1 of his Attachment 6 (also found at AR 009994) shows a single-track *cattle trail* meandering to the left of the roadbed of Road 7155-C0 (7155-0-1C), not a "user-created" route.  As further evidence of this fact, there is no obstacle, such as large rocks present in this location that would cause a driver to need to go off of the roadbed in this location (AR 009994).

96.     BLM's Road Analysis Form documents that the route was mechanically improved by blading with a bulldozer in the past. The surface type is natural soil or gravel.  In particular, the photos CQ0032 (AR 009994), 2611.S (AR 011655; road on left), SK2 (AR 011527), JPMT200711 12_051 (AR 011135), JPMT2007lll2_054 (AR 011138), JPMT20071 112_055 (AR 011139), HUB4 (AR 011530), HUB5 (AR 011531), JPMT2007l1l2_060 (AR 011144), IMG_2128 (AR 011742), IMG_2129 (AR 011743), and JPMT20071ll2_061 (AR 011145) show clear evidence of past mechanical improvement by blading which removed sagebrush vegetation from the roadbed surface .  Evidence of road improvements also included some documented drainage features and a road marker sign (AR 11856).  Maintenance of the southern portion has also been documented since 1980.  This route currently is passable by two-wheel drive, high-

clearance vehicle along its entire length and receives relatively regular and continuous use (AR 011855-011857).

97.    Mr. Miller also errs in his aerial photo interpretation.  Aerial Photo 7 of his Attachment 6 does not document a "user-created" or "braided route" parallel to Road 7155-C0 (7155-0-1C).  Rather, it documents the presence of numerous single-track cattle trails coming into a large water development located to the south.  One of these cattle trails runs immediately parallel to BLM Road 7155-C0 (7155-1-1C) which gives it a wider, less-defined appearance on the aerial photo (Attachment 12).

98.    Mr. Miller does not specifically elaborate on his objections to BLM's reliance on the route's purpose, inclusion in BLM's transportation plan, and a surface condition class rating of "good" in FAMS for Road 7155-C0 (7155-0-1C).  Generally speaking, my responses to these same claims for Road 7155-00 segment 1, are applicable to Road 7155-C0 (7155-0-1C).  Refer to my responses in paragraphs 62-65, 71-73, and 75-77 regarding these same claims.

### Road 6165-C0

99.    In his paragraph 46, Mr. Miller claims the photographs for BLM Road 6165-C0 (6165-0-1C) demonstrate that it is a primitive, "two-track" through sagebrush, and the road is only passable by high-clearance vehicle.  He goes on to state that "by the time a traveler reaches BLM photo points 2142 and 2143 (AR 011756-011757), the route becomes very rocky and rough."

100.    Mr. Miller makes substantial errors in his ground photo interpretations.  Both Photos 1 and 2 of his Attachment 7 (also found at AR 011756-011757) shows clear evidence of past mechanical improvement in the form of both vegetation removal from the roadbed surface and a berm of large rocks pushed off to the side of the road by a bull-dozer or grader on the right side of the road (see also AR 011756-011757).

101.    As stated previously, the BLM Wilderness Inventory ID Team based its road determinations on field inventory, staff knowledge, and an evaluation of all available photos, including those provided by ONDA and the permittee.  Consideration of these photos is documented in the Road Analysis Form (AR 011840).  In addition to the two photos referenced above, photos CX045 (AR 010015), JPMT20071112 _078, IMG_2131 (AR 011745), IMG_2132 (AR 011746), IMG_2134 (AR 011748), IMG_2135 (AR 011749), IMG_2137 (AR 011751), IMG_2l38 (AR 011752), IMG2139 (AR 011753), IMG_2144 (AR 011758), IMG_2145 (AR 011759), IMG_2149 (AR 011763), IMG_2150 (AR 011764), IMG_2l53 (AR 011767), and IMG_2154 (AR 011768) clearly show evidence of past mechanical improvement in the form of removal of sagebrush vegetation from the roadbed surface by blading.   Photo CQ020 shows evidence of past mechanical improvement in the form of removal of sagebrush vegetation from the roadbed surface and a small dirt berm on the left side of the road, both resulting from mechanical construction by blading (AR 009982).

102.    Mr. Miller cites to an OHA stay order when he states that the "Dept. of Interior has explained (ONDA v. BLM, OR-020-09-06), that extensive vegetation growth, not only in the center of the route, but also in both vehicle tracks" means a route is not a road.   Mr. Miller appears to be making a legal comparison here that this stay order describes conditions that are similar to conditions along Road 6165-C0 (6165-0-1C).  In fact, none of the photos actually demonstrate "extensive vegetation growth" in the wheel tracks and only a few show even minor vegetation in the center of the road.  Thus, the finding of that stay order does not apply to the facts for Road 6165-C0 (6165-0-1C).

103.    In his paragraph 47, Mr. Miller claims that the BLM upgraded the description of FAMS surface condition from "poor" to "good" between 2008 and 2011.  Aerial imagery shows

user-created parallel tracks (Aerial photos 8 and 9 of his Attachment 7).  BLM cited the presence of

a gate and road signs as evidence of improvements.  Further, the record contains no evidence of

mechanical improvements or maintenance, and is not a road.

104.    Mr. Miller is correct in noting that the FAMS surface condition attribute value for this

road in 2011 is listed as "good".   However, according to a separate declaration provided by James

Elvin, who was the District Engineer between 2007 and 2011, the surface condition for this road was

rated as "good" both prior to, and after BLM completed updates to the FAMS database in 2008.   As

noted in Mr. Elvin's declaration, the road condition assessment work that was conducted by a

contractor in 2006 did not even include or update information for Road 6165-C0 (6165-0-1C).

Further, this claim is irrelevant because the BLM did not use or even reference the FAMS *surface

condition* rating at all during its wilderness road determination process.  As explained in paragraph

65, there is nothing in the record that demonstrates that the BLM based its assessment of overall

route condition on the FAMS *surface condition* attribute value.  The Wilderness Inventory ID Team

documented that "the route is currently passable by two-wheel drive, high-clearance vehicle along its

entire length. The assigned maintenance level indicates it would be maintained in the future if it

became impassable." (AR 011841).  This assessment of route condition was based on the field

inventory, review of all available photos, and staff field knowledge.  Specifically, the record notes

that BLM staff "went to the field to verify the presence, surface type, and *overall condition*

(emphasis added) of each route" (AR 011871).  In this case, the Wilderness Inventory ID Team

determined that the route currently ensures relatively regular and continuous use (AR 011841-

011842).   It is easy to see how one could confuse this terminology, but the fact remains that the

BLM did not consider or utilize the FAMS surface condition rating during its road determination

process, as Mr. Miller claims.  To the extent it is even relevant, Mr. Miller provides no evidence that

demonstrates that the BLM changed the road's surface condition rating within the FAMS database between 2008 and 2011.

105.    Mr. Miller also misinterprets the 2005 aerial image (Aerial photos 8 and 9 of his Attachment 7).  The roadbed for 6165-C0 (6165-0-1C) is very well defined on the aerial photo and in the ground photos IMG_2131 and IMG_2132 that BLM took in this location (AR 011745-011746).  The road cuts across the edge of a lakebed playa in this area (Attachment 13).  A playa is a low spot or depression within a closed basin system that collects water as it drains from the surrounding uplands during the late winter and spring seasons.  Since there is no stream or other outlet to this type of system, the water sits and evaporates during the warmer summer and fall seasons, leaving behind various salts and minerals on the soil surface.  This is why the soil surface appears white in the aerial and ground photos (Attachments 13 and AR 011745-011746).  Occasionally (perhaps one or two years out of ten), the entire lakebed may be completely inundated with water during the spring.   The white soil shown on Attachment 13 represents the maximum area that may be inundated during a high precipitation year.  The actual areal coverage of water seen on Attachment 13 (taken in summer of 2005) represents the amount of inundation that is more typical of most years.  What Mr. Miller refers to as a "parallel track" on his Aerial Photo 8 is not a regularly traveled "drive-around".  During most years, the edge of this lakebed playa is dry and the roadbed is passable by vehicles in this area. This parallel track represents where a vehicle has traversed around the edge of the playa on rare occasions when the entire playa is flooded (Attachment 13).  However, it does not demonstrate that Road 6165-C0 (6165-0-1C) is regularly impassable or in need of maintenance in this location.

106.    BLM took several ground photos in the vicinity of Mr. Miller's Aerial Photo 9.  In particular, photos IMG_2142 and IMG_2143 (AR 011756-011757) were taken in the middle of this

road segment (Attachment 14).  Photo IMG_2144 (AR 011758) was taken from a point just to the northwest and is looking in a southeasterly direction back toward this road segment.  The linear disturbance visible on Attachment 14 which veers away from Road 6165-C0 to the northeast is a drainage ditch that drains into the waterhole shown on the photo.  The wide spot in the road highlighted with a yellow arrow and noted as "braided indistinct channel" on Mr. Miller's Aerial Photo 9 is, in fact, showing a slightly wider roadbed profile and the associated, adjacent rock berm.  This rock berm is evident in photos IMG_2142 and IMG_2143 (AR 011757-011758).  These photos demonstrate that there is no "braided" road present on the ground in this location.

107.    As stated previously, the 2007 version of the draft Oregon wilderness inventory guidance did include a place to document the presence of gates along a route as one of many possible types of improvements on the Road Analysis Form (AR 010853).  While BLM no longer considers gates to be evidence of mechanical improvements in its most recent national guidance (AR 015805), it was only one of many evidences documented in the Juniper Mountain inventory[2].  Further, the BLM did not rely on this one criterion all by itself.   Other evidences of mechanical improvements were documented along this road, most notably mechanical construction by blading (AR 011840-011841).  BLM also contests Mr. Miller's claim that road signs do not represent evidence of mechanical improvements.  Road signs are installed specifically to give travelers on the road an idea of where they are at on the ground.  These signs are directly associated with the road and would not be needed or installed if the road were not there.

108.    As stated in my response in paragraphs 101-102, the photos for this road document evidence of past mechanical improvement in the form of construction by blading.  Mr. Miller is correct in noting that the BLM found no recent maintenance records for this road (AR 011841).

However, as noted in paragraphs 67, 70, and 74-75, a route that has been mechanically improved does not need to be maintained annually, recently, or even on a regular basis to meet the definition of a road.  It must only be "maintained when road conditions warrant actions to keep it in a *useable condition*" (emphasis added) (AR 011393-011394, 015794).   The term "relatively regular and continuous use" is defined as "vehicular use that has occurred and will continue to occur on a relatively regular basis (AR 011393-011394, 015794).  Therefore, a route that has been mechanically improved only needs to be maintained often enough or when "warranted" to "ensure relatively regular and continuous use" to continue to meet the definition of a road.

109.    The Road Analysis Form documents that this "route is currently passable by two-wheel drive, high-clearance vehicle along its entire length" and receives relatively regular and continuous use (AR 011841-011842).  The photos referenced above clearly document that relatively regular and continuous use is occurring throughout.  The record demonstrates that this road has not yet needed maintenance to continue to ensure relatively regular and continuous use, and would be maintained in the future if it became impassable (AR 011841).

### Road 7155-00 Segment 0

110.    In his paragraph 48, Mr. Miller states that BLM Road 7155-00 (7155-00-00) has been joined to 7155-0-1.  He notes that while the northern 2 miles may meet definition of a road, the remainder suffers from the same "flaws", including reliance on the road's purpose, inclusion in the transportation plan, historic blading, little or no evidence of modern day improvement or maintenance, and altered condition class rating in FAMS between 2008 and 2011.  Mr. Miller provides no specific documentation to support these claims in this portion of his declaration, but elaborates on some of these claims in his paragraphs 49-50.  I will speak to these claims in my responses which follow.

46

111.    As noted previously, there are two distinct segments to Road 7155-00 (Sagebrush Knoll).  These segments are stored as separate records in FAMS and are documented on two separate Road Analysis Forms.  I will refer to this specific road segment as BLM Road 7155-00 segment 0 (7155-00-00).   (The other segment (7155-00 segment 1) was previously addressed in paragraphs 51-80 above).

112.    BLM documented that Harney County claims the northern portion of this road (i.e. that portion lying completely within Harney County) as County Road 3186 (AR 011846).  Under current guidance, a County Road can be determined automatically to meet the wilderness inventory definition of a boundary road without further documentation, provided a right-of-way has been issued to the county for the road (AR 015792, 015804).  In this instance, an associated right-of-way could not be documented so the BLM provided additional documentation for the road (AR 011846-011848).

113.    In his paragraph 49, Mr. Miller states that only the portion of Road 7155-00 segment 0 (7155-00-00) that meets the definition of a road should be a "cherry-stem" boundary road and then cites to BLM's 2001 wilderness inventory handbook (AR 005302).  This 2001 wilderness inventory guidance is no longer in effect (AR 010486, 008166-008175, and 007945-007946).  While the BLM agrees that current inventory guidance, specifically Washington Office Instruction Memorandum No. 2011-154 (AR 015782-015815), and past guidance does state that it is appropriate to "cherry-stem" a boundary road where a portion of the route meets the wilderness inventory definition of a road, and a portion does not.  However, Road 7155-00 segment 0 (7155-00-00) is not an example of such a scenario.

114.    In his paragraph 50, Mr. Miller claims that BLM has no photographs except at each end of the road segment.  Further, ONDA's photos CQ016-CQ034 (AR 009978-009996) show a

two-track passing through grass, vegetation in the tracks (as documented in his Attachment 8). Mr. Miller makes substantial errors here. Most importantly, many of the ONDA photos he references here are not actually taken of Road 7155-00 segment 0 (7155-00-00) or document past maintenance rather than rocky conditions. I will elaborate more specifically on these interpretation errors in the following section.

115.    Further, BLM took numerous photos of this road segment (AR 011833-011836) and the BLM Wilderness Inventory ID Team relied on field inventory, staff knowledge, and an evaluation of all available photos, including its own photos and those provided by ONDA and the permittee, during its road determination process (AR 011833-011836, 011871, 011846).

116.    Mr. Miller makes substantial errs in his ground photo interpretations associated with his Attachment 8. In particular, the photos shown on pages 4, 6, 7, 8 of his Attachment 8 (see also AR 009982, 009984, 009990, 009994, 011833-011836) are not actually looking at Road 7155-00 segment 0 (7155-00-00), but are looking at other numbered and unnumbered roads that connect to Road 7155-00 segment 0 (7155-00-00). This is detailed further in paragraphs 117-122 which follow. Those photos of Mr. Miller's Attachment 8 (pages 1, 2, 3, and 5) that are actually showing portions of Road 7155-00 segment 0 (7155-00-00), show some minimal amount of low-growing vegetation in the median of the road (see also AR 009991, 009978, 009980, and 009983). With the possible exception of photo shown on page 1 of Miller's Attachment 8 (AR 009991), none of the photographs show any vegetation growing in the wheel tracks.

117.    The photo on page 1 of Miller's Attachment 8 (AR 009991) is taken at ONDA photo point CQ029 and is not characteristic of the road as a whole. At this specific point, the road immediately turns to the southwest and traverses across the base of the slight rise visible in the background. This is clearly evident on the 2005 aerial photo (Attachment 15). However, the

48

observer can be left with the impression that the road suddenly dead-ends at this location, or that

grass is widely prevalent in the tracks throughout the entire road.  As can be seen in Attachment 15,

grass is only found on about 50 linear feet of the roadbed in this one location.  One must examine the

entire set of photos taken of this road segment to see that grass or other vegetation is prevalent in the

wheel tracks of the entire route (AR 009974; road on right, 011771, 011772, 009983, 009995, 011131,

011500, 011524, 009981, 009978, and 009979) (see also discussion in paragraphs 123-124 which

follow).

118.    The ground photos on pages 2 and 3 of Mr. Miller's Attachment 8 represent ONDA

photo points CQ016 (AR 009978) and CQ018 (AR 009980) respectively.  Mr. Miller describes these

as indicative of rough, rocky road conditions.  In fact, these photos show two specific locations

where the BLM actually imported rock fill material and spread on the road base to deal with past

erosion problems.  BLM often refers to this type of activity as "spot rocking". BLM described this as

evidence of past maintenance that it documented along this road in the early 1970's (AR 011847,

011492).

119.    The ground photo on page 4 of Mr. Miller's Attachment 8 represents ONDA photo

point CQ020 (AR 009982).  According to ONDA's photo log (AR 009859), this photo is looking

southeast at ONDA route number 185-186 (AR 009858).  This photo is actually of BLM Road 6165-

C0 (6165-0-1C), not Road 7155-00 segment 0 (7155-00-00).  Therefore, it does not actually

represent the road that Mr. Miller claims it does.

120.    The ground photo on page 5 of Mr. Miller's Attachment 8 is looking to the southwest

at Road 7155-00 segment 0 (7155-00-00) from ONDA photo point CQ021 (AR 009983).  It shows

another location where a short segment of the roadbed has been reconstructed or relocated in the

past.  The old, abandoned road bed is visible in the distance on the left.  The current

reconstructed/maintained road bed is visible on the right.  This is also visible on the 2005 DOQ

(Attachment 16).   The BLM describes this as evidence of past maintenance it documented along this

road in the early 1970's (AR 011847, 011492).  It is not a user-created drive-around.

121.    The photos on pages 6 and 7 of Mr. Miller's Attachment 8 represent ONDA photo

points CQ022 (AR 009984) and CQ028 (AR 009990) respectively.  According to ONDA's photo

log, photo CQ022 is looking in a west-northwest direction at ONDA road number 172k (AR

009859) and photo CQ028 is looking in an easterly direction at ONDA road number 172k (AR

009860).  ONDA's road number 172k is actually an unnumbered road that spurs off of Road 7155-

00 (7155-00-00) to the northwest (see AR 009858 and Attachment 16).  Neither of these photos

actually represents Road 7155-00 segment 0 (7155-00-00) as Mr. Miller claims.

122.    The ground photo on page 8 of Mr. Miller's Attachment 8 represents ONDA photo

point CQ032 which Mr. Miller claims is showing a user-created drive-around.  Mr. Miller errs in his

ground photo interpretation on several points.  According to ONDA's photo log, this photo is

looking southeast at ONDA's road number 185e (AR 009860).  ONDA's road number 185e (AR

009858) corresponds with BLM Road 7155-C0 (7155-1-C0), not Road 7155-00 segment 0 (7155-

00-00).  Therefore, this photo does not actually represent Road 7155-00 (7155-00-00) as Mr. Miller

claims.  Further, this photo does not show a user-created drive-around.  It actually shows a

meandering, single-track cattle trail to the left of the roadbed not a vehicle wheel track.  In addition,

to the extent this photo is even relevant, there is no obstacle shown in the roadbed in this location

that would cause a driver to go off of the road.

123.    BLM's Road Analysis Form documents that Road 7155-00 (7155-00-00) was

mechanically improved by blading with a bulldozer in the past. Evidence of construction includes

roadside berms, drainage features, and cuts through tall sagebrush in places.  The surface type is

natural improved. During the 1970's contractors maintained "bad spots" in this route to provide

access to Radio Springs and Badger Draw water developments. Evidence of spot rocking in short

segments are still visible in the northern reach of this route. (AR 011847-011848).

124.    The BLM Wilderness Inventory ID Team considered all photos taken along this road

(AR 011846).  In particular, photos CQ012 (AR 009974; road on right), IMG_2157 (AR 011771),

IMG_2158 (AR 011772), CQ021 (AR 009983), CQ033 (AR 009995), JPMT20071112_047 (AR

011131), and BDroad (AR 011500, 011524), all show evidence of past mechanical improvement in the

form of removal of sagebrush vegetation from the roadbed surface as a result of mechanical

construction by blading.  Photo CQ019 (AR 09981) shows evidence of past mechanical improvement

in the form of both removal of sagebrush vegetation from the roadbed surface and small dirt berms

on both sides of the road, both resulting from construction by blading.  Photos CQ016 (AR 009978)

and CQ018 (AR 009979) show evidence of mechanical improvement by blading and subsequent

maintenance in the form of spot rocking.  Photo CQ018 also includes a drainage ditch adjacent to the

road.

125.    Finally, Aerial Photo 10 (page 9 of Mr. Miller's Attachment 8) does not document a

"user-created" or "braided tracks" parallel to Road 7155-00 (7155-0-00).  It actually documents the

presence of several old, abandoned road bed locations and a relocated/reconstructed segment (see

Attachment 17).  BLM describes this as evidence of past maintenance that it documented along this

road in the early 1970's (AR 011847, 011492).

## BLM FAILED TO DISCLOSE WILDERNESS INFORMATION IN THE EA

126.    In his paragraph 51, Mr. Miller states that BLM refused to disclose or discuss this

(wilderness) information in the EA itself.  He claims this precluded ONDA, other members of the

public, and himself from meaningfully reviewing BLM's (inventory) work.

127.    It is important to note that the FLPMA does not require public review, comment, or involvement of the resource inventories that the BLM is required to maintain under Section 201. Further, Sections 102(2) and 202 make it clear that such inventory information is to be used during the development of *land use plans*, which does require public involvement.  However, the decision at issue in this case is a project or implementation level decision, not a land use plan decision. Despite this distinction, the record demonstrates that ONDA and other members of the public had several opportunities to review BLM's wilderness inventory work for the Juniper Mountain area. In 2007, the BLM attached its wilderness inventory documentation as Appendix A directly to the 2007 EA (AR 010771-010807) and summarized its findings within the main body of the EA (AR 010737, 010745).  ONDA provided comments on BLM's wilderness inventory by letter dated April 6, 2007 (AR 010822-010833).

128.    In 2008, BLM received and considered additional wilderness information provided by a variety of public interests, including ONDA/Craig Miller (AR  011085-011163, 010827-010833, 009965-010050, 009853-009865), Jesse Laird (permittee) (AR 011495-011531, 011569), and A.K. Majors (former BLM manager and consultant for permittee) (AR  011491-011493) during its 2008 wilderness inventory update process.  Upon completion, BLM provided copies of its 2008 wilderness inventory documentation directly to ONDA and the permittee (AR 012081, 012082). Further, BLM posted its inventory documentation for public viewing on its webpage at http://www.blm.gov/or/districts/lakeview/plans/inventas.php.   ONDA provided additional comments on BLM's wilderness inventory as part of its review of the 2009 EA (AR 012856-012862).

129.    BLM addressed the controversy regarding the presence/absence of wilderness character, along with a summary of its wilderness inventory findings within the 2010 EA itself (AR

013476-013478).  Both ONDA and BLM wilderness inventory documentation were also incorporated by reference in this section of the EA.  As discussed previously, BLM's 2008 NEPA Handbook encourages incorporation of such voluminous information by reference (AR 011204-011205).

130.    In his paragraphs 52-55, Mr. Miller states that ONDA provided its wilderness inventory report to the BLM in 2005 before the original (2005) EA was published, and ONDA asked BLM to consider this new wilderness information in its 2005 EA, 2007 EA, and 2009 EAs.  Further, he states that BLM did not disclose ONDA's report, data, or findings, or its methodology or review protocol in the EA.  Finally, Mr. Miller claims that BLM's failure to include detailed inventory wilderness information and analysis in the EA "materially hindered" his and ONDA's ability to study BLM's (project) proposal and evaluate impacts on the environment, including wilderness/roadless area impacts.

131.    Mr. Miller errs in his time sequence of some of these events.  ONDA first provided its complete wilderness inventory information to the BLM by letter dated April 1, 2005 (AR 009728), approximately two months *after* the original EA was signed and put out for public comment in February 2005 (AR 009532-009533).   ONDA also provided an extract of this inventory as part of their March 31, 2005 comments on the 2005 EA (AR 009709-009727).  Contrary to Mr. Miller's claim, BLM did not have this information in front of it when the 2005 EA was put out for public comment.  BLM did provide written responses to ONDA regarding its understanding of the potential for wilderness characteristics being present in the area at the time (AR 010055-010056, 010067-010070).  When BLM revised its EA in 2007, it attached its wilderness inventory documentation as Appendix A directly to the EA (AR 010771-010807) and summarized its findings within the main body of the EA (AR 010737, 010745). BLM's inventory guidance, methodology, and findings are

documented extensively in the record and were made available to all interested public, including

ONDA, during the 2008 inventory process (AR 011384-011406, AR 011868-011875, 011573,

011571-011572, 011568, 011533-011534, 011532, 011378-011381).  BLM's inventory findings

were summarized and incorporated by reference into the 2010 EA itself (AR 013477-013478).

132.    Mr. Miller appears to confuse BLM's responsibilities to disclose potential impacts of

Federal actions under NEPA with its responsibility to maintain an updated inventory of resource

values on public lands under Section 201 of the FLPMA.  The record clearly demonstrates that BLM

updated its wilderness inventory as required by the FLPMA, but found no lands with wilderness

characteristics to be present in the area.  NEPA does not require consideration of issues or resources

that are either not present or would not be impacted by a proposed Federal action.  The IBLA found

(in ONDA, Western Watersheds Project, 173 IBLA 348, 353-54 (2008)), that there is no existing

statutory, regulatory, or policy requirement to analyze non-existent resources in a NEPA document.

133.    In his paragraph 56, Mr. Miller claims that BLM failed to follow its own criteria for

making wilderness inventory road determinations and, thereby precluded an evaluation that would

have found the much larger area to have wilderness character.  In fact, the record demonstrates that

the BLM followed its current wilderness inventory guidance when it made it's wilderness road

determinations and updated it's wilderness inventory for the Juniper Mountain area in 2008.

**PROPER FUNCTIONING CONDITION**

134.    During BLM's consideration of, and response to public comments on the 2009 EA

related to riparian and hydrologic conditions (AR 013585-013587), BLM staff discovered errors in

the EA regarding the discussion of Proper Functioning Condition (PFC) findings for the Horseshoe

Meadow area[3].  Specifically, the 2009 EA contained statements within the document that the

Horseshoe Meadow is rated as "functioning at risk" as the result of a PFC assessment (AR 012725,

---

3 The PFC methodology is described in Dkt #48.

12734).   However, the BLM found these statements to be in error and were not supported by any documentation contained in the record or elsewhere in BLM's PFC assessment files.  In fact, BLM has never actually made a "functioning at risk" finding through a PFC assessment for the Horseshoe Meadow area.  There is a 60-acre area noted in the Juniper Mountain rangeland health assessment that is described as "functioning at risk" which is actually referring to the Hogback Playa, located over 12 miles to the southwest of the Horseshoe Meadow, elsewhere in the allotment (AR 004556-004560, 009358).  The Hogback Playa is the only area in the entire allotment that BLM has actually documented as "functional at risk" under the PFC methodology (AR 009358 and 013842).   In the rangeland health assessment, BLM documented that the 50-acre Horseshoe Meadow was not meeting Standard 2, but did not find that it was "Functional at Risk" (AR 009358).

135.    The 2010 EA was revised to remove references to the erroneous PFC information.  However, it appears that two such statements were overlooked during the revision and remained in the 2010 EA (AR 013488 and 013495).  These statements should have been removed from the document as they are incorrect.   For this reason, any claims by ONDA that the Horseshoe Meadow area is "functioning at risk" are also in error.


## CONCLUSION

136.     Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the forgoing is true and correct.

Executed on this 10th day of November 2011.

PAUL WHITMAN
Planning and Environmental Coordinator
Lakeview District
Bureau of Land Management



**Attachment 1 - Photo 2613.S on Road 7155-00 Segment 1**



2613-2614

7155-00

Attachment 2 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-00 Segment 1

Legend



GTRN_PUB_ROADS_ARC

BLM_photo_pts



Relocated 7155-00 Segment 1

Abandoned Roadbed

Attachment 3 - 1982 NHAP Photo #57-180 of Road 7155-00 Segment 1





Multiple Cattle Trails

2607-2608

JPMT20071112_049.jpgJPMT20071112_050.jpg

Roadbed

7155-A0

Multiple Cattle Trails

JPMT20071112_048.jpg

Attachment 4 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-A0



Legend

BLM_photo_pts

ONDA_Juniper_Mtn_2007



No Cattle Trails Visible in 1983

7155-A0 Roadbed

Attachment 5 - 1983 NHAP Photo #127-125 of Road 7155-A0





2607-2608

**Faint Cattle Trails in 2009**

JPMT20071112_049.jpgJPMT20071112_050.jpg

7155-A0

**Roadbed**

JPMT20071112_048.jpg

Attachment 6 - 2009 Digital Orthophoto Quad and Photo Points on Road 7155-A0



**Legend**

BLM_photo_pts

ONDA_Juniper_Mtn_2007



**Abandoned Roadbed**

**Relocated 7155-A0 Roadbed**

Attachment 7 - 1983 NHAP Photo #127-121 of Road 7155-A0





Attachment 8 - 2005 Digital Orthophoto Quad and Photo Points on Road



**Legend**

BLM_photo_pts

Attachment 9 - Photo 593 - Looking South at Road 7155-A0



Abandoned Reclaiming Roadbed



Attachment 9- Photo 39534-Looking FSouth

Relocated 7155-A0
Roadbed

Abandoned Reclaiming
Roadbed

Abandoned Reclaiming Roadbed



Abandoned
Reclaiming Roadbed



v-01331-SU Document 42 Filed 11/21/11 P

Abandonded Reclaiming Roadbed

Attachment 9 - Photo 3957 Looking North

Constructed Ditch

Attachment 9 - Photo 3958 Looking South

Abandoned Reclaiming Roadbed

Old Culvert



Relocated Road 7155-A0

Abandoned Reclaiming
Roadbed



Attachment 10 - 2009 Digital Orthophoto Quad and Photo Points on Road 7155-A0



Legend

• BLM_photo_pts ▲ ONDA_Photo_pts_2004



Relocated 7155-A0 Roadbed

Abandoned Reclaiming Roadbed



Relocated
7155-A0
Roadbed

Abandoned
Reclaiming
Roadbed

Attachment 39 Looking Southwest

Abandoned
Reclaiming
Roadbed

Relocated
7155-A0
Roadbed



Relocated
7155-A0
Roadbed

Abandoned Reclaiming
Roadbed



Cattle Trail

JPMT20071112_057.jpg

7155-C0

Cattle Trail Immediately Parallel to 7155-C0 Roadbed

Cattle Trail

7155-C0

Multiple Cattle Trails

7155-C0

JPMT20071112_059.jpg
JPMT20071112_058.jpg

Attachment 12 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-C0



N
W  E
S

Legend

BLM_photo_pts

ONDA_Photo_pts_2004
ONDA_Juniper_Mtn_2007
Features



6165-C0

2131-2133

2130

Attachment 13 - 2005 Digital Orthophoto Quad and Photo Points on Road 6165-C0



Legend

GTRN_PUB_ROADS_ARC

BLM_photo_pts

ONDA_Photo_pts_2004

ONDA_Juniper_Mtn_2007



**Drainage Ditch**

**Drainage Ditch**

2144-2146

6165-C0

2142-2143

Attachment 14 - 2005 Digital Orthophoto Quad and Photo Points on Road 6165-C0



**Legend**

GTRN_PUB_ROADS_ARC

BLM_photo_pts

ONDA_Photo_pts_2004

ONDA_Juniper_Mtn_2007



CQ030CQ031
CQ029

Grassy spot visible in photo CQ-029

7155-00 - Segment 0

7155-00 - Segment 0

Attachment 15 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-00 Segment 0



Legend

ONDA_Photo_pts_2004
ONDA_Juniper_Mtn_2007



Attachment 16 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-00 Segment 0



Legend





GTRN_PUB_ROADS_ARC

BLM_photo_pts



ONDA_Photo_pts_2004

ONDA_Juniper_Mtn_2007



Abandoned Roadbed

Abandoned Roadbed

Relocated Roadbed

7155-00

Abandoned Roadbed

Attachment 17 - 2005 Digital Orthophoto Quad and Photo Points on Road 7155-00 Segment 0



Legend

GTRN_PUB_ROADS_ARC
BLM_photo_pts

ONDA_Photo_pts_2004
ONDA_Juniper_Mtn_2007