**Peter M. Lacy ("Mac") (OSB # 01322)**
Oregon Natural Desert Association
917 SW Oak Street, Suite 408
Portland, OR 97205
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
917 SW Oak Street, Suite 409
Portland, OR 97205
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiff


# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PENDLETON DIVISION


| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N,** | Case No. 2:10-cv-1331-SU |
| Plaintiff, | |
| v. | **SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **BUREAU OF LAND MANAGEMENT**, **THOMAS E. RASMUSSEN**, Field Manager, Lakeview Resource Area, and **CAROL BENKOSKY**, District Manager, Lakeview District BLM, | |
| Defendants, | **(Environmental Matter)** |
| and | |
| **LAIRD RANCH, LLC**, | |
| Defendant-Intervenor. | |

**NATURE OF ACTION**

1.      This action seeks judicial relief ordering defendants Bureau of Land Management ("BLM") *et al.* to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–61, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–84, with respect to the agency's management of public lands with inventoried wilderness values and important habitat for imperiled Greater sage-grouse (*Centrocercus urophasianus*), on and around Juniper Mountain in eastern Oregon's high desert.

2.      In 2004, BLM determined that domestic livestock grazing within Horseshoe Meadow at the base of Juniper Mountain was causing degradation to natural resources and failing to meet the agency's ecological standards. Concentrated livestock use had degraded fragile riparian areas by compacting and eroding soils, and by causing headcuts—steep bank erosion at the leading edges of a gully—on a stream near the meadow's Horseshoe Spring. BLM documented areas of bare ground, trampled livestock trails void of vegetation, stream bank trampling, and deep "postholing" where livestock hoofs had destroyed fragile soils around streams and other wet areas in the meadow.

3.      In an attempt to address the continuing grazing damage, and to meet its obligations under the Fundamentals of Rangeland Health ("FRH") regulations, 43 C.F.R. Subpart 4180, BLM has issued a new grazing management decision for the area. BLM plans to build a 5-mile barbed-wire fence along the ridgeline of Juniper Mountain, cut down native juniper trees in Horseshoe Meadow, and stabilize the headcuts. BLM does not, however, address the root of the problem, instead allowing livestock grazing to continue on Horseshoe Meadow.

4.      Unfortunately, the project threatens both wilderness values and sagebrush habitat that is critical to the sage-grouse. BLM's decision violates NEPA and FLPMA because BLM

failed to properly consider impacts to wilderness characteristics and sage-grouse habitat, and because the decision is inconsistent with the underlying land use plan. BLM's environmental analysis suffers the same flaws that it did in the agency's two prior attempts since 2005 to implement this project.

5.     In August 2011, almost a year after plaintiff Oregon Natural Desert Association ("ONDA") filed this action, BLM issued a separate, related decision titled, "Worksheet Documentation of Land Use Plan Conformance and NEPA Adequacy (DNA) DOI-BLM-OR-L050-2011-03013-DNA." In the DNA decision, BLM determined not to conduct further environmental analysis under NEPA, and that the Horseshoe Meadow grazing decision could proceed.

6.     ONDA has been injured by defendants' refusal or failure to comply with statutory and regulatory obligations. Defendants' decisions to proceed with the "Horseshoe Pasture Riparian Improvement and Livestock Grazing Management Strategy" and to not prepare an EIS or to otherwise supplemental the NEPA analysis to account for new information concerning impacts to Greater sage-grouse are arbitrary, capricious, and not in accordance with the law, and will result in significant adverse environmental impacts, some of which may be long-term or irreversible in nature.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, FLPMA, the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq*. An actual,

justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–06.

8. Venue is proper in this Court under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Defendants reside in this district, and the public lands and resources at issue are located in this district.

9. The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

10. ONDA has properly exhausted its administrative remedies. *Id*. at § 704.

## PARTIES

11. Plaintiff OREGON NATURAL DESERT ASSOCIATION is an Oregon non-profit public interest organization of approximately 1,500 members. It has offices in Portland, Oregon and Bend, Oregon. ONDA's mission is to protect, defend, and restore forever the health of Oregon's native deserts. ONDA actively participates in Department of the Interior and Bureau of Land Management activities concerning the management and protection of public lands. ONDA brings this action on its own behalf and on behalf of its members and staff, many of whom regularly enjoy and will continue to enjoy the public lands on and surrounding the area that is the subject of this action for educational, recreational, spiritual, and scientific activities. ONDA also has been active in monitoring ecological conditions and wilderness values in the BLM's Lakeview District, including the public lands on and surrounding Juniper Mountain and Horseshoe Meadow.

12. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency or instrumentality of the United States, and is charged with managing the public

lands and resources of the Lakeview District BLM in accordance and compliance with federal laws and regulations.

13.     Defendant CAROL BENKOSKY is sued solely in her official capacity as District Manager for the Lakeview District of the Bureau of Land Management, in which the Juniper Mountain Allotment and project area occur. Ms. Benkosky is one of the BLM officials responsible for implementing the challenged project, and has principal authority for the actions and inactions alleged herein.

14.     Defendant THOMAS E. RASMUSSEN is sued solely in his official capacity as Field Manager for the Lakeview Resource Area of the BLM's Lakeview District. Mr. Rasmussen is one of the BLM officials responsible for implementing the challenged project, and has principal authority for the actions and inactions alleged herein.

## STATEMENT OF FACTS

15.     Juniper Mountain is an isolated mountain in eastern Oregon. It lies within both Harney and Lake counties, about 50 miles west of Frenchglen, Oregon.

16.     Juniper Mountain rises dramatically from the surrounding sagebrush steppe landscape to an elevation of more than 6,000 feet. Its ridgeline forms an unusual horseshoe shape, with the horseshoe opening to the west. Inside the horseshoe-shaped ridge lies Horseshoe Meadow. Both the ridge and the meadow provide important wildlife habitat for a wide variety of species. The BLM manages the public lands on and surrounding Juniper Mountain, including about 92,000 acres of land managed as an administrative unit called the Juniper Mountain Allotment.

17.     Much of Juniper Mountain is covered with an ancient forest of old-growth native juniper trees. The tree canopy is 400 to 600 years old, with some trees up to 1,000 years old. The

stand is the only old-growth juniper woodland of both its size and tree canopy density throughout a vast region of southeast Oregon ranging from Klamath Falls to the Snake River basin. A wildfire burned part of the juniper forest in 2001, but much of it remains alive and intact.

18.     In 2004 BLM recognized the uniqueness of this old-growth juniper forest by designating both the mountain and Horseshoe Meadow as the Juniper Mountain Area of Critical Environmental Concern and Research Natural Area ("ACEC/RNA"). ACECs are areas where special management is required to protect important values, and BLM creates RNAs to maintain areas for unique scientific research opportunities.

19.     Juniper Mountain supports a wide variety of wildlife and includes important habitat for Greater sage-grouse, mule deer, pronghorn antelope, red-tailed hawk, sage thrasher, and countless other birds and mammals.

20.     The sage-grouse is a particularly imperiled species. Sage grouse once numbered more than a million birds across 16 western states and 3 Canadian provinces, but its numbers have declined severely over the last 50 years. For this reason, the U.S. Fish & Wildlife Service has determined that the species is "warranted" for protection under the Endangered Species Act. 12-Month Findings for Petitions to List the Greater Sage-Grouse, 75 Fed. Reg. 13,909 (Mar. 23, 2010).

21.     Sage grouse are sagebrush obligates. This means that they depend on sagebrush all year to provide roosting, cover, and food. They require large areas with a variety of sagebrush communities to meet their life-history needs. For example, they require big sagebrush on deep soil sites with a healthy understory and tall residual grass cover for nesting. They rely on low sagebrush communities for food and winter habitat.

22.     Riparian areas, seeps, springs, and other wet areas also are important for sage grouse. This is because they rely upon eating forbs (i.e., wildflowers), in these areas during the late growing season when upland plant communities have been depleted.

23.     Oregon sage grouse populations and sagebrush habitats comprise nearly 20% of the range wide distribution of the species. For this reason, management actions in Oregon have implications on a range wide scale for the species.

24.     Oregon contains some of the largest expanses of relatively intact sagebrush habitat in North America. Juniper Mountain is in the northwest corner of an area recently identified by scientists as containing one of two remaining strongholds of relatively unfragmented sagebrush habitat in North America.

25.     The Oregon Department of Fish and Wildlife recently identified most of the Juniper Mountain Allotment as "core habitat" for sage-grouse.

26.     The entire Juniper Mountain Allotment is classified as yearlong habitat for the sage-grouse. The Allotment contains eight sage-grouse leks. Leks are sage-grouse breeding areas, which generally are located in areas of low sagebrush.

27.     Sagebrush is one of the most imperiled ecosystems in North America. Habitat fragmentation is the main cause of the decline of sage-grouse populations because the species requires large expanses of contiguous, unfragmented sagebrush. Among the myriad threats to sage-grouse habitat are altered and unnatural fire regimes, the spread of non-native weeds and grasses, climate change, road networks, energy development and transmission corridors, and other land use issues including urban development and agriculture.

28.     Livestock grazing can seriously degrade sage-grouse habitat and exacerbate many of the most significant threats to sage-grouse. For example, grazing can degrade nesting and

brood-rearing habitat by decreasing vegetation. Cattle compact soils, consume native plants, increase soil erosion, and increase the proliferation of exotic plant species including cheatgrass, a rapidly spreading non-native grass that is replacing sagebrush.

29. Beyond grazing's direct effects, the infrastructure necessary to manage large herds of cattle in the desert also degrades sagebrush habitat. For example, massive systems of fencing constructed to manage domestic livestock can cause direct mortality to sage-grouse in addition to degrading and fragmenting habitats. Fencing is a mortality threat for sage-grouse because the low-flying birds collide with barbed-wire fences, leading to injury or death. This is especially the case around leks and riparian areas. Fences also provide artificial perches for predators like golden eagles and ravens. Sage-grouse avoid habitat adjacent to fences even if the actual habitat is not yet removed.

30. In the Lakeview Resource Management Plan ("RMP"), the underlying land use plan that governs BLM's management of about 3.2 million acres of public land including the lands within the Juniper Mountain Allotment, BLM has stated that it will manage the sage-grouse to maintain, enhance, or restore its habitat or population.

31. Much of Juniper Mountain and Horseshoe Meadow also contain wilderness characteristics worthy of protection for future generations. The Juniper Mountain Allotment contains a large area which ONDA has inventoried according to BLM's wilderness inventory protocol and found to possess defined wilderness characteristics. ONDA's "Juniper Mountain Proposed Wilderness Study Area" is a roadless area spanning 55,442 of the allotment's 92,000 acres.

32. The BLM's governing FRH regulations require BLM to periodically assess ecological conditions on the public lands and make an evaluation of whether specific rangeland

health standards are being met. If standards are not being met, and BLM determines that existing grazing is a significant causal factor for the failure, the FRH regulations require BLM to implement grazing management changes on those lands no later than the start of the next grazing season.

33.     In 2004, pursuant to the FRH regulations, BLM evaluated ecological conditions on the Juniper Mountain Allotment. In a Rangeland Health Assessment ("RHA") dated September 30, 2004, BLM determined the Horseshoe Pasture was failing to meet the agency's rangeland health standard for riparian and wetland functionality, and that current livestock grazing was the cause of the violation.

34.     BLM determined that 60 acres within Horseshoe Meadow are "Functional at Risk" and that livestock have caused compacted and eroded soils and headcuts at Horseshoe Spring and elsewhere throughout the meadow. Evidence of overgrazing included areas of bare ground, trails, bank trampling, and "postholing" in the spring area.

35.     BLM then implemented an "interim" grazing plan under which it allowed the Horseshoe Pasture to be grazed every other year, usually early in the spring. BLM began by resting the pasture in 2005, then grazing it in 2006, 2008 and 2010. BLM has authorized Horseshoe Pasture to be grazed again in 2012.

36.     In 2005, BLM issued an environmental assessment ("EA"), the "Horseshoe Pasture Division Fence Environmental Assessment," and proposed to build a 5-mile, barbed-wire fence up the ridgeline of Juniper Mountain to try to keep cattle from straying into Horseshoe Meadow when they were supposed to be on the allotment's other pastures. BLM also proposed to trim or cut down old-growth juniper trees with chainsaws, traveling the length of the fence corridor with an off-road vehicle.

37.     ONDA commented on the EA, administratively protested and appealed BLM's decision to move forward with the project, and then filed suit in federal court challenging BLM's decision. *Or. Natural Desert Ass'n v. Rasmussen*, No. 06-CV-443-KI (D. Or. filed Mar. 30, 2006). ONDA was concerned that BLM had not considered a citizens' wilderness proposal for Juniper Mountain, and also about ongoing grazing damage in the Horseshoe Meadow. ONDA also was concerned with the project's potential impacts to the unique old-growth juniper stand atop Juniper Mountain.

38.     With respect to wilderness, ONDA argued to BLM that much of the Juniper Mountain Allotment contains wilderness characteristics that the agency should consider as part of its planning process for the allotment. Although BLM decided not to designate the area as a Wilderness Study Area in the 1980s, ONDA argued that many vehicle routes no longer meet BLM's definition of a "road" and that the area is therefore a large roadless area today, suitable for designation as Wilderness. ONDA explained that construction of the ridgeline fence and cutting juniper trees was likely to impair the area's wilderness character and asked BLM to consider this in the agency's environmental analysis.

39.     In the 2005 EA, BLM claimed without elaboration that no wilderness characteristics existed in the area. Based on that assertion, BLM declined to study impacts to wilderness in the EA.

40.     Shortly after ONDA filed its lawsuit in this Court, BLM sent a letter to the public announcing it was "rescinding" its Horseshoe Pasture Division Fence decision.

41.     The parties then entered into a settlement agreement. Based on this settlement, which was entered with this Court, ONDA voluntarily dismissed the case without prejudice. The settlement provided that BLM would prepare a new environmental assessment, studying

additional grazing alternatives and considering ONDA's wilderness report for Juniper Mountain. The settlement also provided that the parties would meet at Juniper Mountain to discuss ONDA's wilderness survey findings prior to BLM's new environmental analysis and decision. The parties did so in September 2006.

42.     In 2007, BLM issued a revised EA. The EA, identified by the same number as the rescinded EA, is largely identical to the original document issued in 2005. The main difference between the documents was the addition of an appendix titled, "Appendix A—Wilderness Characteristics Evaluation for Juniper Mountain Proposed WSA."

43.     In the appendix, BLM noted its determination that none of the areas identified in the ONDA wilderness report possessed wilderness character. Based on this conclusion, BLM did not study impacts to wilderness characteristics in the revised EA.

44.     BLM once again proposed the same, 5-mile barbed-wire fence on Juniper Mountain. The proposal also would permit grazing to continue at previous levels.

45.     During the public comment period on the revised EA, ONDA provided further wilderness survey data and photographs, and revised the boundaries of its wilderness proposal based on the new data. ONDA also argued that BLM's proposal to continue grazing Horseshoe Meadow in the face of continued degraded conditions was inconsistent with the underlying land use plan, again failed to consider reasonable alternatives to address the identified grazing problems that had necessitated a change in management in the first place, did not meet its duty under the FRH regulations, did not adequately analyze impacts to sage-grouse, and did not properly consider the impacts of the project on wilderness characteristics.

46.     BLM issued a final decision adopting this second iteration of its Juniper Mountain project in May 2007. ONDA once again appealed the decision to the Office of Hearings and

Appeals ("OHA"), including moving the OHA to stay BLM's decision pending a decision on the merits of ONDA's claims.

47.     In July 2007, an OHA administrative law judge ("ALJ") issued an order granting ONDA's stay petition. The ALJ found that ONDA had raised "serious questions as to whether BLM's 2007 Decision is supported by adequate information and the actual facts," explaining that ONDA had "presented objective proof establishing a likelihood of error in BLM's conclusion that the area affected by the Projects lacks wilderness character."

48.     In 2008, following the OHA's stay order, the parties reached another settlement. BLM agreed again to revise its wilderness evaluations and study additional alternatives. ONDA urged BLM to adopt an alternative fencing off and closing Horseshoe Meadow to any livestock grazing, and including key route closures in addition to recognizing the wilderness characteristics present in ONDA's proposed wilderness area.

49.     In 2009, BLM issued yet another revised EA ("2009 EA"), which is the subject of this action. ONDA provided written comments on September 11, 2009, again asking BLM to close Horseshoe Meadow to grazing, to take proactive measures to protect sage-grouse, and to recognize the outstanding wilderness values documented in ONDA's Juniper Mountain roadless area.

50.     BLM issued a proposed decision dated July 19, 2010, again proposing to build the 5-mile fence on Juniper Mountain and to continue to allow livestock to graze within Horseshoe Meadow every other year. BLM's new plan also involves cutting down juniper trees in Horseshoe Meadow.

51.     BLM's new plan also involves closing a vehicle route that runs through the meadow. The route, identified by BLM as Route 7155-AA, runs through the middle of the

sensitive riparian area in Horseshoe Meadow. BLM closed this route in its 2003 Record of Decision ("ROD") adopting the Lakeview RMP.

52.     In the 2009 EA and final decision, however, BLM admits that it has not yet "implemented" the RMP/ROD closure. BLM's final decision for the Horseshoe Pasture Riparian Improvement and livestock Grazing Management Strategy allows Route 7155-AA to remain open until BLM completes its proposed Horseshoe Meadow projects.

53.     The 2009 EA does not disclose or discuss the ONDA wilderness report data or findings. The 2009 EA does not disclose or discuss BLM's wilderness inventory information, including its evaluation of the ONDA report. The 2009 EA does not include a discussion of impacts to wilderness characteristics in the 2009 EA itself. The 2009 EA discloses BLM staff recommendations made to and adopted by the BLM District Manager, concerning the presence or absence of wilderness characteristics.

54.     The "Comment Content Analysis" document contains no substantive disclosure of the data and analyses provided to BLM, nor BLM's substantive evaluation of those data and analyses.

55.     BLM maintains that no areas with wilderness character exist on the Juniper Mountain Allotment.

56.     Whether a route is a "road" or a "way," for wilderness inventory purposes, depends on the evidence of improvement, maintenance, and regular and continuous use. BLM makes this determination based on no other factor. For example, a route's purpose is not a determining factor when deciding whether a route is a road or a way.

57.     Whether a route may be maintained in the future is not a determining factor when deciding whether a route is a road or a way.

58. A route's assigned maintenance level in a BLM transportation plan is not a determining factor when deciding whether a route is a road or a way.

59. A route that was constructed or improved in the past by mechanical means is no longer a road if it is no longer mechanically maintained to insure regular and continuous use.

60. Several vehicle routes within the ONDA-documented roadless area, including routes 7155-0-1, 7155-0-1A, and 7155-0-1C, include places where users have driven around rough or impassable segments of the route. This has created braided or multi-tracked routes in these places.

61. Pursuant to the Department of the Interior's regulations, BLM's proposed decision became a final decision on August 6, 2010. At that point, BLM's final decision was subject to administrative appeal in accordance with 43 C.F.R. §§ 4.470, 4160.3, 4160.4.

62. ONDA timely appealed BLM's final decision on September 7, 2010.

63. Because the OHA failed to act timely on ONDA's stay petition, BLM's EA and final decision became effective and final agency action on October 23, 2010 in accordance with 43 C.F.R. §§ 4.21 and 4.472. ONDA then filed this action in federal district court.

64. On December 22, 2010, the Secretary of the Interior issued Secretarial Order 3310. The Order provided direction to BLM regarding its obligation to maintain wilderness resource inventories on a regular and continuing basis for public lands under its jurisdiction. It directed BLM to protect wilderness characteristics through land use planning and project-level decisions.

65. In February 2011, BLM issued guidance to its field offices describing how the agency will ensure public lands with wilderness characteristics are inventoried, described, and managed in accordance with Secretarial Order 3310. For the first time since 2003, when its

wilderness inventory handbook was revoked as a result of a controversial out-of-court settlement between then-Secretary Gale Norton, the State of Utah, and other parties, BLM once again had a comprehensive, long-term guidance on how to identify and manage lands with wilderness characteristics.

66.     On August 22, 2011, the Lakeview Resource Area Field Manager signed a document titled, "Worksheet Documentation of Land Use Plan Conformance and NEPA Adequacy (DNA) DOI-BLM-OR-L050-2011-03013-DNA." The DNA is a "final agency action" reviewable by the district court pursuant to the APA.

67.     In the DNA decision, BLM determined not to conduct further environmental analysis under NEPA with respect to impacts to sage-grouse, and that the Horseshoe Meadow grazing decision could proceed.

68.     The DNA decision was not appealable pursuant to the Department of the Interior's administrative appeals regulations.

69.     On December 22, 2011, the BLM Director issued Instruction Memorandum ("IM") 2012-043 titled, "Greater Sage-Grouse Interim Management Policies and Procedures." The IM provides interim policies and procedures to be applied to ongoing and proposed authorizations and activities that affect the sage-grouse and its habitat. The IM requires that BLM field offices implement the interim conservation policies and procedures while BLM develops and incorporates long-term, sage-grouse conservation measures into its land use plans.

70.     Among other things, the IM requires BLM to maintain or improve sage-grouse habitat when authorizing livestock grazing and associated range projects, by incorporating site information collected using the "Sage-Grouse Habitat Assessment Framework."

71.     BLM, in association with the Western Association of Fish and Wildlife Agencies ("WAFWA"), published the Sage-Grouse Habitat Assessment Framework in August 2010. This Framework represents the best available science from BLM on assessing sage-grouse habitats at multiple scale levels. Such analysis is consistent with the analytical steps called for in BLM's 2004 Sage-grouse Habitat Conservation Strategy.

72.     In its August 22, 2011 DNA decision, BLM reviews the April 22, 2011 Oregon Strategy for sage-grouse. The DNA decision does not review IM 2012-043 or the Sage-Grouse Habitat Assessment Framework, nor the new guidance concerning protection of lands with wilderness characteristics following Secretarial Order 3310.

73.     On information and belief, BLM has or will implement all or part of the challenged decisions, and intends to continue such implementation for the life of the challenged decisions.

## FIRST CLAIM FOR RELIEF
### Violations of NEPA

74.     Plaintiff realleges and incorporates by reference all preceding paragraphs.

75.     This claim for relief challenges defendants' violations of NEPA and its implementing regulations. BLM violated NEPA by issuing a FONSI for the August 6, 2010 management decision for the Juniper Mountain Allotment, by failing to prepare an environmental impact statement ("EIS") prior to issuing that decision, by failing to prepare a supplemental environmental analysis addressing significant new information concerning sage-grouse, by failing to address new information and responsible opposing views in the EA, a supplemental EA or an EIS, by issuing a decision not to supplement the EA, and thereby by failing to take a hard look at the environmental impacts of the grazing plan. Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

76.     NEPA requires that federal agencies undertake a thorough and public analysis of the environmental consequences of proposed federal actions. An agency must prepare an EIS for all major federal actions significantly affecting "the quality of the human environment." 42 U.S.C. § 4332(2)(C). An analysis prepared in compliance with NEPA must undertake site specific and cumulative impacts analysis of the likely environmental consequences of proposed actions. 40 C.F.R. §§ 1508.7, 15087.8, 1508.25(a)(2). An agency may issue a FONSI only where the proposed action will not have a significant effect on the human environment and for which an EIS is therefore is not required. *Id*. § 1508.13. An agency must discuss responsible opposing views and scientific information and must do so in the NEPA document itself. *Id*. § 1502.9(b). An agency must prepare supplemental NEPA analysis if the agency makes substantial changes to the proposed action or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. *Id*. § 1502.9(c)(1)(i)–(ii).

77.     To satisfy NEPA's procedural requirements, an agency must demonstrate it has taken a "hard look" at the environmental consequences of the proposed action.

78.     Defendants violated NEPA and federal regulations in multiple respects through issuance of the challenged decisions, including but not limited to:

a.  Adopting the challenged decision without first preparing an EIS addressing the proposed action, and instead electing to prepare an EA/FONSI;

b.  Adopting the challenged decision without studying impacts to wilderness characteristics;

c.   Adopting the challenged decision without considering significant new information concerning sage-grouse and deciding not to prepare a required supplemental NEPA document;

d.   Adopting the challenged decision without discussing new information and responsible opposing views in the EA itself or in a supplemental NEPA document or an EIS; and thereby

e.   Adopting the challenged decision without taking the requisite "hard look" at the significant and potential environmental impacts of the proposed actions, including impacts to wilderness characteristics and to sage-grouse and their habitat.

79.   Accordingly, defendants' final decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with the National Environmental Policy Act, and therefore are actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF:
## Violations of FLPMA

80.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

81.   This claim for relief challenges defendants' violation of FLPMA and its implementing regulations. BLM violated FLPMA by adopting a management decision for Juniper Mountain Allotment that is inconsistent with the underlying land use plan and the FRH regulations. In its Record of Decision adopting the Lakeview RMP, BLM closed Route 7155-AA. The Lakeview RMP also requires livestock grazing to be removed from areas BLM has determined are "at risk" with no apparent trend, requires compliance with the FRH regulations, and requires BLM to manage sage-grouse to maintain, enhance, or restore its habitat or population.

82.     FLPMA requires the BLM to manage the public lands "in accordance with the land use plans developed." 43 U.S.C. § 1732(a); *see also* 43 C.F.R. § 4100.0-8 (requiring BLM to manage grazing activities and management actions on public lands in accordance with applicable land use plans). The FRH regulations require BLM to determine whether rangeland health standards are, or are not, being met. If standards are not being met, and BLM determines that existing grazing management or levels of grazing use are the cause for the failure, BLM must implement grazing management changes on those lands no later than the start of the next grazing season. 43 C.F.R. §§ 4180.1, 4180.2(c).

83.     Defendants violated FLPMA and federal regulations in multiple respects through issuance of the challenged decisions, including but not limited to:

a.  Leaving Route 7155-AA open to motorized vehicle use;

b.  Leaving Horseshoe Meadow open to livestock grazing despite the fact that BLM has classified it as being in "at risk" condition with no apparent trend and provides no evidence of "measurable progress" in the EA/FONSI or decision documents;

c.  Leaving Horseshoe Meadow open to livestock grazing and authorizing construction or implementation of range projects that will impair sage-grouse populations and/or habitat; and

d.  Failing to include in the grazing permit or decision documents any mandatory, quantitative term or condition that will ensure "substantial progress" toward achieving rangeland health standards.

84.     Accordingly, defendants' final decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with the Federal Land Policy and Management Act, and therefore is actionable pursuant to the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.      Order, declare, and adjudge that Defendants' adoption of the final decision pursuant to the "Horseshoe Pasture Riparian Improvement and Livestock Grazing Management Strategy" EA and/or Defendants' subsequent DNA decision are unlawful under and in violation of NEPA;

B.      Issue an injunction barring Defendants from implementing or further implementing any and all construction or other ground-disturbing activity as part of the Horseshoe EA projects, unless and until such time as Defendants have completed a lawful analysis that complies with NEPA;

C.      Issue an injunction ordering that Defendants' immediately close Route 7155-AA;

D.      Issue an order setting aside the final decisions, and ordering Defendants to prepare a new NEPA analysis or revise or supplement its current analysis in compliance with NEPA;

E.      Enter such temporary, preliminary and/or permanent injunctive relief as Plaintiffs may request hereafter;

F.      Award Plaintiff its reasonable costs, litigation expenses, and attorney's fees associated with this litigation as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and all other applicable authorities; and

G.      Grant such other further relief as the Court deems just and proper.

DATED this 4th day of April, 2013.

Respectfully submitted,

s/ Peter M. Lacy

_____
Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff