IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

OREGON NATURAL DESSERT
ASSOCIATION,

          Plaintiff,

    v.

BUREAU OF LAND MANAGEMENT;
THOMAS E. RASMUSSEN, Field Manager for
Lakeview Resource Area; and CAROL
BENKOSKY, District Manager for Lakeview
District Bureau of Land Management,

          Defendants,

    v.

LAIRD RANCH, LLC,

          Defendant - Intervenor.

Case No. 2:10-CV-01331-SU

FINDINGS AND
RECOMMENDATION

Page 1 - FINDINGS AND RECOMMENDATION

SULLIVAN, Magistrate Judge:

Oregon Natural Desert Association ("ONDA"), a non-profit public interest organization, filed a complaint against the Bureau of Land Management, Thomas Rasmussen, and Carol Benkosky[1] (collectively "BLM"), alleging claims under the National Environmental Policy Act ("NEPA") and the Federal Land Policy and Management Act ("FLPMA"), arising out of the BLM's decision to build approximately five miles of fence within a grazing allotment in southern Oregon. ONDA moves for summary judgment pursuant to Fed. R. Civ. P. 56.  The BLM and defendant-intervenor Laird Ranch, LLC ("Laird") each filed cross-motions for summary judgment.  For the reasons set forth below, ONDA's motion for summary judgment should be denied, and the BLM's and Laird's motions for summary judgment should be granted.

## BACKGROUND

This case involves a challenge to a BLM decision that authorizes construction of approximately five miles of fencing within the 50-acre Horseshoe Meadow ("Project"), which is to be added to an extensive network of fences in a livestock grazing allotment known as the Juniper Mountain Allotment.  The Juniper Mountain Allotment is located in southern Oregon, within the BLM's Lakeview Management District, and consists of over 90,000 acres of BLM administered land, divided into six pastures (Big Juniper, Horseshoe, Radio Springs, Eagle Butte, Sagebrush Knoll, and Flint Hills).  Administrative Record ("AR") 13568.  The Horseshoe Pasture encompasses Horseshoe Meadow and abuts Juniper Mountain proper; it is grazed on a rest-rotation system, along

---

[1]    Rasmussen and Benkosky are BLM employees who had "principal authority for the actions and inactions alleged" in ONDA's complaint.  Compl. ¶¶ 12-13.

with the five other pastures, pursuant to a 10-year grazing permit held by Laird.  AR 10726-31, 13568.

In 2004, pursuant to the Federal Rangeland Health Regulations ("FRHR"), the BLM evaluated ecological conditions within the Juniper Mountain Allotment.  In the corresponding Rangeland Health Assessment, the BLM determined, in relevant part, that the Horseshoe Meadow was failing to meet the agency's ecological standard for riparian and wetland function (Standard 2), and that wayward livestock were the cause of the violation.  AR 9354-66.  When the Juniper Mountain's existing partial enclosures were constructed, it was thought that the topography of mountain slopes would serve as an effective barrier to protect Horseshoe Meadow from cattle grazing out of rotation.  However, field observations revealed that some cattle were moving from pasture to pasture, climbing up over the top of Juniper Mountain and around the ends of the existing fences, thereby ending up in Horseshoe Meadow in late summer when the pasture is scheduled for rest.  AR 13568.  The Project was designed to remedy issues articulated in the Rangeland Health Assessment via construction of a fence, removal of juniper, and implementation of the closure of Route 7155-AA.  *Id.*  Because the BLM concluded that the area was not meeting a standard set forth in the FRHR, the BLM executed an interim grazing plan in anticipation of the 2005 grazing season, under which Laird was allowed to graze in Horseshoe Pasture every other year for less than one month in the spring.  AR 9370-74, 13568-69.

In 2005, BLM issued its first Environmental Assessment ("EA"), and corresponding Finding Of No Significant Impact ("FONSI"), authorizing the Project.  AR 9531-40.  ONDA commented on the 2005 EA, administratively protested, and appealed the BLM's decision to the Department of the Interior's Office of Hearings and Appeals ("OHA").  AR 9709-9965, 10060-64, 10089-112.  The

primary basis of ONDA's 2005 appeal was the BLM's allegedly erroneous wilderness designation. The BLM did not designate the Juniper Mountain Allotment as a Wilderness Study Area ("WSA") during its initial assessment from the 1980s.  ONDA asserted that wilderness characteristics existed because many of the area's vehicle routes no longer legally qualified as roads under the Wilderness Act, as evinced through its own wilderness survey conducted in 2004.[2]  After the OHA denied its petition to stay the Project, ONDA filed suit in the U.S. District Court of Oregon.  The parties ultimately entered into a settlement agreement, pursuant to which the BLM withdrew the 2005 EA and agreed to prepare a new decision.  AR 10292-301, 10564-70.

In 2006, the BLM and ONDA met in the Juniper Mountain Allotment to discuss potential wilderness characteristics, as well as the proper environmental analysis for the proposed action.  AR 10574, 13476.  That same year, the BLM also had a field meeting with Laird, a consultant, several range management professors from Oregon State University, and other interested parties to discuss conditions in Horseshoe Pasture.  AR 10575-83, 13476; *see also* AR 10584-88.

In 2007, the BLM issued a revised EA that was similar to the 2005 version, the main difference being an additional appendix containing the agency's wilderness analysis.  *See* AR 10734-807.  During the public comment period, ONDA provided further wilderness survey data and updated the boundaries of the proposed roadless WSA.  AR 10819-33.  ONDA appealed the BLM's 2007 decision to the OHA, which granted its stay petition.  AR 10871-902, 11020-33.  Following the OHA's stay order, the parties again settled, with the BLM agreeing to revisit its wilderness evaluation a second time and to study additional alternatives.  AR 11354-62.  Accordingly, in 2008,

---

[2]    ONDA prepared this survey pursuant to the BLM's then-in-effect guidance documents, which do not materially differ from the BLM's current guidance documents.  *See* ONDA's Reply to Mot. Summ. J. 2-3 (citations omitted).

the BLM performed a formal "Juniper Mountain Wilderness Characteristics Evaluation," reflecting that none of the areas on or around Juniper Mountain possess the requisite wilderness characteristics or otherwise qualify as WSAs. AR 11876-914.

In 2009, the BLM released another revised EA, which included and expanded upon information from the prior EAs. The 2009 EA again approved the Horseshoe Meadow Project and confirmed that it complied with the applicable land-use plans. AR 12714-97. Thereafter, ONDA administratively commented on the proposed action; the BLM responded to ONDA's comments, affirmed its decision, and issued a final revised EA and FONSI in 2010. AR 12854-62, 13472-568. ONDA then appealed the 2010 EA to the OHA and petitioned for a stay. AR 13602-47.

During and/or subsequent to the BLM's preparation of the 2010 EA, the United States Fish and Wildlife Service ("FWS"), the Oregon Department of Fish and Wildlife ("ODFW"), and other researchers disseminated findings regarding the sage-grouse.[3] AR 13282-471, 13907-15483, 15559-789, 15871-976.

On October 25, 2010, ONDA filed a complaint in this Court, alleging that the BLM violated NEPA by failing to: (1) take the requisite "hard look" at and prepare an Environmental Impact State ("EIS") for the area's wilderness characteristics ("wilderness claim"); (2) consider significant new information concerning the sage-grouse; and (3) prepare an EIS based on the presence of sage-grouse. Compl. ¶¶ 65-69. ONDA alleged further that the BLM violated the FLPMA by authorizing actions, including "[l]eaving Route 7155-AA open to motorized use" and allowing continued grazing, that are inconsistent with the governing land use plan, the Lakeview Resource Management

---

[3]    The sage-grouse is a rounded-winged, ground-dwelling bird. Females are a mottled brown, black, and white. Males are larger and have a large white ruff around their neck and bright yellow air sacks on their breasts, which they inflate during their mating display. These birds are found at higher elevations and are highly dependent on sagebrush for cover and food.

Page 5 - FINDINGS AND RECOMMENDATION

Plan ("RMP").  *Id.* at ¶¶ 70-74.  In light of these alleged violations, ONDA requested an order enjoining the BLM from proceeding with the Project and "requiring removal of cattle from Horseshoe pasture."  *Id.* at pg. 18; ONDA's Surreply to Cross-Mots. Summ. J. 13-14.

Also on October 25, 2010, but subsequent to ONDA's initiation of this lawsuit, the OHA granted ONDA's stay petition.  AR 13817-34.  On November 5, 2010, ONDA sought to voluntarily dismiss its administrative appeal.  AR 13835-36.  The BLM opposed ONDA's request, arguing that failure of the OHA to retain jurisdiction would deprive ONDA of any recourse in this Court.  AR 13845-82.  On January 31, 2011, the OHA dismissed ONDA's administrative appeal.  AR 15488-90.

On August 5, 2011, with leave from the Court, Laird joined this action as a defendant-intervenor.  On August 19, 2011, the BLM issued the "Worksheet Documentation of Land Use Plan Conformance and NEPA Adequacy" ("DNA"), in which the BLM evaluated recent data regarding the sage-grouse that emerged during or after the 2010 EA and confirmed that it did not need to conduct any further environmental analysis under NEPA.  AR 15840-56.

On October 4, 2011, ONDA filed a motion for summary judgment, which was supported by the declaration of Craig Miller, M.D.  On November 14, 2011, Laird cross-moved for summary judgment.  On November 21, 2011, the BLM filed a cross-motion for summary judgment; the BLM attached the declaration of Paul Whitman to its motion, which responded to several issues raised in Dr. Miller's testimony.  On May 11, 2012, ONDA filed a motion to supplement the complaint in order to include allegations regarding the August 2011 DNA.  That same day, ONDA moved to strike Mr. Whitman's declaration.

On October 2, 2012, this Court granted ONDA's motion to supplement the complaint and granted, in part, and denied, in part, ONDA's motion to strike.  In particular, the Court struck five

paragraphs of Mr. Whitman's 136-paragraph declaration that related to post-decisional information or contained improper ad hoc rationalizations. On February 22, 2013, Judge Mosman overruled the parties' objections and adopted this Court's October 2, 2012 order.

On April 4, 2013, ONDA filed its supplemental complaint, reasserting its previous claims under NEPA and the FLPMA, and adding new allegations concerning the DNA. *See generally* Supplemental Compl. BLM and Laird filed their respective answers. On August 16, 2013, ONDA filed its response to the BLM's cross-motion for summary judgment and attached the second declaration of Dr. Miller in support. In December 2013, Laird and the BLM filed their reply briefs, in which both parties objected to Dr. Miller's second declaration. *See* LR 56-1. On January 15, 2014, ONDA filed a surreply, responding to the evidentiary objections at issue and providing additional substantive arguments, as well as the attached third declaration of Dr. Miller. On January 21, 2014, the parties participated in a status conference concerning the substantive arguments raised in ONDA's surreply; the Court granted Laird and the BLM leave to file sur-surreplies. Oral argument was held on January 24, 2014.

## STANDARD OF REVIEW

A federal agency's compliance with NEPA or the FLMPA is reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706. In an APA case, summary judgment is awarded in favor of the plaintiff if, after reviewing the administrative record, the court determines that the agency's action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). A decision is not arbitrary or capricious if the federal agency articulated a rational connection between the facts found and the choice made. *Nat'l*

*Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) (courts examine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

Review under this standard is narrow and the court may not substitute its judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Am. Trucking Ass'ns Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009). Nevertheless, while this standard is deferential, the court must "engage in a substantial inquiry," which entails "a thorough, probing, in-depth review." *Native Ecosys. Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation and internal quotations omitted).

## DISCUSSION

ONDA asserts that the 2010 EA was arbitrary, capricious, and inconsistent with the evidence of record because the BLM neglected to meaningfully address the Project site's wilderness characteristics.  Specifically, ONDA maintains that the BLM's wilderness determination, in which it found that Horseshoe Pasture did not contain wilderness characteristics, was based on a flawed assessment of whether the area's routes were roads, as opposed to ways.  ONDA also argues that the 2010 EA did not adequately evaluate information about or impacts to the sage-grouse.  In addition, ONDA contends that the 2010 EA is inconsistent with the RMP because it authorizes the use of Route 7155-AA and continued livestock grazing without amendment to Laird's grazing permit.

The BLM argues, to the contrary, that its decision to authorize the Project was rationale and supported by the record.  According to the BLM, it was not required under NEPA to assess the

Project area's wilderness characteristics in the 2010 EA because it determined, based on ONDA's and its own wilderness surveys, that no such characteristics existed. Moreover, the BLM asserts that the proposed action will not appreciably impact the species and conforms with more recent information about the sage-grouse. Laird joins the BLM's arguments regarding NEPA and the FLMPA, and further contends that this Court lacks subject-matter jurisdiction due to ONDA's failure to follow the proper administrative procedures.[4]

I.    Statutory Framework

Four statutes or regulations are pertinent to ONDA's claims: the FRHR, the FLPMA, the Wilderness Act, and NEPA.

A.    Federal Rangeland Health Regulations

The FRHR establish the fundamentals of rangeland health for grazing administration and mandate the development of state-specific measures. 60 Fed. Reg. 9894, 9898 (Feb. 22, 1995); 43 C.F.R. § 4180.1.[5] The BLM set standards and guidelines for Oregon in 1997. AR 4523-41. Oregon's five standards are as follows: Standard 1 (watershed function - uplands), Standard 2 (watershed function - riparian/wetlands), Standard 3 (ecological processes), Standard 4 (water quality), and Standard 5 (native, threatened and endangered, and locally important species). AR

---

[4]    Because Laird's arguments in favor of summary judgment are analogous to those raised by the BLM, except where otherwise indicated, the Court addresses Laird's and the BLM's motions together.

[5]    Although "the grazing regulations set forth at 43 C.F.R. Part 4100 *et seq.* were amended effective August 11, 2006 . . . implementation of those regulations [has been] enjoined." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 7 n.3. Accordingly, the parties' and the Court's "citations to the grazing regulations are to the 2005 [version]." *Id.*; ONDA's Reply to Mot. Summ. J. 32 n.10.

4529-34.  Once the state standards and guidelines are approved and in force, the FRHR provide that

the authorized officer:

> shall take appropriate action as soon as practicable but not later than the start of the next grazing year upon determining that existing grazing management practices or levels of grazing use on public lands are significant factors in failing to achieve the standards and conform with the guidelines that are made effective under this section. Appropriate action means implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part that will result in significant progress toward fulfillment of the standards and significant progress toward conformance with the guidelines. Practices and activities subject to standards and guidelines include the development of grazing-related portions of activity plans, establishment of terms and conditions of permits, leases and other grazing authorizations, and range improvement activities such as vegetation manipulation, fence construction and development of water.

43 C.F.R. § 4180.2(c).

>        B.      Federal Land Policy and Management Act

The FLMPA governs land use planning on public lands.  *See* 43 U.S.C. §§ 1701-1785.

Under the FLPMA, the BLM is required to "develop, maintain, and when appropriate, revise land

use plans to ensure that land management be conducted on the basis of multiple use and sustained

yield."  *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and

internal quotations omitted).  Once a land use plan is developed, "[a]ll future resource management

authorizations and actions . . . shall conform to the approved plan."  43 C.F.R. § 1610.5-3(a).  The

land use plan governing the Horseshoe Meadow Project is the Northwest Forest Plan, as

incorporated into the RMP; it therefore "embodies the substantive management directives with

which the BLM must comply under the FLPMA."  *Brong*, 492 F.3d at 1125.

To ensure that the BLM has adequate information to perform this task, the FLPMA directs:

> [t]he Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern.  This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values.

Page 10 - FINDINGS AND RECOMMENDATION

43 U.S.C. § 1711(a); *see also* 43 U.S.C. § 1712(c)(4) (land use plans are to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values"). The BLM, in other words, is obligated to "arrange for resource, environmental, social, economic and institutional data and information to be collected, or assembled if already available." 43 C.F.R. § 1610.4-3. In particular, the BLM must collect "[n]ew information and inventory data [that] will emphasize significant issues and decisions with the greatest potential impact." *Id.*

C.     Wilderness Act

Congress identified the conservation of lands with statutorily-defined wilderness characteristics as a national priority in the Wilderness Act, 16 U.S.C. § 1131 *et seq. Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1055-56 (9th Cir. 2003) (en banc). The Wilderness Act is intended to "assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a).

A "wilderness" is defined as:

> an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

In such areas, the existence of permanent roads is prohibited and the presence of temporary roads is limited to those "necessary to meet minimum requirements for the administration of the area." 16 U.S.C. § 1133(c); *see also* 43 C.F.R. § 6302.20(b).  Thus, only areas that exhibit naturalness and  outstanding opportunities for solitude or primitive/unconfined recreation, are roadless, and contain at least 5,000 acres qualify as wilderness under the act.  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.* ("*ONDA*"), 625 F.3d 1092, 1107 (9th Cir. 2008); *see also Barnes v. Babbitt*, 329 F.Supp.2d 1141, 1155 (D.Ariz. 2004) ("to qualify as a wilderness area, however, the Arrastra Mountain area must have been 'roadless,' meaning that it lacked roads that had been improved or maintained by mechanical means for relatively regular and continuous use").

The Wilderness Act does not directly address the BLM's management of federal lands.  The FLPMA remedied this deficiency by specifically providing for review of wilderness resources on BLM lands and ensuring that lands with wilderness characteristics are regularly inventoried for use in land use planning.  *See* 43 U.S.C. § 1782; *see also Bowler v. U.S. Bureau of Land Mgmt.*, 2011 WL 4962150, *5 (D.Or. Oct. 17, 2011), *aff'd in part*, 488 Fed.Appx. 252 (9th Cir. 2012) ("FLPMA interacts with the Wilderness Act to provide the BLM with broad authority to manage areas with wilderness characteristics contained in federally owned land parcels").  Importantly, although 43 U.S.C. § 1782 provides a mechanism by which the BLM may submit lands to Congress for legislation preserving them, the BLM's authority to identify lands with "wilderness characteristics" is not limited to the process outlined in that statute.[6]  Rather, as 43 U.S.C. § 1782 makes clear, "it

---

[6]    The FLPMA states that "[w]ithin fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory . . . as having wilderness characteristics described in the Wilderness Act [and] report to the President his recommendation as to the suitability or nonsuitability of each such area" for preservation as wilderness.  43 U.S.C. § 1782(a).  The President is then to advise Congress "of his recommendations with respect to designation as wilderness of each [agency-identified] area," after which Congress may "designat[e] as

Page 12 - FINDINGS AND RECOMMENDATION

is the 43 U.S.C. § 1711(a) general resource inventory process, which catalogues all public lands and their resource and other values . . . that is to identify lands as having wilderness characteristics described in the Wilderness Act." *ONDA*, 625 F.3d at 1098 (citations and internal quotations omitted). In sum, wilderness characteristics are among the "resource and other values" of public lands the BLM has an ongoing duty to inventory under the FLPMA.

D.   National Environmental Policy Act

NEPA is "a procedural statute that does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation and internal quotations omitted). NEPA's purpose is therefore realized not through substantive mandates but through the creation of a democratic decision-making structure. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989); *see also Churchill Cnty. v. Norton,* 276 F.3d 1060, 1072-73 (9th Cir. 2001) (describing NEPA's purpose). Because NEPA "simply guarantees a particular procedure," rather than a substantive result, the rights and obligations it creates are "fundamentally unlike" those of substantive land management statutes like the FLPMA. *Kern v. Bureau of Land Mgmt.,* 284 F.3d 1062, 1070-71 (9th Cir. 2002) (citation and internal quotations omitted).

To accomplish the "hard look" mandate, NEPA requires all agencies to author an EIS for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §

wilderness" the lands it deems appropriate. 43 U.S.C. § 1782(b); *Smith v. U.S. Forest Serv.*, 33 F.3d 1072, 1073 (9th Cir. 1994); 43 C.F.R. § 6302.11. In the interim period between the BLM's review of areas "identified during the inventory . . . as having wilderness characteristics" and Congress's final preservation decision, the BLM must, with a few exceptions not material here, manage all such lands "so as not to impair the[ir] suitability . . . for preservation as wilderness." 43 U.S.C. § 1782(c). The recommended lands, managed under this "non-impairment" standard, are referred to as WSAs. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59 (2004).

4332(2)(C).  The agency first prepares an EA to determine whether an action will be significant; if the agency concludes there is no significant effect associated with the proposed action, it may issue a FONSI, "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant," in lieu of preparing an EIS.  *Sierra Club*, 510 F.3d at 1018 (citation and internal quotations omitted); 40 C.F.R. § 1508.9.

II.     Subject-Matter Jurisdiction

Laird contends that, "[i]n its rush to federal court, ONDA chose not to follow the applicable administrative procedure [and] prematurely dismissed its appeal before the [OHA], resulting in [no final decision and] a failure to exhaust its administrative remedies."  Laird's Reply to Cross-Mot. Summ. J. 10, 13-17; Laird's Mem. in Supp. of Cross-Mot. Summ. J. 6-13.  ONDA argues that the 2010 EA was a final agency action and, further, "there is no requirement to exhaust administrative remedies for grazing decisions."  ONDA's Resp. to Laird's Cross-Mot. Summ. J. 3.

Under the APA, only final agency decisions are subject to judicial review.  5 U.S.C. § 704; *see also Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) ("finality is . . . a jurisdictional requirement").  For an agency action to be final, the action must: (1) "mark the consummation of the agency's decisionmaking process"; and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and internal quotations omitted).  "[T]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."  *Indus. Customers of NW Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005)  (citation and internal quotations omitted).

Similarly, the APA "requires that plaintiffs exhaust available administrative remedies before bringing their grievances to federal court.  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957,

965 (9th Cir. 2002); *see also* 5 U.S.C. § 704.  The purpose of the exhaustion doctrines is to allow administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention.  *Buckingham v. Sec'y of the U..S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).  Thus, "the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate."  *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985).

The BLM issued the decision that serves as the basis of this lawsuit "pursuant to BLM's grazing regulations, 43 C.F.R. § 4160.1" on July 18, 2010.  BLM's Mem. in Supp. of Cross-Mot. Summ. J. 14; AR 12854-62, 13472-568.  This decision was sent by certified mail to a number individuals, including ONDA, Laird, and the interested public.  AR 13598-99 (return receipts indicating that ONDA, Laird, and A.K. Majors received the BLM's proposed decision between July 22, 2010 and August 2, 2010); *see also* 43 C.F.R. § 4160.1.  None of the individuals who received the proposed decision elected to lodge a protest within 15 days, as permitted by 43 C.F.R. § 4160.2.  ONDA filed a notice of appeal and petition for stay with the OHA on September 7, 2010; the BLM did not oppose ONDA's petition.  AR 13602-47, 13760-800.  On October 25, 2010, before the OHA had issued a decision on the merits, ONDA commenced this lawsuit.  Despite the fact that the OHA later issued a stay, ONDA nonetheless elected to abandon its administrative appeal and instead seek recourse in this Court.

A.    Exhaustion

Both ONDA and Laird rely on  *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 825-

28 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 29–31 (2008), in support of their respective positions.  Laird's Mem. in Supp. Cross-Mot. Summ. J. 7-9; ONDA's Resp. to Laird's Cross-Mot. Summ. J. 3.  In *Hahn*, environmental groups challenged the agency's issuance of grazing permits to cattle ranchers because overgrazing was causing environmental harm.  *Hahn*, 307 F.3d at 820.  The defendants argued that the district court erred by ordering interim equitable relief because "[i]t is undisputed that the Environmental Groups did not exhaust their administrative appeals" before filing suit.  *Id.* at 823-25.  *Hahn* summarized the issue as follows:

> [t]he question before us is whether the BLM's administrative appeal regulations provide procedures that effectively render inoperative the challenged decision pending appeal. If the regulations do not allow for the decision to be rendered inoperative pending administrative appeal, then exhaustion of administrative appeals is not required and the matter was properly before the district court.

*Id.* at 825; *see also* 43 C.F.R. § 4.479.

The *Hahn* court noted that, under 43 C.F.R. § 4.21, an "aggrieved party must file not only an appeal but must also file a petition for a stay of the decision pending appeal as well," yet "additional BLM regulations" allowed continued grazing under the challenged grazing permit "even when a stay is granted."  *Hahn*, 307 F.3d at 825-27.  The stay at issue in *Hahn* did "not render the permit decision inoperative but actually implement[ed] an unreviewed decision to renew grazing authorizations and at the same time allow[ed] grazing practices that are known to harm the environment."  *Id.* at 827.  The court held "that exhaustion [was] not required" because "under the facts of this case the BLM's regulations render[ed] the decision 'inoperative' in name only, while in fact implementing an unreviewed decision."  *Id.* at 827-28.

Accordingly, under *Hahn*, whether exhaustion is required hinges on whether an OHA stay of the agency decision is a true stay - i.e. whether it actually stops the harm alleged to flow from the

Page 16 - FINDINGS AND RECOMMENDATION

proposed agency action.  *Id.*; *see also W. Watersheds Project v. Salazar*, 843 F.Supp.2d 1105, 1123 (D.Idaho 2012) (exhaustion was not required where the harm alleged - i.e. overgrazing - was allowed to continue under the challenged permits pursuant to 43 C.F.R. § 4160.4(b), even where an OHA stay was granted).[7]

In this case, the primary harm alleged in ONDA's OHA petition is the 2010 EA's authorization of construction of a five-mile fence: "[i]f allowed to implement its decision, BLM will build five miles of barbed-wire fence and cut native juniper trees within a citizen-proposed wilderness area despite the fact that the agency has not complied with its obligation under NEPA to study impacts to wilderness characteristics in the project area."  AR 13605, 13612-19; *see also* ONDA's Resp. to Mot. Intervene 2 (phrasing the harm alleged as erection of the proposed fence: "[a]t most, an order from this Court requiring BLM to reconsider its Horseshoe Meadow decision could delay construction of a fence"). While ONDA argued briefly that the 2010 EA was also inconsistent with the RMP to the extent that it did not call for the immediate removal of cattle from Horseshoe Meadow, it never directly raised any issues associated with the BLM's issuance or renewal of Laird's grazing permit during its OHA appeal.  *See* AR 13605, 13620-21.  Thus, unlike *Hahn* and *W. Watersheds*, ONDA did not administratively challenge a grazing permit, or any specific harms associated therewith, such as overgrazing.

---

[7]    In addition to *Hahn* and *W. Watersheds*, ONDA relies on *Or. Natural Desert Assoc. v. Green*, 953 F.Supp. 1133, 1142 (D.Or. 1997).  *See* ONDA's Resp. to Laird's Cross-Mot. Summ. J. 3. In *Green,* the court held that ONDA was not required to the file an appeal with the OHA prior to initiating a lawsuit in this District because 43 C.F.R. § 4.21 "vests discretion in the [OHA] to grant or deny a stay pending review." *Green*, 953 F.Supp. at 1142.  In so holding, the court engaged in a cursory examination of the stay regulations without the benefit of briefing by the parties.  *Id.*  Regardless, *Green's* broad holding that an administrative appeal is never required due to the OHA's discretion is contrary to *Hahn's* subsequent holding, which requires an evaluation of the practical impacts of a stay on the harm alleged.  *Compare id.*, *with Hahn*, 307 F.3d at 825-28.  *Hahn* is therefore controlling.

As a result, the regulation under which continued grazing was allowed in *Hahn* and *W. Watersheds*, even where an OHA stay is granted - i.e. 43 C.F.R. § 4160.4(b) - is inapplicable here because, as discussed in greater detail below, the proposed action does not affect the current grazing management system. *See* 43 C.F.R. § 4160.4(b) ("[w]hen OHA stays implementation of all or part of a grazing decision that . . . changes any term or condition of a permit or lease during its current term, or renews a permit or lease, BLM will continue to authorize grazing under the permit or lease"); *see also* AR 13503, 13620, 13822 (2010 EA retains the status quo by "continuing the rest rotation grazing system," such that the decision at issue "makes no changes to the grazing use levels or management scheme"). In other words, grazing will continue under the 2010 EA because that decision does not modify, amend, or otherwise alter Laird's grazing rights, and not because another regulation exists that permits continued grazing even with an OHA stay in place. *See, e.g.*, ONDA's Resp. to Mot. Intervene 2, 4, 6 (acknowledging that its lawsuit will not affect Laird's grazing rights).

Therefore, an OHA stay would have rendered the proposed action inoperative because it actually would have stopped the alleged harm flowing from the 2010 EA. *See W. Wesley Wallace*, 156 I.B.L.A. 277, 278 (2002) ("issuance of a stay is generally designed to maintain the status quo during consideration of an appeal"). ONDA was thus required to exhaust its administrative remedies prior to seeking recourse in this Court.

B.    Timing and Finality

The administrative appeal period for a "final" BLM decision is "within 30 days after receiving it or within 30 days after a proposed decision becomes final as provided in § 4160.3(a) of this title." 43 C.F.R. § 4.470(a); *see also* 43 C.F.R. § 4160.3(a) ("[i]n the absence of a protest, the proposed decision will become the final decision of the authorized officer without further notice

Page 18 - FINDINGS AND RECOMMENDATION

unless otherwise provided in the final decision"). Once an administrative appeal and petition for stay have been timely filed, the agency decision becomes "effective immediately" when the OHA: "(1) fails to act upon the petition for a stay within 45 days of the expiration of the time for filing a notice of appeal, (2) denies a petition for stay, or (3) partially denies such a petition." *Or. Natural Desert Ass'n v. McDaniel* ("*McDaniel I*"), 751 F.Supp.2d 1145, 1148 (D.Or. 2010) (discussing 43 C.F.R. § 4.21); *see also* 43 C.F.R. § 4.472(d)(l) (OHA must rule upon a petition for stay "[w]ithin 45 days after expiration of the time for filing a notice of appeal"). In sum, after expiration of the 45–day time period, the agency decision becomes effective, final, and appealable in district court. 43 C.F.R. §§ 4.21(c), 4.472(e); *Cntr. for Biological Diversity v. U.S. Dep't of Interior*, 255 F.Supp.2d 1030, 1034 (D.Ariz. 2003).

The BLM interprets these regulations as rendering the 2010 EA administratively "final" 15 days after the last person received it – i.e. Mr. Majors, who acquired the proposed decision on August 2, 2010. BLM's Mem. in Supp. of Cross-Mot. Summ. J. 15 n.15 (citing AR 13845-51); Laird's Mem. in Supp. of Cross-Mot. Summ. J. 10-13. As such, the proposed decision became final and appealable to the OHA on August 18, 2010, and the 30-day appeal period did not expire until September 16, 2010. The OHA's deadline for ruling on ONDA's stay petition was November 1, 2010, or 45 days after September 16, 2010. *See* Laird.'s Oral Arg. Ex. 1. According to the BLM, the OHA's grant of a stay, on October 25, 2010, was well within the requisite time-frame.

ONDA neglected to meaningfully address this issue in its briefs. *See* ONDA's Resp. to Laird's Cross-Mot. Summ. J. 3; *see generally* ONDA's Mem. in Supp. of Mot. Summ. J.; ONDA's Reply to Cross-Mot. Summ. J.; ONDA's Surreply to Cross-Mots. Summ. J. Further, at oral argument, ONDA declined to proffer a general rule, stating only that the 2010 EA became final for ONDA (but not necessarily for other interested individuals who received the BLM's proposed

Page 19 - FINDINGS AND RECOMMENDATION

decision) on August 7, 2010, and, by extension, appealable to this Court on October 22, 2010. *See* ONDA's Oral Arg. Ex. A; *see also* Compl. ¶¶ 60, 62 (indicating that ONDA construes the 15-day protest period to inhere to the date on which each individual received the proposed decision, which, in ONDA's case, was on July 22, 2010); *but see* ONDA's Mem. in Supp. of Mot. Summ. J. 14 ("[u]nder BLM's regulations, 43 C.F.R. § 4160.3(a), [the 2010 EA] became a final decision when no party filed an administrative protest").

The Court finds that a proposed decision can only become administratively final under 43 C.F.R. § 4160.3(a) once the 15-day protest period has run for all interested individuals who received the proposed decision. To hold otherwise would contravene the regulation's plain language and purpose for two reasons. First, the regulation makes clear that the protest period correlates to the date it closes for the BLM, as opposed to any interested party. *See* 43 C.F.R. § 4160.3(a) ("[i]n the absence of a protest, the proposed decision will become the final decision . . . without further notice"). The BLM only knows that it has not received any protests; at no time prior to the expiration of the last protest period can the BLM construe a proposed decision as administratively final. The 30-day administrative appeal period does not begin to run until the last protest period has expired and no timely protests have been filed with the agency "as provided in § 4160.3(a) of this title." 43 C.F.R. § 4.470(a). By extension, the 45-day period in which the OHA must issue a stay decision commences upon "the expiration of the time for filing a notice of appeal." *McDaniel I*, 751 F.Supp.2d at 1148.

Second, accepting ONDA's reading of 43 C.F.R. § 4160.3(a) would result in proposed agency decisions becoming final at different times, for different interested individuals, which produces an illogical result that undermines the notion of finality. By way of example, under ONDA's interpretation, the proposed decision would have become administratively final for ONDA

Page 20 - FINDINGS AND RECOMMENDATION

on August 7, 2010, but that decision could have been undone at any point up until August 18, 2010, were Mr. Majors to file a protest.  This is an absurd result; the regulation simply cannot be interpreted to allow a decision to become final one day for one individual and then become final and/or un-final on a later date for a different individual.  *See Rowland* v. *Cal. Men's Colony,* 506 U.S. 194, 200 (1993) ("the common mandate of statutory construction to avoid absurd results"), *Griffin* v. *Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982) ("interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purposes are available").

This reading is also consistent with other general principals regarding the exhaustion requirement.  *See, e.g.*, *Hahn*, 307 F.3d at 829 (federal court should not "inappropriately interfere with the agency's decision making process before it was completed").  In sum, because ONDA dismissed its administrative appeal prior to an OHA decision on the merits, ONDA neglected to exhaust its administrative remedies, such that this Court is without jurisdiction and this case should be dismissed.

However, in order to provide the most complete review of this lawsuit, which has been pending for nearly four years, the Court will discuss the procedural and substantive issues regarding ONDA's claims below.

III.    Threshold Procedural Issues

Before reaching the substantive merits of the parties' respective motions, the Court addresses the BLM's arguments that: (1) ONDA waived certain issues by failing to properly raise them; and (2) ONDA's wilderness claim does not accrue under NEPA.

A.    Issues Not Adequately Raised

The BLM asserts that ONDA neglected to properly raise issues regarding the sage-grouse

Page 21 - FINDINGS AND RECOMMENDATION

during the administrative process. BLM's Mem. in Supp. of Cross-Mot. Summ. J. 28-30; BLM's Reply to Cross-Mot. Summ. J. 21-22. The BLM further contends that the Court should not consider the following issues because ONDA failed to introduce them in its opening brief: (1) the naturalness of the Project area; (2) inconsistencies between the 2010 EA and the RMP's direction regarding special status species, which include the sage-grouse; and (3) modification of Laird's grazing rights by the 2010 EA. BLM's Reply to Cross-Mot. Summ. J. 14, 31, 38.

Courts ordinarily decline to consider arguments that are first raised in a reply brief. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 n.6 (9th Cir. 2004). A party also waives the right to preserve an argument for judicial review that was not raised during the administrative process. *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir.2010); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration"). However, a party "need not raise an issue [during the administrative process] using precise legal formulations, so long as enough clarity is provided that the decision maker understands the issue raised." *McNair*, 629 F.3d at 1076. Flaws in an environmental evaluation may also be "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Pub. Citizen*, 541 U.S. at 765. The "so obvious" standard applies only if the agency has an independent knowledge of the issues that concern petitioners. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011).

The administrative record reveals that ONDA never provided comments or any other indication, throughout the administrative process, suggesting that an EIS should be prepared for the Horseshoe Meadow Project. AR 12854-62, 13602-47. Instead, ONDA's administrative challenges

Page 22 - FINDINGS AND RECOMMENDATION

were focused primarily on the BLM's road vs. way determinations as they relate to the area's wilderness characteristics. *See, e.g.*, AR 12856 ("[w]hat we remain concerned about with this project is BLM's decision not to study impacts to wilderness in the EA"), 13605 ("the agency has not yet complied with its obligation under NEPA to study impacts to wilderness characteristics in the project area"), 13612 ("BLM has violated NEPA by failing in its EA to take a 'hard look' at impacts to wilderness values on Juniper Mountain[,] [which] is evidenced by BLM's flawed road/way determinations"). Furthermore, at no point did ONDA discuss the sage-grouse, except as a facet of its wilderness analysis, or the Project's allegedly significant environmental impacts. AR 12854-62 (ONDA's 2009 EA comments do not mention the sage-grouse except to the extent ONDA "incorporate[d] by reference our past comments and concerns over BLM's previous iterations of this project"); *see also* AR 13606-07, 13622 (ONDA's 2010 OHA appeal, briefly mentioning the sage-grouse in its recitation of facts concerning the Juniper Mountain Allotment and noting that fences and road fragments are harmful thereto in the context of its assessment of wilderness characteristics).[8]

As a result, *Or. Natural Desert Ass'n v. McDaniel* ("*McDaniel II*"), 751 F.Supp.2d 1151 (D.Or. 2011), on which ONDA relies, is not persuasive. *See* ONDA's Reply to Mot. Summ. J. 6-7. Notably, in *McDaniel II*, the plaintiff repeatedly "described deficiencies in BLM's EA/FONSI" and argued that the prosed agency action "would, in fact, have significant

---

[8] During oral argument, ONDA suggested that the "so obvious" standard governs because the BLM was on notice of issues with the sage-grouse based on ONDA's comments during earlier iterations of this lawsuit. However, ONDA and the BLM settled their disputes regarding the 2005 and 2007 EAs. The BLM therefore reasonably presumed that any issues arising out of those prior decisions had been adequately resolved unless expressly raised in ONDA's 2009 comments or 2010 OHA appeal. For this reason, ONDA's "incorporat[ion] by reference" of past comments is insufficient to inform the BLM of any specific sage-grouse issues, especially in light of the extensive procedural history of this case.

Page 23 - FINDINGS AND RECOMMENDATION

environmental impacts." *McDaniel II*, 751 F.Supp. 2d at 1167-68. Thus, while the plaintiff in that case did not specifically invoke the BLM's need to prepare an EIS, it was clear from the record that this aspect of the agency action was being challenged. *Id.* The same cannot be said in the case at bar; ONDA's comments during the administrative process, which related primarily to the BLM's determination that certain routes were roads, were too attenuated to alert the BLM of the need to supplement or revise the 2010 EA due to allegedly significant impacts to the sage-grouse or its habitat.

Similarly, pursuant to its FLPMA claim, ONDA neglected to mention inconsistencies between the 2010 EA and the RMP's direction regarding special status species in its opening brief. *See generally* ONDA's Mem. in Supp. of Mot. Summ. J. In addition, the BLM is correct that ONDA's opening brief failed to discuss any aspect of the BLM's wilderness inventory, other than roadlessness, or the 2010 EA's alleged alteration of Laird's grazing permit rights. *Id.*

For these reasons, ONDA waived the right to assert the aforementioned issues. *See, e.g.*, *Cascadia Wildlands v. Bureau of Land Mgmt.*, 2013 WL 5723315, *9 n.6 (D.Or. Oct. 18, 2013) ("while plaintiffs are correct that arguments raised during the administrative process need not be raised in precise legal terms, they nonetheless forfeited any objection to the EA on this ground" by failing to mention the issue during the "NEPA comment/protest period or in their opening brief") (citations and internal quotations omitted); *see also Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 967 (9th Cir. 2006) (general objections that are too attenuated from the issues raised before the district court will not suffice). Regardless, because ONDA's arguments also fail on the merits, the Court addresses these matters below in section III(B) (wilderness claim), section IV (NEPA claims), and section V (FLPMA claims).

B.    Wilderness Claim

Page 24 - FINDINGS AND RECOMMENDATION

The BLM contends that "[a]ll of the arguments on which ONDA relies basically allege that BLM did not update its inventory correctly under FLPMA, but it has not brought a claim under that statute with respect to such issues, and instead vainly tries to assert that its disagreements over such questions somehow amount to a NEPA violation." BLM's Mem. in Supp. of Cross-Mot. Summ. J. 16. The BLM argues that ONDA's claim relating to the Project area's "wilderness characteristics should be denied on this basis alone." *Id.* at 17. As noted above, the FLMPA embodies the substantive management directives with which the BLM must comply, whereas NEPA is a procedural statute that does not mandate particular results, but instead provides the necessary processes for democratic decisionmaking.

Three recent cases have addressed an agency's duty to address wilderness characteristics pursuant to NEPA and/or the FLMPA: *Or. Natural Desert Ass'n v. Rasmussen*, 451 F.Supp.2d 1202 (D.Or. 2006); *ONDA*, 625 F.3d 1092; and *Or. Natural Desert Ass'n v. Shuford*, 2007 WL 1695162 (D.Or. June 8, 2007), *aff'd*, 405 Fed.Appx. 197 (9th Cir. 2010). *Rasmussen* and *ONDA* concerned the agency's failure to consider any current wilderness information prior to completing its NEPA analysis. *Rasmussen*, 451 F.Supp.2d at 1213; *ONDA*, 625 F.3d at 1118-22. In those cases, the agency had not performed any wilderness inventory since the early 1990s and did not discuss any wilderness values in the relevant decisions, despite the fact that the plaintiff pointed to its self-prepared 2004 wilderness inventory as evidence of changed circumstances. *Id.* The *Rasmussen* and *ONDA* courts held that the agency acted arbitrarily and capriciously by authorizing the proposed actions without first considering and/or discussing more recent information relating to wilderness values. *Id.*

In *Shuford*, the plaintiff bought claims under both NEPA and the FLPMA based on the agency's alleged failure to designate certain areas as WSAs due to their alleged wilderness

Page 25 - FINDINGS AND RECOMMENDATION

characteristics.  Concerning the plaintiff's FLMPA claim, the court held:

> ONDA has not shown that BLM's baseline information for wilderness was outdated
> or inaccurate to the point that the agency did not meet FLPMA's requirements of
> managing for multiple use and preventing unnecessary or undue degradation. The
> record demonstrates that BLM considered ONDA's wilderness inventory . . . Even
> if BLM excluded parcels that ONDA believes have wilderness characteristics, BLM
> has wide discretion in conducting its wilderness analysis and need not agree with
> ONDA's assessment.  This court will defer to the agency's expertise in this regard,
> absent a showing that BLM failed to analyze the RMP's impact on an obviously-
> present resource value . . . ONDA cannot prevail on its FLPMA wilderness claims.

*Shuford*, 2007 WL 1695162 at *9-11.

Regarding the plaintiff's NEPA claim, the *Shuford* court held that the agency did not act

unlawfully by omitting discussion from the EIS of an area which it found to have no wilderness

characteristics based on current wilderness information.  *Id.* at *6-9 (distinguishing *Rasmussen*, 451

F.Supp.2d at 1213).  In so holding, the court emphasized that the "BLM only has to consider an

adequate baseline of resource information to satisfy NEPA's hard look requirement, and BLM can

rely on its expertise to determine whether a parcel has the requisite wilderness characteristics

[because] NEPA is a procedural statute and does not mandate particular results."  *Id.* at *8 (citations

and internal quotations omitted).

Read together, the foregoing precedent indicates that a wilderness claim is cognizable under

NEPA upon a showing that the agency did not meaningfully discuss the proposed project area's

wilderness characteristics in a environmental analysis, in reliance on an outdated wilderness

inventory, and evidence of changed circumstances.  *See Soda Mountain Wilderness Council v.*

*Bureau of Land Mgmt.*, 945 F.Supp.2d 1162, 1178 (D.Or. 2013) ("[w]hile the BLM must inventory

and consider an area's potential for designation under the Wilderness Act, it need not conduct a new

inventory every time it proposes a project . . . a new inventory may need to be done [only] if there

is a change of circumstances in the project area") (citations and internal quotations omitted); *see also*

Page 26 - FINDINGS AND RECOMMENDATION

*Rasmussen*, 451 F.Supp.2d at 1213; *ONDA*, 625 F.3d at 1118-22.  Conversely, a wilderness claim is appropriately brought under the FLPMA where the substance of the agency's wilderness determination is at issue. *See Shuford*, 2007 WL 1695162 at *6-11.  In sum, NEPA is implicated where there is no evidence that the agency actually considered adequate baseline resource information, whereas the FLPMA governs where the party challenging the proposed action disputes the agency's substantive conclusions.

Here, ONDA's wilderness claim states that the "BLM violated NEPA by failing to study and disclose the project's impacts to wilderness characteristics . . . because the agency misidentified routes within the planning area as 'roads' instead of 'ways.'"[9]  ONDA's Mem. in Supp. of Mot. Summ. J. 16-17.  Central to ONDA's assertion is whether, under the FLPMA, the BLM properly designated the disputed routes as roads: "if ONDA can show that BLM's road v. way determinations were erroneous, it follows that BLM acted arbitrarily in not studying impacts to wilderness in the 2010 EA." *Id.* at 17.  To the extent that ONDA's wilderness claim is premised on a disagreement with the BLM's determination that there are no lands within Horseshoe Meadow that exhibit wilderness characteristics, it does not accrue under NEPA.  However, although it is well-established that NEPA and the FLPMA afford guarantees that are fundamentally different, the BLM has not cited to any authority to support the proposition that a court may refuse to consider substantive wilderness claims that are incorrectly alleged under NEPA. *See generally* BLM's Mem. in Supp. of Cross. Mot. Summ. J.; BLM's Reply to Cross. Mot. Summ. J.; BLM's Sur-sureply to Cross. Mot.

---

[9]   The existence of ways does not "render an area 'roaded' so as to eliminate that area from further evaluation of wilderness."  *ONDA*, 625 F.3d at 1107.  A road is any route "improved and maintained by mechanical means to [e]nsure relatively regular and continuous use."  AR 349, 5301-02, 15541; *see also Square Butte Grazing Ass'n*, 67 I.B.L.A. 25, 29 (1982) (BLM adopted its definition of road from the legislative history of the FLPMA).  Conversely, a way is a route "maintained solely by the passage of vehicles."  AR 15541.

Page 27 - FINDINGS AND RECOMMENDATION

Summ. J.  In fact, courts often fail to distinguish between the different types of wilderness claims or their statutory basis.  *See, e.g.*, *Soda Mountain*, 945 F.Supp.2d at 1178.

Regardless of whether it should have been alleged under NEPA or the FLPMA, ONDA's wilderness claim fails.  ONDA neglected to address all of the requisite elements in regard to the BLM's wilderness designation - i.e. roadlessness, sufficient acreage, naturalness, and outstanding opportunities for solitude or primitive recreation.  *See* 16 U.S.C. § 1131(c); AR 16325-29; *see also* BLM's Sur-surreply to Cross-Mot. Summ. J. 13 n.3 ("[r]oadlessness is generally part of the first criteria BLM looks at in attempting to identify wilderness characteristics: namely roadless areas that are larger than 5,000 acres in size").  ONDA maintains that roadlessness "is a threshold question for determining the presence or absence of wilderness on public lands" because "the larger the roadless area, the more likely it is to possess outstanding wilderness characteristics."  ONDA's Mem. in Supp. of Mot. Summ. J. 16 (citing *ONDA*, 625 F.3d at 1107[10]); ONDA's Reply to Mot. Summ. J. 10.  While ONDA is correct that roadlessness can impact an area's naturalness or qualifying acreage, the fact remains that all three factors must be simultaneously present in order for wilderness characteristics to exist.  *See Soda Mountain*, 945 F.Supp.2d at 1178-80 (evaluating naturalness,

---

[10]   This case merely acknowledged that "the BLM has long treated the presence of roads as cancelling out any other wilderness characteristics an area might otherwise have, as they defeat the 'natural conditions' wilderness characteristic."  *ONDA*, 625 F.3d at 1107.  Here, however, the BLM identified "four roadless units [that] met the 5,000-acre size criteria," including one containing the Horseshoe Pasture, but nonetheless "found them to not exhibit" the other requisite elements.  BLM's Sur-surreply to Cross-Mot. Summ. J. 13 n.3; *see also* AR 11876-914 (BLM's 2008 wilderness inventory).  Notably, the BLM resolved that naturalness was not present in the Horseshoe Pasture and adjoining area due to the existence of "Clark Cow Camp, with a corral and buildings," and "2.8 miles of fence, 11 developed livestock waterholes, 5 developed springs, 6 reservoirs, 3 wildlife guzzlers, and 42-acres of non-native seeding."  AR 11887-88.  The BLM also determined that opportunities for solitude and/or recreation were lacking "due to the increased number and location of human developments, the increased motorized access to this area, and noise intrusions from military aircraft" that use the adjacent airspace "for low tactical training."  AR 11888-89; *see also* First Laird Decl. Ex. D; Second Laird Decl. ¶¶ 2-8.

Page 28 - FINDINGS AND RECOMMENDATION

opportunities for solitude, and acreage under 16 U.S.C. § 1131(c), in that order, to determine whether the agency's wilderness designation was arbitrary or capricious).  In other words, the BLM's analysis related to naturalness and opportunities for solitude or primitive recreation, irrespective of whether roads or ways are present, precludes a wilderness finding for the pertinent area.  *See* AR 11867-914.  Because it did not provide any argument or evidence concerning these other factors, ONDA cannot prevail on its wilderness claim.[11]

Further, ONDA does not cite to a single case in support of the proposition that an agency's substantive wilderness assessment, based on current wilderness information, may be overturned on the basis of conflicting evidence.  *See generally* ONDA's Mem. in Supp. of Mot. Summ. J.; ONDA's Resp. to Laird's Cross-Mot. Summ. J.; ONDA's Reply to Mot. Summ. J.; ONDA's Surreply to Cross-Mots. Summ. J.  To the extent that ONDA relies on *Rasmussen* and *ONDA*, these cases are readily distinguishable.  Both concerned scenarios in which the agency had not updated its inventory for lands with wilderness characteristics since the 1990s.  In the case at bar, the BLM updated its wilderness inventory under the FLMPA, most recently in 2008, such that it had adequate baseline information.  *Compare Rasmussen*, 451 F.Supp.2d at 1212-13, *and ONDA*, 625 F.3d at 1111-22, *with* AR 11876-914.

Relevant precedent establishes that deference is afforded to the agency where it considered recent information concerning the area's naturalness, opportunities for solitude, and acreage, and documented its findings.  *See Shuford*, 2007 WL 1695162 at *8 (in considering the plaintiff's

---

[11]   As denoted in section III(A), ONDA's opening brief addresses only roadlessness.  Despite the fact that the BLM raised this deficiency, ONDA did not meaningfully discuss naturalness until its surreply and its briefs remain silent as to opportunities for solitude or primitive recreation.  *See* BLM's Mem. in Supp. of Cross-Mot. Summ. J. 18; *see also* ONDA's Reply to Mot. Summ. J. 11, 14 (mentioning naturalness only in a footnote and again briefly in reference to Dr. Miller's second declaration); *see also* ONDA's Surreply to Cross-Mots. Summ. J. 5-7.

conflicting evidence, which is nearly identical to the evidence in this case, the Court held that in "a factual situation where it is debatable whether a route is a 'road' or a 'way,' the court cannot substitute its judgment for that of the BLM" because the "BLM has wide discretion in conducting its wilderness analysis and need not agree with ONDA's assessment"); *Soda Mountain*, 945 F.Supp.2d at 1180 ("[t]hough the court understands plaintiffs' skepticism of the thoroughness and correctness of the 2006 inventory, . . . the inventory considered the factors it was required to and documented its findings [such that the] court should defer to agency decisions") (citation omitted); *see also Conoco, Inc., et al.*, 61 I.B.L.A. 23, 34-35 (1981) ("[w]here the record evidences BLM's firsthand knowledge of the lands within an inventory unit and contains comments from the public as to the area's fitness for wilderness preservation . . . BLM's determination that a vehicle route does or does not meet the definition of a road is entitled to great deference"); *Charles Schwenke*, 67 I.B.L.A. 201, 205 (1982) (affording deference to the agency's wilderness determination where "[i]nventory case files assembled by BLM evidence its firsthand knowledge of the lands at issue [and] BLM has received the benefit of numerous comments from individuals and groups of wide ranging interests").

In planning the Horseshoe Meadow Project, the BLM contemplated current information concerning the Project area's naturalness, opportunities for solitude, and acreage, and documented its findings in the "Juniper Mountain Wilderness Characteristics Evaluation." AR 11645-914, 13477-78. Specifically, the BLM "follow[ed] the BLM Oregon/Washington State Office inventory guidance" during its 2008 wilderness inventory update. Whitman Decl. ¶ 39 (citing 11378-81, 11384-406, 11532-34, 11568, 11571-73, 11868-75); *see also* AR 11867-914. Pursuant to this assessment, the BLM considered evidence provided by ONDA, including its 2004 wilderness inventory and 2008 update, as well as information from other private entities. AR 11886; *see also*

Page 30 - FINDINGS AND RECOMMENDATION

Whitman Decl. ¶ 20; AR 9853-65, 9965-10050, 10771-807, 10827-33, 11085-163, 11491-93, 11495-531, 11569, 11571-72, 11645-914, 11867-914.  The BLM also "reviewed resource data . . . as well as existing wilderness inventory information contained in the BLM's wilderness inventory files and previously published inventory findings."  Whitman Decl. ¶ 20 (citing AR 11378-81, 11384-406, 11532-34, 11568, 11571-73, 11868-75).  Additionally, "BLM staff drove the [routes] in the area[,] took additional photos of field conditions[,]"and "documented the presence or absence of mechanical improvement by construction (paving, blading, gravel, roadside berms, and cut and fills, other improvements (culverts, stream crossings, bridges, gates, cattle guards, drainage features, and barriers), and recent maintenance on the road analysis forms based on recent visits or professional knowledge of the route."  *Id.* at ¶¶ 20, 22; *see also* AR 11491-93, 11838-67, 11869-73, 11886.

Based on this information, the BLM found that the five routes at issue qualified as roads and, furthermore, "that prior inventory findings that no lands with wilderness characteristics exist in the project area remain valid."  BLM's Reply to Cross-Mot. Summ. J. 3; AR 11867-914; *see also* Whitman Decl. ¶ 29, 48, 67; AR 481-83, 488-89, 872, 11378-79, 11568, 11571, 11573, 11659, 11662, 11668-69, 11840-41, 11846-56.  Accordingly, the Court declines to depart from established precedent and defers to the agency's route determinations because they were based on relevant information the agency deemed reliable.  *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012).  Simply put, the fact that conflicting evidence exists in the record - relating to whether the routes identified by the BLM are, in fact, roads, as opposed to ways - is insufficient to establish a violation of the FLPMA because the BLM based its wilderness determination on

current evidence, the relevant factors,[12] and documented its findings.

Because the BLM reasonably did not identify any lands with wilderness characteristics within the proposed Project area during its most recent FLPMA inventory, it was not required to disclose or evaluate any wilderness properties as part of its NEPA review. *Shuford*, 2007 WL 1695162 at *7-9 ("NEPA does not require that BLM designate wilderness study areas when considering the impacts of an agency action . . . it is sufficient that BLM considered additional parcels as wilderness resources and other resources in the planning area"); *W. Watersheds Project*, 173 I.B.L.A. 348, 353-54 (2008) ("[w]hen BLM has completed an inventory of the wilderness resource as part of its FLPMA obligations and reached the conclusion that no lands meeting the necessary wilderness criteria[,] [there is] nothing to analyze in the EA"); *see also* AR 13477-78 ("wilderness character need not and will not be considered further within this EA" because, pursuant to its 2008 wilderness survey, "the BLM did not find any unit that met all the required wilderness criteria"). NEPA does not create an obligation to analyze impacts to non-existent resources or non-

---

[12]    To the extent it asserts that the BLM's wilderness designation was not based on the relevant factors, ONDA's wilderness claim fails. As a preliminary matter, it is beyond dispute that the BLM did, in fact, consider roadlessness, sufficient acreage, naturalness, and outstanding opportunities for solitude or primitive recreation. AR 11867-914. Accordingly, the fact that the BLM may have considered additional factors, including the purpose of a route, whether it would receive future maintenance, or whether it appears in the agency's transportation network database, is immaterial. In any event, current BLM guidance, which ONDA does not challenge, states that a route's purpose, although not dispositive, is relevant to "provide context in which to consider the criteria for a road determination." AR 15542; *see also* AR 403, 15803-04. BLM guidance also permits consideration of whether a route will be maintained if needed. AR 15541-42 ("[a] route . . . which was mechanically improved to permit the passage of vehicles, but which to date has not needed any further mechanical improvement or maintenance to facilitate the relatively regular and continuous passage of vehicles, can be a road in those circumstances where the road would be maintained if the need were to arise"); *see also Sierra Club*, 62 I.B.L.A. 367, 370 (1982). Finally, the BLM did not act contrary to inventory guidelines by merely acknowledging the presence of the disputed routes within its ground transportation and FAMS databases. AR 11867-914; *see also* Whitman Decl. ¶¶ 16-17, 64-65, 77, 98, 104; BLM's Reply to Cross-Mot. Summ. J. 7 n.4.

significant issues.  Rather, the statute counsels against this type of conduct.  *See* 40 C.F.R. § 1500.1(b) ("NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail"); 40 C.F.R. § 1500.4(c) ("NEPA's purpose is not to generate paperwork"); *see also* AR 11219-21.  For these reasons, the BLM's and Laird's motions should be granted, and ONDA's motion denied, in regard to ONDA's wilderness claim.

IV.    National Environmental Policy Act Claims

ONDA asserts that the BLM violated NEPA by neglecting to take the requisite "hard look" at the consequences of constructing the proposed fence in light "significant new information" concerning the sage-grouse.  ONDA's Mem. in Supp. of Mot. Summ. J. 23.  According to ONDA, the 2010 EA is insufficient because: (1) "sage-grouse are affected by habitat disturbances at far greater spatial scales than previously recognized" and the BLM decided to  "build the Juniper Mountain fence within known sage-grouse habitat, just 1.8 miles from the nearest lek"; (2) "females may travel 12.5 miles or more from leks to establish nests"; (3) the BLM failed to discuss collision mortality rates and "the fence's likely impact as a new 5-mile predator perch"; and (4) the "BLM produced not a single project map depicting the projects and sage-grouse lek (let alone nesting and other habitat) locations."  *Id.* at 23-25.  By extension, ONDA contends that the BLM was required to prepare an EIS because the proposed action will "cause significant impacts . . . to important sagebrush habitat within one of the last remaining sage-grouse stronghold west of the Rockies."  *Id.* at 25-26.

A.    Significant New Information

To accomplish the "hard look" procedural requirement, NEPA requires all agencies to prepare an EIS for any action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Where, as here, the agency determines in an EA that there is no significant

effect associated with the proposed action, it may issue a FONSI in lieu of preparing an EIS. *Sierra Club*, 510 F.3d at 1018; 40 C.F.R. § 1508.9. An EA "need not be extensive" and must only discuss the important aspects of the proposed action. *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 623 F.Supp.2d 1015, 1026 (D.Ariz. 2009); *see also* 40 C.F.R. §§ 1500.1(b), 1500.4(c). Although NEPA imposes a continuing duty on federal agencies to supplement their decisions to respond to new information, "an agency is not required to prepare a supplemental EIS or EA every time new information comes to light; rather, a supplemental analysis is required only if changes, new information, or circumstances may result in significant environmental impacts in a manner not previously evaluated and considered." *Cascadia*, 2012 WL 6738275 at *9 (citing *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008)); *see also City of Santa Clarita v. U.S. Dep't of Interior Bd. of Land Appeals*, 2006 WL 4748737, *17 (C.D.Cal. Feb. 8, 2006) ("[a]n agency is not required to supplement an EIS unless the new information provides a seriously different picture of the environmental landscape such that another hard look is necessary") (citation and internal quotations omitted).

The BLM evaluated the environmental impacts of the Horseshoe Meadow Project between 2005 and 2010, ultimately resulting in the July 2010 EA and FONSI. AR 13472-587. This decision acknowledges that the Project calls for construction of a fence within sage-grouse habitat. AR 13492. The BLM determined, however, that the Project was not anticipated to have a "significant" or otherwise appreciable affect on the species because "Oregon has had a fluctuating, but stable sage-grouse population since 1973" and "active leks are located approximately 5 and 10 miles to the south of the Horseshoe Pasture." AR 13472, 13492. The selected alternative was also designed to improve sage-grouse habitat by "cutting . . . post-settlement (i.e. invasive) juniper" and "restor[ing] . . . the meadow area through the stabilization of existing headcuts." AR 13506; *see also*

Page 34 - FINDINGS AND RECOMMENDATION

AR 13501-02. While the BLM acknowledged that "some studies suggest that sage-grouse and other birds can collide with fences by accidentally flying into them," it nonetheless found that the proposed action's impacts would be "minimal" because "this fence is located several miles north of the nearest active lek." AR 13502. Thus, the BLM found that the Project was not likely to negatively impact the species and would maintain or restore sage-grouse habitat. AR 13542, 13571-72.

Immediately before the BLM issued the 2010 EA, the ODFW released a draft "Greater Sage-Grouse Conservation Assessment and Strategy for Oregon." AR 13282-471; *see also* AR 15559-779 (final "Greater Sage-Grouse Conservation Assessment and Strategy for Oregon"). As its name implies, the study evaluated the incidence and distribution of sage-grouse across Oregon, and set guidelines for maintaining and restoring core habitat. *Id.* The ODFW found that, while long-term populations have declined, Oregon's sage-grouse are considered "secure," in part because "population indices over the last decade suggest stable or increasing populations." AR 13299, 15604 ("[s]tatewide spring population trends were relatively stable for the assessment period (1980-2010) with population increases in most areas from the mid 1990s through 2006"). Yet the ODFW acknowledged that human influences, such as fences, can cause habitat fragmentation and/or sage-grouse mortalities. AR 13298, 13389-90, 15585, 15676, 15683. Accordingly, the ODFW recommended that fences identified "within 1.6 km (1 mile) of an active lek or known seasonal use area should be marked with anti-strike markers." AR 15676.

In 2010, after the BLM completed the 2010 EA, the FWS issued "12–Month Findings for Petitions to List the Greater Sage-Grouse as Threatened or Endangered." AR 15871-976. The FWS concluded that listing the greater sage-grouse under the Endangered Species Act was warranted but precluded by higher priority actions. *Id.* Pursuant to this determination, the FWS found that: (1)

Page 35 - FINDINGS AND RECOMMENDATION

"[f]emales have been documented to travel more than 20 km (12.5 mile) to their nest after mating . . . but distances between a nest site and the lek on which breeding occurred are variable," with the average distance "rang[ing] from 3.4 km (2.1 mi) to 7.8 km (4.8 mi)"; (2) although "numbers are difficult to estimate," sage-grouse populations declined from 1965 to 2007, but with "[t]he rate of decline rangewide slow[ing] to 0.37 percent annually during 1986 to 2003 and some populations increas[ing]"; (3) "habitat conversion for agriculture; urbanization; infrastructure (e.g. roads, powerlines, fences) in sagebrush habitats; fire; invasive plants; pinyon-juniper woodland encroachment; grazing; energy development; and climate change . . . individually and in combination, are contributing to the destruction, modification, or curtailment of the greater sage-grouse's habitat or range"; and (4) "[t]wo strongholds of relatively contiguous sagebrush habitat (southwestern Wyoming and northern Nevada, southern Idaho, southeastern Oregon, and northwestern Utah) with large populations" represent "sufficient habitats currently to support the greater sage-grouse in these areas," despite "the presence of several threats," including "habitat destruction and modification."[13] AR 15877, 15879, 15883-85, 15889, 15891, 15924, 15948, 15950.

In early 2011, Steven Knick and John Connolly issued findings regarding the sage-grouse ("Monograph"). AR 13907-15483. The majority of the Monograph is simply a compilation of or further elaboration upon previous work. *Compare id.*, *with* AR 15871-976 (relying on many of the same sources that the FWS used in formulating its warranted but precluded finding). Like the studies that preceded it, the Monograph concluded that "[o]verall, population trends have been more stable in recent years although sage-grouse numbers still are declining in some regions . . . the underlying cause [being] loss of suitable sagebrush habitat." AR 13909. The Monograph generally

---

[13]    The Juniper Mountain Allotment lies within the Oregon portion of one of these strongholds. *See* AR 15920, 15924, 15950; *see also* AR 13933-35 (ODFW maps showing primary habitat areas).

advocated for examining impacts to sage-grouse on a larger spatial scale. *See, e.g.*, AR 13910-11, 13915, 14702-03, 15085, 15469.

In May 2011, the BLM prepared the DNA, "which sets out [its] review of recent new information and conclusions regarding the significance of any new information in the Oregon Strategy in terms of any need to prepare a supplemental NEPA document for the Horseshoe grazing decision." AR 15840-56. The BLM began by denoting that it "did review the July 2010 draft of the [ODFW study] prior to the signing of the proposed Horseshoe grazing decision [but] did not cite the document, as it was still in draft form and subject to revision." AR 15840. Regardless, the BLM resolved that, even considering recent studies, "[t]he direct and indirect impacts to sage-grouse remain unchanged from those already analyzed in the 2010 EA." AR 15853. In particular, the BLM acknowledged the ODFW's new "recommend[ation] that fences within 1 mile of sage-grouse leks be marked with anti-strike markers." AR 15844. Nevertheless, the BLM found that "this new recommendation [will] not result in any change to the proposed action because the selected alternative (2B) does not call for the construction of any fencing within nearly 5 miles of any active lek sites." *Id.*

The BLM noted further that the evidence on which the FWS's finding concerning fences was based indicated, to the contrary, that "[f]ences with 1-3 strands of wire are normally not negative to sage-grouse although sage-grouse have been observed and documented flying into fences." AR 15846-47. As such, because the "proposed fence would be a three st[r]and barbed wire fence . . . located over 4.4 miles from the nearest sage-grouse lek, which according to the best available information on the subject renders the risk of collision very low, it will have little impact on the fragmentation of sage-grouse habitats [and] is consistent with the information and impacts analysis in the EA." AR 15847. In sum, "[d]ue to the placement of half of the fence along habitat not

Page 37 - FINDINGS AND RECOMMENDATION

generally used by sage-grouse, the distance of the fence from an active lek, and the low numbers of

birds likely using the area, the BLM biologist has determined it is highly unlikely that the proposed

fence would be detrimental to the local sage-grouse population."  AR 15850.

As a preliminary matter, the very supplementation that ONDA seeks in light of this new

information has already been completed.  Although the DNA itself is not a NEPA document or a

supplement to a NEPA document, it is functionally equivalent in this case because, in the DNA, the

BLM took the requisite hard look at the environmental effects of the proposed action and responded

to new information.[14]  *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157 ("[t]o assist the agency

in determining whether a [supplemental] EIS is required, an agency may prepare an environmental

---

[14]  Perhaps in recognition of this fact, ONDA's reply brief focuses on the DNA, which, according
to ONDA, fails to remedy defects in the 2010 EA because it does not "address whether the
Horseshoe Project is consistent with the Department of Interior's conservation policies and
guidelines for sage-grouse [and] contains critical errors in its analysis."  ONDA's Reply to Mot.
Summ. J. 19.  ONDA's argument concerning the Department of Interior's Instruction
Memorandum concerning "Greater Sage-Grouse Interim Policies and Procedures" ("IM") is not
viable for several reasons.  *See id.* at Ex. 2.  Importantly, the IM was issued several months after
the DNA and therefore could not have been cited to or discussed therein.  Additionally, the IM
does not present new information; instead, it represents internal agency guidance, based on
extant information about the sage-grouse, and is therefore not judicially enforceable in federal
court.  *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 900-01 (9th Cir.), *cert. denied*, 519 U.S.
822 (1996).  In any event, the BLM adequately considered information on which the IM was
based in its 2010 EA and/or DNA and, moreover, "out of an abundance of caution," the BLM
assessed the 2010 EA "against the applicable guidance in the [IM], and found . . . that the project
is wholly consistent with such guidance."  BLM's Reply to Cross-Mot. Summ. J. 20; *compare*
AR 16821-24 (BLM's IM review memorandum), *with* ONDA's Reply to Mot. Summ. J. Ex. 2
(IM).  ONDA moves to strike the BLM's IM review memorandum as a post-decisional
"litigation-driven document."  ONDA's Surreply to Cross-Mots. Summ. J. 7-8.  Given that
ONDA first introduced the IM in 2013 as an exhibit to its reply brief, the Court finds ONDA's
request to strike this evidence somewhat disingenuous.  As this Court previously explained,
"where one party introduces extra-record evidence in support of its summary judgment motion,
the opposing party is entitled to rebut that evidence."  Order on Mot. Strike 7 (D.Or. Oct. 2,
2012) (citation and internal quotations omitted); *see also Friends of the Clearwater v. Dombeck*,
222 F.3d 552, 560 (9th Cir. 2000) ("if extra-record evidence shows that an agency has rectified
a NEPA violation after the onset of legal proceedings, that evidence is relevant to the question
of whether relief should be granted").

report (such as a reevaluation) or an EA") (citations omitted); *see also Or. Natural Desert Ass'n v. Bureau of Land Mgmt.* ("*ONDA II*"), 2011 WL 5830435, *5-6 (D.Or. Nov. 15, 2011) (agency did not violate NEPA by failing to consider post-decision information about the sage-grouse where it issued a DNA addressing new information and found that it was not significant); *City of Santa Clarita*, 2006 WL 4748737 at *5, 17-19 (agency did not violate NEPA because, "[i]n accordance with its policy directives, the BLM . . . prepared a . . . DNA to determine whether new information and circumstances relating to the Project required that the BLM prepare a supplemental NEPA analysis . . . [and] concluded that the addition of three monitoring wells did not change the proposed action"). Consideration of the DNA is especially appropriate in light of the fact that it was prepared to rectify the alleged NEPA violation at issue and ONDA amended its complaint specifically to include allegations related thereto. *See generally* Supplemental Compl.; *see also Dombeck*, 222 F.3d at 560. Because the BLM reasonably interpreted and carefully analyzed the Monograph, the ODFW study, and the FWS study in the DNA, and nonetheless found that this information was not significant as applied to Horseshoe Pasture, ONDA's claim fails. *See* AR 15840-56. This Court "is foreclosed from masquerading as an expert and choosing what it deems is the best result," and instead must defer to the agency. *W. Watersheds Project v. Salazar*, 2011 WL 4526746, *14 (D.Idaho Sept. 28, 2011) (citing *McNair*, 537 F.3d at 987); *see also ONDA II*, 2011 WL 5830435 at *5-12.

In any event, neither the information in the Monograph, the ODFW study, nor the 12-Month Finding can be said to be significant for five reasons. First, ONDA inaccurately describes the spatial scales of the Project site. Although ONDA is correct that the nearest lek is 1.8 miles from the proposed fence, this lek is inactive and has been since 1980. First Forbes Decl. pg. 5. The closest

active lek is actually 4.4 miles from the proposed fence.[15]  *Id.*; AR 13567; *see also* AR 15844-46.

Furthermore, the ODFW study establishes that Horseshoe Pasture has no core habitat, and

approximately 36% of Project area falls outside both core and low-density habitats.  AR 15651-60,

15848; *see also* ONDA's Surreply to Cross-Mots. Summ. J. 9.  ONDA relies on the most dramatic

example to support its argument regarding employment of a larger spatial scale; while a 12.5 mile

range is the maximum distance traveled by female sage-grouse between leks and nests, the FWS

study indicates that the average distance between a female's nest and lek was significantly lower,

from 2.1 to 4.8 miles.  AR 15877.  Similarly, the Monograph recommends "[c]onservation of

sagebrush within 5 km [3.1 miles] of leks . . . to maintain the most locations used for nesting and

early brood-rearing by nonmigratory populations."  AR 15085.  Consistent with the Monograph and

the FWS's 12-Month Finding, the ODFW study demonstrates that, in Oregon, 80% of sage-grouse

nests are within 4.0 miles of a lek in non-migratory populations, such as those found within the

Juniper Mountain Allotment.  AR 15580; *see also* AR 15849-50, 15855-56.  These spatial scales

belie ONDA's concerns about habitat fragmentation due to fences.

Second, the new information at issue is not significant in regard to collision mortality rates.

Again, ONDA relies on the most dramatic examples of collision-related sage-grouse impacts, yet

---

[15]   The ODFW defines "active lek" as "[a] lek attended by ≥ 1 male sage-grouse during the breeding
season."  AR 15712.  An inactive lek is, conversely, "[a] lek [where] there was no male
attendance throughout a breeding season," although "[a]bsence of male grouse during a single
visit is insufficient."  *Id.*  However, prior to the most recent ODFW survey, "there was no
standardized definition for this term."  Second Forbes Decl. ¶ 13.  As a result, the 2010 EA
adopted a definition of active lek consistent with "the BLM sage-grouse Lek GIS dataset," which
is "any previously known lek site where three or more male sage-grouse were observed strutting
at least one time during the lekking season over the previous 5 year period."  *Id.*; *see also*
ONDA's Reply to Mot. Summ. J. Ex. 1, at 8 (August 2010 "Sage-Grouse Habitat Assessment
Framework" defining "active lek" as "[a] display area in or adjacent to sage-brush habitat where
at lease two male sage-grouse have attended in at least two of the previous five years [or] [a]n
area used by displaying males in the previous five years").

the fence studies ONDA cites occurred in areas with high to extremely high sage-grouse densities that were less than 2.0 miles from lek sites.  AR 12903-04.  Here, by contrast, the Horseshoe Meadow is not heavily used seasonal sage-grouse habitat - i.e. it is not core habitat - and it is not near any active leks.  AR 13492, 13567, 15849-50, 15855-56; First Forbes Decl. pg. 5.  Moreover, ONDA fails to acknowledge that not all fences present the same mortality or fragmentation risk to sage-grouse.  AR 12904, 13929, 15827, 15891.  As the BLM imparted in its DNA, fences with 1 to 3 strands of wire normally do not negatively impact sage-grouse.  AR 15827–28.  Nevertheless, the 2010 EA actually considered sage-grouse mortality directly associated with flying into fences.  AR 13502.  To the extent new information exists concerning collision-related mortality rates, it is not significant within the meaning of NEPA because it does not speak to environmental impacts that were not previously evaluated or considered.

Third, although ONDA emphasizes the importance of a 3.1 to 4.3 mile radius buffer around perches to reduce indirect mortality from raptor predation, this recommendation pertains to power lines, not fences.  AR 15890.  Even so, the placement of the fence is 4.4 miles from the nearest active lek, well outside the recommended buffer radius, and, as the ODFW observed, "predation is not a limiting factor range-wide."  AR 13502, 15583, 15846-48.  Much of the Project area is also already covered with old-growth juniper, which acts as a natural predator perch.  *Id.*; AR 13493.  The addition of other perches, in the form of barbed wire or fence posts, would not significantly increase raptor predation or otherwise impair sage-grouse populations within Horseshoe Pasture.

Fourth, while the ODFW study prescribed an increased 1.0 mile radius for reflectors, this change has no effect on the selected alternative because the proposed fence will be 4.4 miles from

the nearest active lek.[16]  AR 15846.  In addition, approximately half of the proposed fence will be located in moderate to high density juniper stands, making it nearly impossible for sage-grouse to fly low enough to impact the fence.  AR 15850.  Finally, ONDA is correct that the 2010 EA did not furnish a single project map with lek sites superimposed over the Project's proposed fences.  Nonetheless, the BLM did provide all the information necessary for the public to determine approximate distances between fences and leks in multiple maps, appending four maps designating proposed fence locations for Alternatives 2A and 2B, 6, 8, and 9, immediately followed by a map of the entire Project area with existing fences and both active and inactive leks depicted; the DNA provided two additional maps.  AR 13563-67, 15855–56.

Accordingly, neither the Monograph nor the ODFW/FWS surveys constitute significant new information within the meaning of NEPA.  As the BLM confirmed in the DNA, the evidence at issue is either similar to that previously considered or not significant in the context of the proposed action.  *See* AR 15840-56.  The new information cited by ONDA confirms that the primary assumptions on which the 2010 EA was premised were correct - namely, that sage-grouse populations within the project area were relatively stable and that placing a barbed-wire fence nearly five miles from the closest active lek site would not appreciably impact the species.  Even accepting that individual sage-grouse may be affected, the species remains invulnerable to extirpation or extinction within the

---

[16]  ONDA attacks the BLM's reliance on the fact that the closest active lek cite is 4.4 miles away from the proposed fence: "'active' versus 'inactive' . . . is a single-season denotation and does not reflect whether sage-grouse are using surrounding habitat areas for other life history stages - e.g. nesting, brood-rearing, or over-wintering."  ONDA's Reply to Mot. Summ. J. 20-21; *see also id.* at 3-5.  This is not entirely accurate, given that the definition used for an active lek in the 2010 EA actually considered lek use within the previous 5 years.  *See* Second Forbes Decl. ¶ 13; *see also* ONDA's Reply to Mot. Summ. J. Ex. 1, at 8.  Further, the IM focuses on active leks in its fence guidance, as do the FWS and ODFW when discussing the species' range.  *See id.* at Ex. 2, at 9; AR 15085, 15580, 15849-50, 15855-56, 15877; *see also* Second Forbes Decl. ¶¶ 11-14.

Project area and, more generally, within the Juniper Mountain Allotment. AR 15850 ("it is highly unlikely that the proposed fence would be detrimental to the local sage-grouse population"), 15920-24, 15950 (FWS study identifying the Juniper Mountain Allotment as one of the remaining "strongholds of relatively contiguous sagebrush habitat . . . with large populations" that are "sufficient . . . to support the greater sage-grouse in these areas"); *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010-11 (9th Cir. 2006) (NEPA regulations only "direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species") (citation omitted). ONDA's motion should be denied to the extent that it is based on the BLM's failure to take a "hard look" at allegedly significant new information and the BLM's and Laird's motions on this issue should be granted.

B.    Failure to Prepare an EIS

In determining whether a project "significantly" impacts the environment, thereby triggering the need for an EIS, NEPA counsels the agency to consider context and intensity. 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(C). Context refers to the area of "the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and is evaluated based on a number of "significance" factors,[17] of which ONDA identifies the

---

[17]    The following factors are considered in evaluating intensity: (1) impacts that may be both beneficial and adverse; (2) The degree to which the proposed action affects public health or safety; (3) unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial; (5) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (6) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts; (8) the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (9) the degree to which the action may adversely

"unique characteristics" of the Project area and the allegedly "highly controversial effects" to the sage-grouse. 40 C.F.R. § 1508.27(b); ONDA's Mem. in Supp. of Mot. Summ. J. 26. A court may find a substantial risk of a significant effect based on just one of these factors. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2004). However, an EIS is not required "any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240-41 (9th Cir. 2005).

Presuming that ONDA properly raised this issue during the administrative process, the Horseshoe Pasture does not contain any core sage-grouse habitat and approximately 36% of the area falls entirely outside either core or low density habitat. AR 15651-60, 15848. The impact of the Project is also small - i.e. 1.2 acres - and, based on the best and most recent available science, it is not likely to have a marked adverse effect on the species or its habitat. AR 13499, 15850. In fact, the proposed action is designed to improve sage-grouse habitat through the removal of invasive juniper. Thus, as detailed in its 2010 EA and DNA, the BLM's decision not to prepare an EIS was reasonable. Accordingly, the BLM's finding that the proposed action will not significantly impact the sage-grouse was neither arbitrary, capricious, nor contrary to the evidence of record. *See Native Ecosystems Council*, 428 F.3d at 1240-41 (a proposed action was not "highly controversial" or "highly uncertain," such that an EIS was required, where the agency acknowledged in its EA that the proposed action "may impact individual goshawks and their habitat, but determined that this impact was not significant"); *see also Soda Mountain*, 945 F.Supp.2d at 1185-87. Accordingly, the BLM's and Laird's motions should be granted as to ONDA's NEPA claims and ONDA's motion

affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA; (10) whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27 (b).

Page 44 - FINDINGS AND RECOMMENDATION

should be denied.

V.    Federal Land Policy and Management Act Claims

ONDA asserts that the BLM acted in contravention of the RMP, thereby violating the

FLPMA, by: (1) "unlawfully opening" Route 7155-AA to motorized use; (2) continuing to allow

livestock grazing on the allotment because the area is "functioning at risk"; (3) failing to document

any "mandatory, quantitative term or condition that will ensure 'substantial progress' toward

achieving rangeland health standards" in Laird's grazing permit; and (4) failing to maintain,

enhance, or restore sage-grouse habitat.  ONDA's Mem. in Supp. of Mot. Summ. J. 28-35; ONDA's

Reply to Mot. Summ. J. 29-31.

As the land use plan governing the Juniper Mountain Allotment, the RMP "embodies the

substantive management directives with which the BLM must comply under the FLPMA." *Brong*,

492 F.3d at 1125.  The BLM therefore may not authorize any action that is inconsistent with the

RMP.  *See* 43 C.F.R. § 1610.5-3(a).  The BLM, however, retains "'a great deal of discretion in

deciding how to achieve'" compliance with the applicable land use plan.  *Klamath Siskiyou*

*Wildlands Ctr. v. Gerritsma*, 2013 WL 4477834, *4 (D. Or. Aug. 21, 2013) (quoting *S. Utah*

*Wilderness Alliance*, 542 U.S. at 66).

A.    Route 7155-AA

Route 7155-AA runs through Horseshoe Meadow.  AR 13577.  In its 2003 Record of

Decision ("ROD") adopting the RMP, the BLM decided to close this route in order to prevent

erosion and protect Juniper Mountain's botanical resources.  AR 8244, 8251; *see also* AR 8194,

8282-83, 13580.  The 2010 EA authorized continued use of Route 7155-AA to facilitate completion

of the Project, after which "[t]his closure would be implemented on the ground."  AR 13479-80.

Initially, contrary to ONDA's assertion, the 2010 EA does not "unlawfully re-open" or

Page 45 - FINDINGS AND RECOMMENDATION

"expressly re-open" Route 7155-AA.  ONDA's Mem. in Supp. of Mot. Summ. J. 29.  Central to

ONDA's argument is the assumption that this route was actually closed by the RMP.  However, the

RMP did not achieve closure of Route 7155-AA.  Rather, that decision merely determined that this

route "will be closed" at some later date, when doing so is consistent with other management

directives; the BLM has not yet taken any action on the ground to effectuate this closure.  AR 8211,

8251, 8283; *see also* BLM's Reply to Cross-Mot. Summ. J. 26.  As the challenged decision itself

expressly recognizes, the "RMP/ROD (2003) made a decision to close BLM Road 7155-AA," but

that "closure has not yet been implemented on the ground due to other management priorities."  AR

13477-79, 13570-71.  As such, the RMP granted the BLM discretion in determining when to

complete its mandates; it therefore does not follow that the BLM acted contrary thereto by failing

to actualize this closure immediately, especially because administrative issues, such as funding and

staffing levels, have had a direct effect on the rate of implementation.  AR 8211; *see also* AR 13479.

Seemingly acknowledging this, ONDA retreats from this argument in its subsequent briefs:

"ONDA agrees that the Horseshoe decision does not 'open' the route - and therefore clarifies its

argument in that respect . . . ONDA's argument is not that the Horseshoe Meadow decision is

inconsistent with the RMP because it opens the route - but rather because it allows motorized use

on a closed route."  ONDA's Reply to Mot. Summ. J. 27.  In support of the proposition "that the

RMP/ROD unequivocally closed the road," ONDA cites to Table 4 of the RMP, which ONDA

categorizes as a summary of "land use plan decisions that would be 'implemented over time' as

opposed to effective immediately," and notes that it "does not contain closure of Road 7155-AA."

*Id.* at 27-28 (citing AR 8200).  However, Table 4 of the RMP is actually a list of "[n]ew

implementation decisions now subject to appeal," which appears in conjunction with three other

lists, none of which are determinative of whether the authorized actions will be implemented over

Page 46 - FINDINGS AND RECOMMENDATION

time or effective immediately. *See* AR 8192-8200 (RMP Tables 1 through 4, respectively, listing "[a] [s]ummary of land use allocations," "[e]xisting decisions carried forward and not subject to further administrative remedies," "[f]uture actions likely requiring further NEPA analysis prior to implementation," and "[n]ew implementation decisions now subject to appeal"); *see also* AR 8186 (clarifying that decisions listed in Table 3 "require the preparation of detailed, project-level NEPA analyses prior to implementation," as opposed to those decisions listed in Table 4, which "have been addressed to a sufficient level of detail in the RMP/EIS process to be implemented over time without further NEPA analysis").

Further, ONDA's contention that it was "unreasonable [to] not place . . . a 'closed' sign at the beginning of the route sometime within the past [eleven] years" is unpersuasive. ONDA's Mem. in Supp. of Mot. Summ. J. 29. The RMP specifies that implementation will take place "over a 15-20 year timeframe, as funding allows . . . Most of the land use  plan decisions are effective upon approval of this document [although] many decisions will take a number of years to implement on the ground." AR 8284. Here, the record demonstrates that the BLM first began planning this Project in 2005, less than two years after the RMP was adopted, and that "other management priorities" precluded the closure of Route 7155-AA. AR 13477-79. To the extent the BLM is now unable to effectuate the closure of Route 7155-AA, it is due, in large part, to this litigation. *See, e.g.*, BLM's Mem. in Supp. of Cross-Mot. Summ. J. 35 ("[t]he only thing keeping BLM from implementing the BLM decision is this lawsuit, and ONDA is actually seeking to set aside the BLM decision (which would include the implementation of the road closure)"). As such, assuming 43 C.F.R. § 1610.5-3(b) is applicable, which requires agencies to implement land use plans "within a

reasonable period of time," the BLM sufficiently complied therewith.[18]

In sum, nothing in the record indicates Route 7155-AA was effectively closed by the RMP and/or that the BLM's decision to implement closure of this route in its 2010 EA was untimely. Thus, the BLM's and Laird's motions should be granted as to this issue and ONDA's motion should be denied.

B.     Continued Grazing

The RMP identifies several goals that are pertinent to continued livestock grazing in the context of a proposed management decision. *See* AR 8211-12. First, the "Plant Communities - Riparian and Wetland" section, the goal of which is to "[r]estore, maintain, or improve riparian vegetation, habitat diversity, and associated watershed function to achieve healthy and productive riparian areas and wetlands," articulates:

> [r]iparian/wetland areas will be managed for uses within the watershed that emphasize the maintenance or improvement of naturally-occurring values while providing for commodity production and the attainment of proper functioning condition, riparian management objectives, and desired range of conditions . . . Areas not in proper functioning condition will be managed to attain an upward trend in the composition and structure of key riparian/wetland vegetation and desired physical characteristics of the stream channel. Uses within the riparian conservation area and contributing upland watersheds will be allowed as long as there is measurable progress towards attainment of State water quality standards, proper functioning condition, and riparian management objectives. Specifically, in fenced Federal range allotments,[19] BLM riparian sites that are not in proper functioning condition and where it is determined that livestock are contributing to the condition, livestock will be excluded.

---

[18]   It is undisputed that, under *S. Utah Wilderness Alliance*, ONDA cannot "attempt to have the Court compel BLM undertake an affirmative activity specified in its RMP." BLM's Mem. in Supp. of Cross- Mot. Summ. J. 33; ONDA's Reply to Mot. Summ. J. 8-9; *Gardner v. U.S. Bureau of Land Mgmt.*, 633 F.Supp.2d 1212, 1222-27 (D.Or. 2009), *aff'd*, 638 F.3d 1217 (9th Cir. 2011).

[19]   Fenced federal range allotments are defined as areas "where small portions of Federal land are within fenced private land." AR 8233. No such allotments are at issue in this case.

AR 8215.

Next, the "Fish and Aquatic Habitat" section, the goal of which is to "[r]estore, maintain, or

improve habitat to provide for diverse and self-sustaining communities of wildlife, fishes, and other

aquatic organisms," states:

> [m]anagement emphasis will provide habitat for fish and other aquatic organisms to maintain the distribution of native species among subwatersheds while providing opportunities for commodity uses . . . Livestock grazing and related activities will be removed from those stream segments where proper functioning condition assessment ratings are functioning-at-risk with no apparent trend, downward trend, or nonfunctioning and where grazing is determined to be a factor in the current condition. This is especially critical in the BLM riparian sites in fenced Federal range allotments. Exclusion of livestock will continue in these areas until systems are determined able to support reintroduction of grazing with proper management to improve riparian conditions.

AR 8226-27.

The "Livestock Grazing Management" section, the goal of which is to "[p]rovide for a

sustainable level of livestock grazing consistent with other resource objectives and public land-use

allocations," specifies:

> [w]here livestock grazing is found to be limiting achievement of multiple use objectives, actions to control intensity, duration, and timing of grazing and/or provide for periodic deferment and/or rest will be required to meet physiological requirements of key plant species and to meet other resource objectives. Upon determining that existing grazing management practices on public land are contributing to the nonattainment of resource objectives, appropriate actions will be implemented . . . Additional enclosures could be implemented based on the findings of rangeland health assessments . . . Administrative solutions (i.e., season of use revision, stocking level adjustment, and pasture exclusion) will be the preferred solution to meet resource management objectives.

AR 8236-37.[20]

---

[20] ONDA does not refer to or acknowledge the "Livestock Grazing Management" section, despite the fact that the BLM expressly identified it as one of the governing provisions. *See generally* ONDA's Mem. in Supp. of Mot. Summ. J.; ONDA's Resp. to Laird's Cross-Mot. Summ. J.; ONDA's Reply to Mot. Summ. J.; ONDA's Surreply to Cross-Mots. Summ. J.

Page 49 - FINDINGS AND RECOMMENDATION

The RMP, however, does not provide any guidance concerning how to interpret these sections if more than one is potentially applicable. *See* AR 8176-538; *see also* ONDA's Surreply to Cross-Mots. Summ. J. 16-17 ("BLM claims the RMP's section on 'Riparian and Wetland' plant communities is 'more relevant' than the 'Fish and Aquatic Habitat' section - though the agency points to nothing in either section stating that one takes precedence over the other"). Thus, "[w]hile mandatory as to the object to be achieved [the RMP] leaves BLM a great deal of discretion in deciding how to achieve it." *Gardner*, 633 F.Supp.2d at 1223 (discussing the court's jurisdiction under 5 U.S.C. § 706(1) to compel an agency to take action under 43 U.S.C. § 1782(c)) (citation and internal quotations omitted); *see also Klamath Siskiyou Wildlands*, 2013 WL 4477834 at *4.

Here, the "Fish and Aquatic Habitat" section of the RMP mandates that grazing must cease if the conditions described therein are satisfied.  AR 8227.  Yet this section recognizes that, where a proper management tool is in place to improve riparian conditions, such as a fence that excludes wayward cattle, grazing may continue in the effected area. *See, e.g.*, *id.* ("[e]xclusion of livestock will continue in these areas until systems are determined able to support reintroduction of grazing with proper management to improve riparian conditions"); *see also* AR 13472-546 (purpose of the 2010 EA is to prevent unauthorized livestock grazing use, via construction of a fence that would categorically improve riparian conditions).  The "Plant Communities - Riparian and Wetland" section, and especially the "Livestock Grazing Management" section, permit continued grazing even where "existing grazing management practices on public land are contributing to the nonattainment of resource objectives." AR 8237; *see also* AR 8215.  In fact, the "Livestock Grazing Management" section prioritizes other "[a]dministrative solutions," such as construction of a fence, over the removal of cattle.  AR 8237.

The BLM is required under the RMP to make changes in Horseshoe Meadow based on its

Rangeland Health Assessment determination that Standard 2, relating to riparian/wetland function, was not being met and unauthorized grazing was a contributing factor. Regardless, the aforementioned sections, especially when read together, do not reasonably contemplate livestock removal as the only available option. Under these circumstances, the BLM's interpretation of its own regulations is entitled to deference. *See Hapner v. Tidwell*, 621 F.3d 1239, (9th Cir. 2010) ("[a]gencies are entitled to deference to their interpretation of their own regulations, including Forest Plans[,] . . . [if] susceptible to more than one meaning unless the interpretation is plainly erroneous or inconsistent with the directive") (citations and internal quotations omitted); *see also Gardner*, 633 F.Supp.2d at 1223. For this reason alone, the BLM did not act in contravention of the RMP by electing to construct a fence, in lieu of removing cattle, to improve riparian conditions in the Horseshoe Meadow.

Even accepting ONDA's assertion that the "Fish and Aquatic Habitat" section both applies and is the predominant provision, a proper functioning condition ("PFC") assessment finding that the Horseshoe Meadow was functioning at risk "has never been completed." BLM's Sur-surreply to Cross-Mot. Summ. J. 18; AR 13485. Indeed, the Rangeland Health Assessment found that the 60-acre Hogback Playa, located *elsewhere* in the Juniper Mountain Allotment, was functioning at risk pursuant to a PFC assessment. AR 4556-60, 9358. This is the only area in the entire allotment identified as functioning at risk under the PFC standards, yet "[l]ivestock grazing is not a factor limiting Riparian/Wetland function" therein. AR 9358, 13842; *see also* AR 16363 (explaining that "'functioning at risk' . . . is one of several possible ratings that may be assigned upon completing a riparian Proper Functioning Condition (PFC) assessment carried out in accordance with the Lentic

PFC methodology").[21]  Conversely, although the BLM found that the 50-acre Horseshoe Meadow

was not meeting FRHR Standard 2 due to wayward "[l]ivestock use [that] contributed to

compaction, erosion, and headcuts," it did not find that this area was formally functioning at risk.[22]

AR 9358.  The sole PFC functioning at risk finding in the Rangeland Health Assessment does not

refer to the Project area.[23]

       Lastly, ONDA's contention that the BLM's failure to remove livestock was arbitrary and

capricious because the 2010 EA "fails to take into account the heightened protection the plan places

on Riparian Conservation Areas" is without merit.  ONDA's Surreply to Cross-Mots. Summ. J. 16.

The "Plant Communities - Riparian and Wetland" section's goal is to "[r]estore, maintain, or

---

[21]  This statement appears in a BLM errata, prepared on April 8, 2013, concerning "two minor
    factual errors" in the 2010 EA.  AR 16363-67.  ONDA moves to strike this document because
    the "BLM is limited to defending the August 2010 decision on the rationale supplied in that
    decision itself and on the administrative record in existence at the time the decision was made."
    ONDA's Surreply to Cross-Mots. Summ. J. 13.  The Court, however, relies on this document
    solely for its elaboration on the functioning at risk rating, which is consistent with pre-decisional
    evidence.

[22]  ONDA asserts the Rangeland Health Assessment's conclusion that the Horseshoe Meadow was
    not meeting FRHR Standard 2 is a *de facto* finding that the area is functioning at risk.  *See*
    ONDA's Surreply to Cross-Mots. Summ. J. 14.  While the record indicates that an area is not
    in PFC when on or more FRHR standards are not being met, ONDA has not cited to, and the
    Court is not aware of, any evidence demonstrating that a PFC determination is synonymous with
    a functioning at risk rating.  *Id.*; *see also* AR 4524, 4530-31, 4539, 16018, 16121.  In fact, the
    "Fish and Aquatic Habitat" section intimates that PFC and functioning at risk are discrete.  *See*
    AR 8227 (livestock "will be removed . . . where proper functioning condition assessment ratings
    are functioning-at-risk"); *see also* AR 16363.  In other words, although the Horseshoe Meadow's
    riparian/wetland function may not have been in PFC, nothing in the record evinces that a formal
    PFC assessment rating of functioning at risk is attributable to this area.

[23]  Thus, as the BLM has maintained throughout its briefing and at oral argument, "statements in
    the 2010 EA that referred to the Horseshoe Meadow as 'functioning at risk' were in error."
    BLM's Reply to Cross-Mot. Summ. J. 36-37; *compare* AR 13488 (2010 EA asserting that "[t]he
    RHA (BLM 2004c) determined that the Horseshoe Meadow was functioning at risk"), *with* AR
    9358 (Rangeland Health Assessment making no finding that the Horseshoe Meadow was
    functioning at risk and instead determining that the area's riparian/wetland function was not in
    PFC).

Page 52 - FINDINGS AND RECOMMENDATION

improve riparian vegetation, habitat diversity, and associated watershed function to achieve healthy and productive riparian areas and wetlands." AR 8215. As a result, "[u]ses within the riparian conservation area and contributing upland watersheds will be allowed as long as there is measurable progress towards attainment of State water quality standards, proper functioning condition, and riparian management objectives." *Id.* While this claim was improperly raised, as it was first asserted in ONDA's surreply, it is without merit. The 2010 EA does, in fact, address impacts to water quality, hydrology, soils, and riparian vegetation conditions associated with the selected alternative and resolved that these resources would improve with project implementation. AR 13499-500, 13503-05; *see also Lentini*, 370 F.3d at 843 n.6. Accordingly, the challenged decision meets the RMP's management goal for Riparian Conservation Areas. Therefore, ONDA's motion should be denied in this regard and the BLM's and Laird's motions should be granted.

C.    Modification of Grazing Permit Terms

If a Rangeland Health Assessment indicates that an area is failing to achieve one or more FRHR standards, and existing grazing management practices or levels of grazing are contributing to that failure, the agency has a duty to take "appropriate action" that will result in "significant progress" towards fulfilling the impaired value. 43 C.F.R. § 4180.2(c). "Appropriate action," is defined as "implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part that will result in significant progress toward fulfillment of the standards." *Id.* The FRHR also require that grazing permits "specify the kind and number of livestock, the period(s) of use, the allotment(s) to be used, and the amount of use," as well as any "terms and conditions that ensure conformance with subpart 4180." 43 C.F.R. § 4130.3–1. In sum, a term or condition in a permit is mandatory where it is actually needed to make the required significant progress. *See W. Watersheds Project v. U.S. Dept. of Interior*, 2009 WL 5218020, *2, 11 (D.Idaho Dec. 30, 2009) (agency acted

arbitrarily and capriciously by failing to include mandatory term in a grazing permit where a Rangeland Health Assessment determined that FRHR standards were not being met due to overgrazing and "[t]he BLM's own experts testified that adherence to the utilization limits in the Management Guidelines was necessary to make 'significant progress' under the FRH regulations").

As a preliminary matter, ONDA's sole argument in its opening brief[24] relating to this issue is based on a misconception.  ONDA states that "intensive overgrazing in Horseshoe Meadow has resulted in damaged stream banks and meadow soils . . . BLM's failure to impose any quantitative trampling or utilization standards for grazing . . . thus renders BLM's decision arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with FLPMA and the FRH regulations." ONDA's Mem. in Supp. of Mot. Summ. J. 34-35.  Yet the record makes clear that "unauthorized livestock grazing use," in the form of trespassing cattle that were wandering around Juniper Mountain and ending up in Horseshoe Meadow during seasons slated for rest, was the cause of the FRHR Standard 2 violation.  *See, e.g.*, AR 9326,  9358-59, 9370-74, 13568, 13475.  Put another way, the lack of adequate enclosures, as opposed to overgrazing, let alone "intensive overgrazing," impaired riparian/wetland function in Horseshoe Meadow.  The BLM found that construction of five miles of fence would defend against cattle drift, thereby satisfying its obligation to take "appropriate action" that will ensure "significant progress."  AR 13571, 13573-74; *see also* AR 13506; 43 C.F.R. § 4180.2(c). Critically, ONDA does not provide any argument or evidence that the BLM's proposed solution is insufficient to remedy the impaired standard.  *See generally* ONDA's Mem. in Supp. of

---

[24]   As discussed in section III(A), ONDA raised additional arguments in its reply brief concerning the BLM's alleged violation of the FRHR, including that the challenged "decision quite clearly modifies the permit."  ONDA's Reply to Mot. Summ. J. 33-35 (internal quotations omitted).

Mot. Summ. J.; ONDA's Resp. to Laird's Cross-Mot. Summ. J.; ONDA's Reply to Mot. Summ. J.;
ONDA's Surreply to Cross-Mots. Summ. J.

Essentially, ONDA's reading of 43 C.F.R. § 4180.2(c) would require every "appropriate
action" taken by the BLM to result in the incorporation of a new grazing term and/or condition.
However, this interpretation is inconsistent with the regulation's plain language, which establishes
that "appropriate actions" can include range improvement projects - such as the construction of a
fence - pursuant to 43 C.F.R. § 4120.3-1. *See* 43 C.F.R. § 4180.2(c); BLM's Mem. in Supp. of
Cross-Mot. Summ. J. Ex. 1, at 10-12 (OHA opinion holding that, where the proposed project, which
included construction of a fence to "reduc[e] cattle drift between pastures," would result in
significant progress toward attaining unmet FRHR standards, the "BLM fulfilled its obligations
under FLPMA and 43 C.F.R. § 4180.2(c)"); *see also Dept. of Interior*, 2009 WL 5218020 at *11.

In any event, the 2010 EA did not modify Laird's permit.  The RMP designated the Juniper
Mountain Allotment as having a rest rotation grazing system, with a utilization standard of 50% and
a spring-summer-fall season of use, which is defined as the months of March through October.  AR
8231-33, 8454, 8456.  As such, Laird's current permit authorizes use of a rest rotation system, from
March 16 through October 31, and sets forth terms concerning the kind and number of livestock, the
allotments to be used, and the amount of use.  AR 10726-28, 13480; *see also* AR 9256-59.

The interim grazing strategy negotiated between the BLM and Laird after the Rangeland
Health Assessment contains additional limitations on Laird's grazing rights.  *Compare* AR 9370-74
(interim grazing strategy outlining Project site-specific grazing limits), *with* AR 10726-28 (current
permit providing general grazing limits for the Juniper Mountain Allotment).  Because "[a]n
interdisciplinary team visited the Horseshoe Meadow area in November 2004 and determined that
additional pasture fencing would be required to address the unauthorized cattle use in the meadow

Page 55 - FINDINGS AND RECOMMENDATION

(which is preventing conformance with Standard 2)," the interim grazing strategy limited grazing in Horseshoe Pasture to every-other-year in early spring. AR 9370-71. This strategy was deemed sufficient to "protect the Horseshoe pasture from late season grazing addressing the resource issues identified in the 2004 Rangeland Health Assessment [although] [i]t is important to note that . . . by not providing adequate fencing between Horseshoe Pasture and its surrounding pastures an adequate rest rotation system cannot be achieved." AR 9371-72.

The 2010 EA, in turn, reflects that an interim grazing strategy was put in place to respond to the 2004 Rangeland Health Assessment: "the BLM worked with the permittee to implement an interim livestock grazing management strategy," which has "remained in place," while "a permanent solution was developed and the environmental analysis was completed." AR 13475; *see also* AR 13478. The selected permanent solution - i.e. construction of five miles of fence - "would provide an effective barrier to prevent cattle drift" and was critical to make the requisite significant progress because "[t]he interim grazing strategy has only been partially successful in keeping cattle out of Horseshoe Pasture during unauthorized periods." AR 13491, 13502. Once the Project was completed, "Horseshoe Pasture would continue to be used in early spring as part of the rest rotation system," unless and until "turnout and gather dates for each pasture of the allotment [are] decided upon in the annual authorization meeting." AR 13481, 13502-03; *see also* 43 C.F.R. § 4130.4(b); AR 12138-39. In sum, implementation of the 2010 EA would not change Laird's grazing rights, but would simply improve the effectiveness of the existing rest rotation system. *See* AR 13478-506, 13571-72.

As such, incorporation of new terms and conditions into Laird's existing grazing permit was not required to make significant progress under 43 C.F.R. § 4180.2(c). The 2010 EA did not impact grazing management and instead established that construction of the proposed fence, as opposed to

modification of Laird's permit, was necessary to improve and repair riparian/wetland function in the Horseshoe Meadow. Indeed, ONDA admitted that the 2010 EA did not renew, modify, or otherwise authorize changes to Laird's grazing rights: "[a] legal ruling by this Court that BLM violated [NEPA or the FLPMA] when the agency issued the Horseshoe Meadow decision will not impact the Ranch's interest . . . At most, an order from this Court requiring BLM to reconsider its Horseshoe Meadow decision could delay construction of a fence." ONDA's Resp. to Mot. Intervene 2, 4, 6; *see also See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012) (under the doctrine of judicial estoppel, a party cannot obtain an advantage in current proceedings by taking positions that contravene those previously asserted). ONDA's motion should therefore be denied, and the BLM's and Laird's motions should be granted, as to ONDA's FLPMA claim relating to the FRHR.

### D.    Maintaining, Enhancing, or Restoring Sage-Grouse Habitat

The RMP's "Special Status Species" section, the goal of which is to "[m]anage public land to maintain, restore, or enhance populations and habitats of special status animal species," explains:

> [m]anagement will emphasize achieving desired range of conditions that maintain, enhance, or restore habitats or populations of special status species . . . All special status species habitats or populations will be managed so that BLM actions will not contribute toward the need to list the species as federally threatened or endangered . . . A variety of projects or other land use adjustments could be required to manage for special status species. Some management for habitat maintenance could require avoidance or mitigation measures.

AR 8235-36. As noted above (section V(B)) , grazing is permitted to the extent it is consistent with "other resource objectives," including the protection of sensitive species such as the sage-grouse. AR 8236-37.

Assuming ONDA has not waived this issue, as discussed in section III(A), ONDA's arguments regarding the sage-grouse are unpersuasive for three reasons. First, ONDA's contention

Page 57 - FINDINGS AND RECOMMENDATION

that the BLM's primary management priority for the Horseshoe Meadow area, if not the entire Juniper Mountain Allotment, must be special status species management generally, and sage-grouse habitat specifically, disregards the multiple use goals and management direction contained in the RMP. *See, e.g.*, ONDA's Reply to Mot. Summ. J. 31 (stating that grazing must "yield" to sage-grouse). The plain language of the RMP allows the BLM to "maintain, restore, *or* enhance populations and habitats of special status animal species." AR 8235 (emphasis added). "Or" is clearly not synonymous with "and." Thus, the RMP does not require the BLM to restore and enhance all sage-grouse habitat within the Project area; instead, maintenance alone is sufficient, especially where, as here, it is consistent with other land use objectives. *See, e.g.*, AR 8236-37; *see also State of New Mexico v. Bureau of Land Mgmt.*, 565 F.3d 683, 710 (10th Cir. 2009) (FLPMA "does not mandate that every use be accommodated on every piece of land; rather, delicate balancing is required") (citation omitted). For this reason, the precedent on which ONDA relies is distinguishable. *See W. Watershed Project v. Salazar*, 843 F.Supp.2d 1105, 1131 (D.Idaho 2012) (land use plan at issue mandated that the agency "[i]dentify, protect, and enhance key sage-grouse habitats and populations").

Second, and more importantly, the record is replete with evidence demonstrating that construction of the proposed fence will help restore ecological conditions in Horseshoe Meadow, an action that will also benefit the sage-grouse. AR 9370-72, 13500-02, 13505-06, 15840-54. As previously discussed, the BLM analyzed potential impacts to the species and its habitat, and found that "it is highly unlikely that the proposed fence would be detrimental to the local sage-grouse population," especially in light of the ODFW's finding that sage-grouse within the Project area are "on a stable to slightly increasing trend." AR 15850; *see also* AR 15597, 15604. In fact, the ODFW determined that livestock ranching operations such as Laird's "are compatible with sage-grouse

Page 58 - FINDINGS AND RECOMMENDATION

conservation." AR 15651. Accordingly, this Project is not inconsistent with the RMP's goal as it relates to special status animal species. *See* Second Forbes Decl. ¶¶ 3-7, 9, 11-14.

Third, ONDA's reliance on a 1981 BLM document, extracted from a draft EIS related to grazing management in the Lakeview District and attached as Exhibit 3 to ONDA's reply, as evidence of the vegetation condition of the allotment at the time the RMP was adopted in 2003 is misplaced. ONDA's Reply to Mot. Summ. J. 29-30. As the BLM observes, while "those range conditions were reflective of conditions that existed at the time the draft Lakeview Grazing EIS was prepared in 1981, they do not represent the vegetation data relied upon by BLM in its more recent Lakeview RMP and final EIS (or the 2010 EA) and, therefore, are completely irrelevant to the BLM decision challenged here." BLM's Reply to Cross-Mot. Summ. J. 33. The RMP itself evinces that vegetation types and conditions were based on evidence that became available after 1981. *See* 5793-5806, 6186, 6794-6812, 7190, 16378-567. The 2010 EA depended on even more recent vegetation condition information from the Ecological Site Inventory data and the 2004 Rangeland Health Assessment, which determined that four of the five FRHR standards, including those related to vegetation and wildlife habitat, were being met across the entire Juniper Mountain Allotment. AR 9354-66, 11952-88, 13472-560; *see also* AR 15840-54. Accordingly, the BLM's and Laird's motions should be granted as to all of ONDA's FLPMA claims and ONDA's motion should be denied.

## VI.    Evidentiary Objections

ONDA attaches the second and third declarations of Dr. Miller in support of its reply and surreply, respectively, in which the doctor proffers various opinions regarding the BLM's erroneous interpretation of the evidence concerning the Project area's wilderness characteristics and sage-grouse population. *See generally* Second Miller Decl.; Third Miller Decl. The BLM objects to this

Page 59 - FINDINGS AND RECOMMENDATION

opinion evidence because it relies, in part, on improper post-decisional information and, as a medical professional, Dr. Miller "never la[id] a proper foundation or otherwise demonstrat[ed] that he is qualified to offer an expert opinion" concerning the sage-grouse.[25]  BLM's Reply to Mot. Summ. J. 43-45; *see also* Laird's Reply to Mot. Summ. J. 2; Laird's Sur-Surreply to Cross-Mot. Summ. J. 8; LR 56-1(b).

In addition, ONDA moves to strike three post-decisional "litigation-driven" documents, from 2012 and 2013, that the BLM included in it most recent supplementation of the record.  *See* ONDA's Surreply to Cross-Mots. Summ. J. 7, 13 (citing AR 16359-62, 16363-67, 16821-24).  The BLM opposes ONDA's request on the basis that these documents are all necessary to provide context for the parties' dispute and were prepared to respond or rebut matters first introduced by ONDA. BLM's Sur-Surreply to Cross-Mot. Summ. J. 2-3.  Alternatively, the BLM proposes that, because "there are several other documents that post-date the DNA that are either also in the record and/or on which ONDA has expressly relied[,] . . . the only fair way to deal with such matters is for the Court to treat all documents that post-date the challenged agency decision and the DNA . . . on the same footing." *Id.* at 3-4.

As demonstrated above, the Court did not rely on the disputed portions of the parties' expert opinions or the BLM's post-decisional documents from 2012 or 2013 in resolving ONDA's claims.

---

[25]  ONDA asserts that "[t]he Court should deny BLM's request to strike the Second Miller Declaration because BLM failed to comply with the certification requirement of LR 7-1(a), as required by LR 56-1(b)." ONDA's Surreply to Cross-Mots. Summ. J. 19.  ONDA's assertion strains credulity given that the parties have been in contact regarding this lawsuit and, in fact, previously conferred regarding this precise issue. *See, e.g.*, BLM's Mot. Extension 1-2; BLM's Mem. in Supp. Mot. Stay 1-2.  Regardless, Laird "did confer" regarding its motion to strike and Laird raises substantively the same issues as the BLM.  ONDA's Surreply to Cross-Mots. Summ. J. 19 n.4.  Given the extensive, and extended, procedural history of this case, the Court declines to deny the BLM's motion solely on this basis. *See* LR 7-1(a)(2) (granting the district court discretion to deny any motion that fails to comply therewith).

*See Or. Natural Desert Ass'n v. Sabo*, 854 F.Supp.2d 889, 925 (D.Or. 2012) (denying as moot the defendants' motion to strike where the "court has not considered the extra-record evidence offered by plaintiffs"); *see also Perez-Denison v. Kaiser Found. Health Plan of the N.W.*, 868 F.Supp.2d 1065, 1088-89 (D.Or. 2012). In any event, the Court declines to engage in secondary major litigation over these materials at this stage in the proceedings, especially in light of the fact that, as explained in regard to the ONDA's previous motion to strike, the Court is capable of independently resolving conflicts in the record and questions of admissibility. Order on Mot. Strike 10 (D.Or. Oct. 2, 2012); *see also Cascadia*, 2012 WL 6738275 at *3 n.6. Therefore, the parties' motions to strike are denied as moot.

## RECOMMENDATION

For the foregoing reasons, the ONDA's motion for summary judgment (docket # 35) should be DENIED. The BLM's and Laird's motions for summary judgment (dockets # 39, 40) should be GRANTED. Further, the parties' evidentiary objections (dockets # 119, 124, 126, 135) are DENIED as moot. Therefore, ONDA's complaint and supplemental complaint (dockets # 1, 95) should be DISMISSED.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due by April 3, 2014. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a

response to the objections is due fourteen days after the date the objections are filed and the review

of the Findings and Recommendation will go under advisement on that date.

DATED this  17th  day of March, 2014.


  /s/ Patricia Sullivan

Patricia Sullivan
United States Magistrate Judge

Page 62 - FINDINGS AND RECOMMENDATION